**SEALED**

**Office of the United States Attorney**
District of Nevada
333 Las Vegas Blvd., South, Ste. 5000
Las Vegas, Nevada 89101
(702) 388-6336

```
┌─ FILED        ┌─ RECEIVED
└─ ENTERED      └─ SERVED ON
        COUNSEL/PARTIES OF RECORD

        MAR – 2 2016

     CLERK US DISTRICT COURT
       DISTRICT OF NEVADA
BY:_____ DEPUTY
```

DANIEL G. BOGDEN
United States Attorney
STEVEN W. MYHRE
NICHOLAS D. DICKINSON
Assistant United States Attorneys
NADIA J. AHMED
ERIN M. CREEGAN
Special Assistant United States Attorneys
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, Nevada 89101
PHONE: (702) 388-6336
FAX: (702) 388-6698

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                 Plaintiff,<br><br>        v.<br><br>CLIVEN D. BUNDY,<br>RYAN C. BUNDY,<br>AMMON E. BUNDY,<br>RYAN W. PAYNE,<br>PETER T. SANTILLI, Jr.,<br>MELVIN D. BUNDY,<br>DAVID H. BUNDY,<br>BRIAN D. CAVALIER,<br>BLAINE COOPER,<br>GERALD A. DELEMUS,<br>ERIC J. PARKER,<br>O. SCOTT DREXLER,<br>RICHARD R. LOVELIEN,<br>STEVEN A. STEWART,<br>TODD C. ENGEL,<br>GREGORY P. BURLESON,<br>JOSEPH D. O'SHAUGHNESSY,<br>MICAH L. McGUIRE, and<br>JASON D. WOODS,<br><br>                 Defendants. | SEALED<br><br>**SUPERSEDING CRIMINAL INDICTMENT**<br><br>2:16-CR-00046-GMN-PAL<br><br>**VIOLATIONS:**<br><br>18 U.S.C. § 371 – Conspiracy to Commit an Offense Against the United States;<br><br>18 U.S.C. § 372 – Conspiracy to Impede and Injure a Federal Officer;<br><br>18 U.S.C. § 111(a)(1) and (b) – Assault on a Federal Officer;<br><br>18 U.S.C. § 115(a)(1)(B) – Threatening a Federal Law Enforcement Officer;<br><br>18 U.S.C. § 924(c) – Use and Carry of a Firearm in Relation to a Crime of Violence;<br><br>18 U.S.C. § 1503 – Obstruction of the Due Administration of Justice;<br><br>18 U.S.C. § 1951 – Interference with Interstate Commerce by Extortion;<br><br>18 U.S.C. § 1952 – Interstate Travel in Aid of Extortion;<br><br>18 U.S.C. § 2 – Aiding and Abetting |

The Grand Jury charges that at all times relevant to this Superseding Indictment:

## I.

### SUMMARY

1.      This Superseding Indictment resulted from a massive armed assault against federal law enforcement officers that occurred in and around Bunkerville, Nevada, on April 12, 2014.  The defendants named herein planned, organized, led, and/or participated as gunmen in the assault, all in order to threaten, intimidate, and extort the officers into abandoning approximately 400 head of cattle that were in their lawful care and custody.

2.      One of the goals of the conspiracy was to thwart the seizure and removal of defendant Cliven **BUNDY**'s ("**BUNDY**") cattle from federal public lands.  **BUNDY** had trespassed on the public lands for over 20 years, refusing to obtain the legally-required permits or pay the required fees to keep and graze his cattle on the land.

3.      Since 1998, **BUNDY** was under federal Court Order to remove his trespass cattle, an Order **BUNDY** refused to recognize or follow.  In 2013, a federal court issued two more Orders for removal, each declaring that, in keeping with the law, the United States was authorized to seize and remove the cattle from the land in the event **BUNDY** refused to do so.  **BUNDY** refused.

4.      The removal operation, known as an "impoundment," began on April 5, 2014.  While it was ongoing, **BUNDY** and other leaders and organizers of the conspiracy, used deceit and deception to recruit gunmen and other "Followers" for

the purpose of using force, threats, and intimidation to stop the impoundment, flooding the internet with false and deceitful images and statements to the effect that law enforcement officers were abusing **BUNDY** and stealing his cattle. Deliberately lying, the leaders and organizers pleaded for gunmen and others to travel to Nevada to "stop the abuse" by "making a show of force against [the officers]" in order "to get them to back down" and "return the cattle."  By the morning of April 12, hundreds of people, including gunmen armed with assault rifles and other firearms, had traveled to Bunkerville, becoming **BUNDY**'s "Followers," conspiring with, and aiding and abetting him, and the other leaders and organizers, to execute a plan to recover **BUNDY**'s cattle by force, threats and intimidation.

5.    On the morning of April 12, **BUNDY** organized his gunmen and other Followers and gave them the Order to get the cattle, directing a crowd of hundreds to travel more than five miles to the site where the cattle were corralled. One group of Followers kept law enforcement officers occupied at the main entrance of the site by threatening to enter there, while another group – ultimately consisting of more than 200 Followers led by defendant Ammon **BUNDY** ("A. BUNDY") – assaulted the site from below, converging on its most vulnerable point: a narrow entrance located in a wash that ran under highway bridges.  Seeing the assault unfold, the officers responded to the wash to prevent entry.

6.    The 200 Followers in the wash included a significant number of gunmen, brandishing or raising their assault rifles or other firearms in front of

the officers.  Some of these gunmen took tactically superior positions on high ground, while others moved in and out of the crowd, masking their movements behind other unarmed Followers.  The most immediate threat to the officers came from the bridges where gunmen took sniper positions behind concrete barriers, their assault rifles aimed directly at the officers below.

7.     Having seized the tactical advantage, **A. BUNDY** and about 200 of the Followers pressed forward to and against the wash entrance, demanding that the officers leave and abandon the cattle, threatening to enter by force if they did not do so. Outnumbered by more than 4:1, unwilling to risk harm to children and other unarmed bystanders who had accompanied the Followers, and wishing to avoid the firefight that was sure to follow if they engaged the gunmen on the bridges and elsewhere who posed such an obvious threat to their lives, the officers had no choice and were forced to leave and abandon the cattle to **BUNDY** and his co-conspirators, who promptly released and returned the cattle to **BUNDY**.

8.     Thereafter, the leaders and organizers of the conspiracy organized armed security patrols and checkpoints in and around **BUNDY**'s property to deter and prevent any future law enforcement actions against **BUNDY** or his co-conspirators and to protect his cattle from future removal actions, cattle he continued to hold, graze and keep on federal public lands unlawfully and continues to do so as of the date of this Superseding Indictment.

## II.

## THE DEFENDANTS

9.     Defendant Cliven D. **BUNDY** ("**BUNDY**") was a resident of

4

Bunkerville, Nevada, and the operator of a ranch referred to as "Bundy Ranch." His ranching operations included grazing cattle unlawfully on federal public land.

10.    Defendant Ryan C. **BUNDY** ("R. BUNDY") was a resident of Utah and one of **BUNDY**'s adult sons who affiliated himself with Bundy Ranch.

11.    Defendant Ammon E. **BUNDY** ("A. BUNDY") was a resident of Arizona and one of **BUNDY**'s adult sons who affiliated himself with Bundy Ranch.

12.    Defendant Ryan W. **PAYNE** ("PAYNE") was a resident of Montana and affiliated with an organization that he called Operation Mutual Aid ("OMA"). OMA purported to be "a coalition of States Militias, Patriotic Civilians, Individual Freedom Fighters, and Media Relations personnel from Patriotic political activism groups, in conjunction with local law enforcement if and where applicable."

13.    Defendant Peter T. **SANTILLI** ("SANTILLI") was a resident of California, who purported to be an internet blog radio host and affiliated with a show that he broadcasted over the internet.

14.    Defendant Melvin D. **BUNDY** ("M. BUNDY") was a resident of Nevada and one of Cliven Bundy's adult sons who affiliated himself with Bundy Ranch.

15.    Defendant David H. **BUNDY** ("D. BUNDY") was a resident of Utah and one of Cliven Bundy's adult sons who affiliated himself with Bundy Ranch.

16.    Defendant Brian D. **CAVALIER** ("CAVALIER") was a resident of Arizona who traveled to the State of Nevada with the intent to commit the crimes delineated herein.

17.    Defendant Blaine **COOPER** ("COOPER") was a resident of Arizona

who traveled to the State of Nevada with the intent to commit the crimes delineated herein.

18.     Defendant Gerald A. **DELEMUS ("DELEMUS")** was a resident of New Hampshire who traveled to the State of Nevada with the intent to commit the crimes delineated herein.

19.     Defendant ERIC J. **PARKER ("PARKER")** was a resident of Idaho who traveled to the State of Nevada with the intent to commit the crimes delineated herein.

20.     Defendant O. SCOTT **DREXLER ("DREXLER")** was a resident of Idaho who traveled to the State of Nevada to commit the crimes delineated herein.

21.     Defendant Richard R. **LOVELIEN ("LOVELIEN")** was a resident of Montana who traveled to the State of Nevada with the intent to commit the crimes delineated herein.

22.     Defendant Steven A. **STEWART ("STEWART")** was a resident of Idaho who traveled to the State of Nevada with the intent to commit the crimes delineated herein.

23.     Defendant Todd C. **ENGEL ("ENGEL")** was a resident of Idaho to who traveled to the State of Nevada with the intent to commit the crimes delineated herein.

24.     Defendant Gregory P. **BURLESON ("BURLESON")** was a resident of Arizona who traveled to Nevada with the intent to commit the crimes set forth herein.

25.     Defendant Joseph D. **O'SHAUGHNESSY ("O'SHAUGHNESSY")**

was a resident of Arizona who traveled to Nevada with the intent to commit the crimes set forth herein.

26.   Defendant Micah L. **McGUIRE** (**"McGUIRE"**) was a resident of Arizona who traveled to Nevada with the intent to commit the crimes set forth herein.

27.   Defendant Jason D. **WOODS** (**"WOODS"**) was a resident of Arizona who traveled to Nevada with the intent to commit the crimes set forth herein.

### III.

### TERMS AND DEFINITIONS

28.   "Federal public land" or "public land" was land owned by the United States and managed through various agencies of the United States, including, among others, the United States Department of Interior, Bureau of Land Management ("BLM") and National Park Service ("NPS").

29.   The BLM and NPS employed Rangers, Officers, and Special Agents to enforce federal laws and regulations on public land under their management.

30.   BLM and NPS Rangers, Officers, and Special Agents were "federal law enforcement officers" under Title 18, United States Code, Section 115, that is, they were officers, agents, and employees of the United States authorized by law to engage in or supervise the prevention, detection, investigation, or prosecution of any violation of federal criminal law.

31.   The Bunkerville Allotment ("the Allotment") was an area of federal public land near Bunkerville, Nevada, under the management of BLM. The United States has owned the land comprising the Allotment since 1848, when it

was acquired from the nation of Mexico under the Treaty of Guadalupe Hidalgo, and has never relinquished ownership.

32.    The Lake Mead National Recreational Area ("LMNRA") was an area of federal public land located near or adjacent to the Allotment, under the management of the NPS.  The United States has owned the land comprising the LMNRA since 1848, when it was acquired from the nation of Mexico under the Treaty of Guadalupe Hidalgo, and has never relinquished ownership.

## IV.

## BUNDY TRESPASSED CATTLE ON PUBLIC LAND AND REFUSED TO COMPLY WITH FOUR COURT ORDERS TO REMOVE THEM

33.    Federal law required a rancher to obtain a grazing permit from the BLM and to pay fees to the United States to graze cattle on the Bunkerville Allotment.  Grazing cattle without a permit constituted a trespass on public land.

34.    From 1993 to the date of this Superseding Indictment, **BUNDY** knowingly refused to pay fees or obtain permits as he kept and grazed his cattle on the Allotment year-round, constituting a continuing trespass on public land.

35.    In 1998, and because of **BUNDY**'s continuing trespass, the United States District Court for the District of Nevada (hereinafter "District Court" or "Federal Court") Ordered **BUNDY** to remove his cattle permanently from the Allotment.  **BUNDY** deliberately ignored the Order and continued to trespass by keeping and grazing his cattle unlawfully on public land.

36.    In 1999, the District Court fined **BUNDY** for each day he refused to remove his cattle.  **BUNDY** refused to pay the fines and continued to trespass by

8

keeping and grazing his cattle unlawfully on public land.

37.   By 2012, **BUNDY**'s herd had multiplied substantially and spread into the LMNRA where **BUNDY** kept and grazed them year-round, refusing to pay fees or obtain permits, constituting a continuing trespass on public land.

38.   In 2013, the District Court issued two Orders. One ordered **BUNDY** to remove his trespass cattle permanently from the LMNRA and the other re-affirmed the 1998 and 1999 Orders that required him to remove his cattle permanently from the Allotment. Both Orders declared that, in keeping with the law, the United States was authorized to seize and remove **BUNDY**'s trespass cattle if he did not comply with the Court's Orders. One of the Orders expressly stated that **BUNDY** was "not to interfere" with any removal.

39.   **BUNDY** ignored the Orders and continued to keep and graze his trespass cattle unlawfully on public land.

V.

**THE BLM PLANNED TO SEIZE AND REMOVE THE CATTLE
FROM THE PUBLIC LANDS PURSUANT TO COURT ORDERS**

40.   In keeping with the law and the 2013 federal Court Orders, the BLM planned to seize and remove **BUNDY**'s trespass cattle, following well-established rules and regulations governing this procedure, referred to hereinafter collectively as "impound" or "impoundment."

41.   A preliminary survey revealed that the BLM would have to impound almost 1,000 head of trespass cattle scattered over hundreds of thousands of acres of arid and difficult terrain. Given these circumstances, BLM

1    estimated that it would take a month or more to complete the impoundment.

2         42.    It was part of the plan that BLM would establish a base of operations

3    (hereinafter referred to as "the Impoundment Site") located on the public lands

4    near Bunkerville, about 7 miles away from Bundy Ranch in an area commonly

5    referred to as the Toquop Wash.

6         43.    It was part of the plan that on February 17, 2014, the BLM entered

7    into a contract with a civilian contractor in Utah to round-up and gather the

8    trespass cattle.   The contract required the contractor to transport people and

9    equipment to Nevada to conduct impoundment operations.

10        44.    It was part of the plan that the civilian contractor and crew would

11   gather and move the trespass cattle from public land into corrals at the

12   Impoundment Site where they would be held until such time as they could be

13   further transported.

14        45.    It was part of the plan that on March 20, 2014, BLM entered into a

15   contract for the services of an auctioneer in Utah.   The contract required the

16   trespass cattle to be transported from the Impoundment Site in Nevada to the

17   contract auctioneer in Utah, who would then sell them at public sale.

18        46.    It was part of the plan that BLM would use BLM and NPS Rangers,

19   Officers, and Special Agents to provide security for impoundment operations,

20   including securing the cattle at the Impoundment Site and protecting the civilian

21   contractors and government employees engaged in impoundment operations.

22

23

24

47.    It was part of the plan that BLM designated the Special Agent-in-Charge of BLM's Nevada and Utah region (hereinafter the "SAC") to lead impoundment operations.

## VI.

### BUNDY THREATENED TO "DO WHATEVER IT TAKES" TO PREVENT THE IMPOUNDMENT OF HIS CATTLE

48.    On October 23, 2012, and in connection with legal proceedings culminating in the 2013 Court Orders, **BUNDY** threatened to interfere with any impoundment by stating that he "would do whatever it takes" to stop the impoundment.  When asked whether that included soliciting support from others to help him, **BUNDY** responded: "Yes."

49.    On March 14, 2014, the BLM formally notified **BUNDY** that impoundment operations would take place.

50.    On March 15, 2014, **BUNDY** threatened to interfere by stating publically that he "[was] ready to do battle" with the BLM and he would "do whatever it takes" to protect "his property."

51.    On March 17, 2014, a BLM Special Agent notified **R. BUNDY** that the Special Agent was available to answer any questions about the impoundment operation.  **R. BUNDY** became angry and threatened to interfere, stating that he and his family would "do whatever it takes" and he would "have several hundred" with him to prevent the BLM from removing the trespass cattle. When asked whether his use of "whatever it takes" included physical force or violence, **R.**

11

BUNDY replied: "I will do whatever it takes; you interpret that the way you want."

52.     On March 24, 2014, **BUNDY** threatened to interfere, stating publically that he intended to "organize lots of groups" to "come from hundreds of miles away" and he was in a "range war" with BLM that could "last a long time."

53.     On March 25, 2014, **BUNDY** threatened to interfere, stating publically that: "**BUNDY**'s ready . . . whenever [the federal government's] got the guts to try it . . tell them to come . . . I'll do whatever it takes."

54.     On March 28, 2014, **BUNDY** threatened to interfere, stating publically that: "all of those cowboys are going to be thieves who steal my cattle . . . [i]t's like they're staging for a war . . . I told them I'd do whatever it takes . . . I'll stick with that."

## VII.

## BUNDY CARRIED OUT HIS THREATS BY CONSPIRING TO LIE, THREATEN FORCE AND VIOLENCE, AND USE FORCE AND VIOLENCE

**A.     Object and Nature of the Conspiracy.**

55.     Beginning in at least March 2014, and continuing to the date of this Superseding Indictment, the defendants conspired, confederated, and agreed to commit numerous federal offenses, as charged below, in order to achieve the objects of the conspiracy.

56.     The scope, nature, and objects of the conspiratorial agreement were to threaten force and violence and use force and violence to: (1) impede, obstruct, and interfere with BLM's impoundment; (2) obtain **BUNDY**'s impounded cattle;

(3) intimidate and prevent law enforcement officers from taking action against the conspirators; and (4) threaten, intimidate, and prevent by force law enforcement officers from taking future law enforcement actions against **BUNDY** and his co-conspirators and prevent by force and threats of force, the BLM from exercising regulatory and law enforcement authority over federal public lands.

**B.    Manner and Means of the Conspiracy.**

57.    To achieve their objectives, the leaders and organizers of the conspiracy recruited, organized, and led a force of hundreds of people (hereinafter referred to as "Followers") to threaten and use force and violence to prevent the law enforcement officers from discharging their duties and to coerce their consent to abandon the cattle that were, pursuant to Court Order, lawfully in their care and custody and which they were duty-bound to protect.

58.    As a part of the manner and means of the conspiracy, the leaders and organizers of the conspiracy, among other things:

a.    Used deceit and deception to knowingly recruit gunmen and other Followers, that is, to encourage, counsel, and incite others to travel to Bundy Ranch for the unlawful purposes of interfering with impoundment operations, obstructing the execution of federal Court Orders and using force and violence against federal law enforcement officers while they were performing their duties.

b.    Used the internet and other facilities in interstate commerce to knowingly broadcast false, deceitful, and deceptive images and messages for the purpose of recruiting gunmen and other Followers.

c.    Used the internet and other facilities in interstate commerce to

encourage, counsel, and incite gunmen to bring their guns to Bundy Ranch for the unlawful purposes of interfering with impoundment operations, obstructing the execution of federal Court Orders, and using force and violence against federal law enforcement officers to prevent them from discharging their duties.

d.     Traveled in interstate commerce and used other facilities in interstate commerce to threaten force, violence, and economic harm to private contractors providing services to the BLM during impoundment operations.

e.     Threatened and used force and violence against BLM civilian employees engaged in impoundment operations for the purpose of obstructing the execution of federal Court Orders and interfering with impoundment operations.

f.     Counseled, incited, and led Followers to use, carry, brandish, and aim firearms, including assault rifles, for the purpose of assaulting federal law enforcement officers.

g.     Counseled, incited, and led Followers to use, carry, brandish, and aim firearms, including assault rifles, for the purpose of extorting federal law enforcement officers.

h.     Organized Followers into body guards, armed patrols, and security checkpoints for the purpose of using threats, force, violence, and intimidation to protect the conspirators, prevent law enforcement actions against the conspirators, prevent the execution of federal Court Orders, and prevent law enforcement officers from discharging their duties.

59.     As a part of the manner and means of the conspiracy, the defendants referred to herein as "gunmen," traveled to Bundy Ranch with firearms for the

purpose of joining the conspiracy and to carry, use, or brandish firearms for the purpose of threatening, intimidating, impeding, interfering with, assaulting and extorting federal law enforcement officers while in the performance of their duties.

**C.    Roles of the Conspirators.**

60.    **BUNDY** was the leader, organizer, and chief beneficiary of the conspiracy, possessing ultimate authority over the scope, manner, and means of conspiratorial operations and receiving the economic benefits of the extortion.

61.    **A. BUNDY** and **R. BUNDY**, were leaders and organizers of the conspiracy who, among other things: recruited gunmen and other Followers; interfered with impoundment operations through threats and use of force and violence; interfered with impoundment operations by attempting to extort BLM contractors; led an armed assault against federal law enforcement officers; delivered extortionate demands to law enforcement officers; and extorted federal law enforcement officers.

62.    **PAYNE** was a leader and organizer of the conspiracy who, among other things: recruited gunmen and other Followers; organized gunmen and other Followers; communicated the objectives of the conspiracy to gunmen; led the armed assault on federal officers at the Impoundment Site; and organized protection for the conspirators and the criminal enterprise.

63.    **SANTILLI** was a leader and organizer of the conspiracy who, among other things: recruited gunmen and other Followers using the internet and other facilities in interstate commerce; led an assault on federal officers on April 9; threatened federal law enforcement officers; and participated in the assault and

extortion of federal law enforcement officers at the Impoundment Site.

64.     Defendants **D. BUNDY** and **M. BUNDY** were leaders and organizers of the conspiracy who, among other things: recruited gunmen and other Followers; interfered with impoundment operations through threats and use of force and violence; interfered with impoundment operations by attempting to extort BLM contractors; led the armed assault against federal law enforcement officers at the Impoundment Site; delivered extortionate demands to law enforcement officers; and extorted federal law enforcement officers.

65.     Defendant **CAVALIER** was a mid-level leader and organizer of the conspiracy who, among other things: recruited and organized gunmen and other Followers; conducted reconnaissance missions; and provided personal protection for members of the criminal enterprise.

66.     Defendant **COOPER** was a mid-level leader and organizer of the conspiracy who, among other things: recruited and organized gunmen and other Followers; conducted reconnaissance missions; recruited Followers; and provided personal protection for members of the criminal enterprise.

67.     Defendant **O'SHAUGHNESSY** was a mid-level leader and organizer of the conspiracy who, among other things: organized gunmen and other Followers; led gunmen and other Followers in the assault and extortion of federal law enforcement officers at the Impoundment Site; organized protection for members of the criminal enterprise; and organized armed patrols and security checkpoints.

68.     Defendant **DELEMUS** was a mid-level leader and organizer of the

conspiracy who, among other things: recruited, organized, trained and provided logistical support to gunmen and other Followers and organized and led armed patrols and security checkpoints.

69.   Defendant **PARKER** was a gunman who threatened, impeded, intimidated, interfered with, assaulted and extorted federal law enforcement officers while in the performance of their duties, as described herein.

70.   Defendant **DREXLER** was a gunman who threatened, impeded, intimidated, interfered with, assaulted and extorted federal law enforcement officers while in the performance of their duties, as described herein.

71.   Defendant **STEWART** was a gunman who threatened, impeded, intimidated, interfered with, assaulted and extorted federal law enforcement while in the performance of their duties, as described herein.

72.   Defendant **LOVELIEN** was a gunman who threatened, impeded, intimidated, interfered with, assaulted and extorted federal law enforcement officers while in the performance of their duties, as described herein.

73.   Defendant **ENGEL** was a gunman who threatened, impeded, intimidated, interfered with, assaulted and extorted federal law enforcement officers while in the performance of their duties, as described herein.

74.   Defendant **BURLESON** was a gunman who threatened, impeded, intimidated, interfered with, assaulted, and extorted federal law enforcement officers while in the performance of their duties, as described herein.

75.   Defendant **McGUIRE** was a gunman who threatened, impeded, intimidated, interfered with, assaulted, and extorted federal law enforcement

officers while in the performance of their duties, as described herein.

76.     Defendant **WOODS** was a gunman who threatened, impeded, intimidated, interfered with, assaulted and extorted federal law enforcement officers while in the performance of their duties, as described herein.

**D.     Overt Acts in Furtherance of the Conspiracy.**

77.     It was a part of the conspiracy and for the purpose of carrying out the objects of the conspiracy, the defendants performed, or caused to be performed, the following overt acts, among many others.

**1.     March 28 to April 11:   The Conspirators Interfered with Impoundment Operations and Used Deceit and Deception to Recruit Followers.**

78.     On or about March 28, 2014, **BUNDY, R. BUNDY,** and others working with them, blocked a convoy of vehicles carrying horses and equipment intended for use in impoundment operations, confronting and threatening civilian contractors, endangering the safety of the personnel in the convoy, and interfering with impoundment operations.

79.     Shortly thereafter, and in an effort to recruit Followers, **BUNDY** caused the broadcast of a video of the confrontation with the contractors entitled "Range War," depicting images captured during the confrontation, combining them with false, deceitful and deceptive statements to the effect that the BLM was stealing **BUNDY**'s cattle.

80.     On or about April 2, 2014, **R. BUNDY** and others working with him, traveled from Nevada to Utah to threaten force, violence and economic harm to the contract auctioneer providing services to the BLM, by, among other things,

18

entering upon the contractor's property for the purpose of interfering with business operations, threatening and intimidating customers and employees, interfering with business operations, and threatening to shut down the business if the contractor fulfilled his contractual obligations with BLM.

81.    On or about April 5, 2014, **BUNDY** threatened force and violence against federal law enforcement officers by publically stating, among other things: "I've done quite a bit so far to keep my cattle, but I guess it's not been enough . . . they took 75 of my cattle today . . . I have said I'd do what it takes to keep my cattle so I guess it is going to have to be more physical."

82.    On or about April 5, 2014, **D. BUNDY** traveled from Utah to the Bundy Ranch in Nevada.

83.    On or about April 6, 2014, **R. BUNDY** and **D. BUNDY**, interfered with impoundment operations by positioning themselves to block a BLM convoy and refusing to leave the area when asked to do so.  Failing to leave after repeated requests, **D. BUNDY** was arrested by law enforcement officers.

84.    Shortly thereafter, the defendants caused images of the **D. BUNDY** arrest to be broadcasted over the internet, combining them with false, deceitful and deceptive statements to the effect that the BLM supposedly: employed snipers against Bundy family members; used excessive force during the arrest; and arrested Bundy for exercising his First Amendment rights.

85.    On or about April 6, 2014, **COOPER** posted on his Facebook page a link to an article about the Impoundment and stated, "See where are those Oath Keeper's I say we go their armed together and help him fight if there was ever a

time to make a stand against the feds now is the time.  Good so let's go there 100

strong loaded to the teeth and shoot all of them that try to take this man's cows

and land."

86.    On or about April 7, 2014, **A. BUNDY** traveled from Arizona to the

Bundy Ranch in Nevada.

87.    On or about April 7, 2014, **PAYNE** in Montana contacted **BUNDY** in

Nevada, by telephone.

88.    On or about April 7, 2014, **PAYNE** used the internet and other

facilities in interstate commerce to recruit gunmen and others to travel to the

Bundy Ranch for the unlawful purpose of interfering with impoundment

operations, stating falsely, among other things, that the Bundy Ranch was

surrounded by BLM snipers, that the Bundy family was isolated, and that the

BLM wanted **BUNDY** dead.

89.    On or about April 7, 2014, **BUNDY** and others working with him

established a site only minutes travel distance from the Bundy Ranch along

Nevada State Route 170, a state road that also served as the main route between

the Impoundment Site and the public land where impoundment operations were

taking place.  Strategically located between the Impoundment Site and various

ingress and egress points to public land, the location of site served as both a

natural vantage point from which to observe impoundment operations and a

potential choke-point for disrupting BLM convoys.  Conspicuous for, among other

things, a stage and two tall flagpoles, one of which flew the Nevada State flag

above the flag of the United States, this site (hereinafter referred to as "the

Staging Site") served as a base of operations from which the conspirators made speeches, received and organized gunmen and other Followers as they arrived at Bundy Ranch, and gathered and organized gunmen and other Followers before initiating their assault on federal law enforcement officers.

90.    On or about April 7, 2014, **COOPER** contacted **SANTILLI** about going to Bundy Ranch, stating, "What do you think about getting a movement down to Nevada against the FEDS? . . . Time we stopped all this huffing and puffing and bullshit over the microphones and computers and go down and do what we got to do."

91.    On or about April 8, 2014, **SANTILLI** in California contacted **BUNDY** in Nevada, by telephone.

92.    On or about April 8, 2014, **SANTILLI** and **BUNDY** broadcasted words and images over the internet for the purpose of recruiting gunmen and other Followers.  Using deceit, deception, and threats to encourage and incite others to travel to Bundy Ranch for unlawful purposes, **BUNDY** told listeners, among other things, that: "they have my house surrounded . . . the federal government is stealing my property . . . [the BLM] are armed with assault rifles . . . they have snipers . . . I haven't called no militia but, hey, that look like where we are . . . there is a strong army out here . . . we are going to have to take our land back . . . somebody is going to have to back off . . . we the people will put our boots down and walk over these people . . . they are up against a man who will do whatever it takes."

93.    In that same broadcast, **SANTILLI** used threats to encourage and

incite listeners to travel to Bundy Ranch for unlawful purposes, telling listeners, among other things, that: "if this is not the issue right now where we stand and fight to the absolute death there is no other option; the federal government must get out of the State of Nevada . . . if they don't want it to be peaceful it is by their choice. . . I'm calling on all Americans anywhere in the vicinity of Clark County, Nevada . . . if you're in Nevada and can legally carry, get weapons out there, o.k. . . . we are going to stand and fight in Clark County, Nevada . . . they will leave or else."

94.     On or about April 8, 2014, **PAYNE** sent a message from Montana to Pennsylvania to another person who referred to himself as one of the leaders in OMA, stating, among other things, that it was "time to invite everyone to the first annual Patriots (sic) Picnic at the Bundy Ranch" and telling the OMA leader that the Bundys "still want help."

95.     On or about April 8, 2014, and for the purpose of recruiting gunmen and other Followers, **PAYNE** sent a message over the internet, stating that he had spoken with **BUNDY** and that "he knows we're coming and has opened his land up to everyone willing . . . OMA is moving . . . not going public with this until more are enroute."

96.     On or about April 8, 2014, **PAYNE** caused an email to be sent to OMA members stating: "we have made the decision to mobilize in Nevada, units are underway as I type this  . . . the feds arrested some protestors today, and the words 'we need you now' were uttered . . . we have approximately 150 responding, but that number is [gr]owing by the hour." The message provided directions and

grid coordinates to Bundy Ranch.

97.   On or about and between April 8 and 9, 2014, **SANTILLI** traveled from California to Bundy Ranch in Nevada.

98.   On or about and between April 8 and 9, 2014, **PAYNE** traveled from Montana to Bundy Ranch in Nevada.

99.   On or about April 8, 2014, **DELEMUS** in New Hampshire contacted **BUNDY** in Nevada.

100.  On or about April 9, 2014, **PAYNE** and **SANTILLI** met with **BUNDY** and other conspirators at Bundy Ranch.

101.  On or about April 9, 2014, **ENGEL** in Idaho contacted an OMA member in Pennsylvania.

102.  On the morning of April 9, 2014, **M. BUNDY** and **SANTILLI** met with the SAC. **SANTILLI** stated that he was acting as a liaison between **BUNDY** and the BLM.  Threatening the SAC, **SANTILLI** asked: "What are you guys going to do if 10,000 people show up? . . . Are you prepared for this?"  **SANTILLI** added: "I don't believe in firing a single bullet unless in absolute defense and it's legal and constitutional."

103.  On or about April 9, 2014, and for the purpose of encouraging and inciting gunmen and others to travel to Bundy Ranch for unlawful purposes, the conspirators caused a message to be broadcasted over the internet, stating: "The Bundy family has requested help from militia groups including Operation Mutual Aid, 3 Percenters club, freedom fighters, and other operations to come and stand with us and regain our rights and freedom."

104.   On April 9, 2014, and for the purpose of encouraging and inciting gunmen and others to travel to Bundy Ranch for unlawful purposes, **SANTILLI** broadcasted a message over the internet, stating, among other things: "the BLM knows if they are outnumbered and outgunned . . . they will stand down . . . we want BLM to get out of the state of Nevada . . . I fully expect the standoff will occur when thousands go to repossess the rightfully owned property of the Bundys . . . we need strength in numbers."

105.   On or about April 9, 2014, **R. BUNDY,** and others working with him, traveled for a second time from Nevada to Utah to threaten force, violence and economic loss to the contract auctioneer providing services to the BLM by, among other things: intimidating customers; interfering with business operations; and instilling fear and apprehension in customers and employees.

106.   On or about April 9, 2014, and for the purpose of recruiting gunmen and encouraging and inciting others to travel to Bundy Ranch for unlawful purposes, **SANTILLI** broadcasted a message over the internet, stating, among other things: "now is the time to show up for something like this . . . we need ten thousand people to come here . . . I only have one fear is that people that don't respond to this call . . . it's time to make a stand against tyranny . . . we need to let everyone know that BLM has zero authority."

107.   On April 9, 2014, **SANTILLI, A. BUNDY** and **M. BUNDY** assaulted, interfered with, impeded and intimidated federal officers by, among other things: intercepting and blocking a convoy of BLM vehicles engaged in impoundment operations; colliding an ATV into a truck in the convoy in an attempt to stall the

truck; attempting to forcibly gain entrance to the stalled truck; attempting to throw a rock at law enforcement officers protecting the convoy; threatening physical harm to law enforcement officers while they were protecting the truck and the civilian passengers inside; and causing physical contact with an officer while the officer was engaged in protecting the truck and the civilian passengers inside.

108. On or about April 9, 2014, and for the purpose of recruiting gunmen and inciting others to travel to Bundy Ranch for unlawful purposes, **SANTILLI** broadcasted a message over the internet, stating, among other things: "we were serious about stopping the convoy . . . [the BLM] were caught off guard and tried to push past us . . . they couldn't do it . . . we outnumbered them and they retreated . . . we know how they will come back after they retreat . . . my biggest fear is if we don't respond . . . they retreated and will come back with a bigger force . . . we need to disperse them with tens of thousands . . . we want BLM to always retreat because we will always outnumber them . . . we have all been waiting for that ultimate moment . . . there is so much at stake . . . we can win with numbers . . . I've got people coming from Michigan . . . militia members who are fully armed are here . . . it's good to watch the BLM with its tail between its legs . . . get out here . . . this is going to get exciting . . . ultimately get the feds to leave."

109. On April 10, 2014, and for the purpose of recruiting gunmen and encouraging and inciting others to travel to Bundy Ranch for unlawful purposes, **PAYNE** caused an email to be sent to self-described "militia" members of OMA

25

under the subject line "Bundy Objectives," as follows:

> Nevada Alert!  We are requesting help to distribute the following to any and all media, blog, patriot groups etc.
>
> 1.    Secure the Bundy family from government incursion which includes protection of all personnel responding in support of the Bundys ie. Protestors, extended family, and friends.
>
> 2.    To return the confiscated Clark County Nevada property currently blocked by federal personnel to it's (sic) rightful stewards, the people of Clark County, Nevada.
>
> 3.    To secure and return to Mr. Bundys (sic) ranch the mounting number of cattle which have been confiscated by BLM agents and private contractors.
>
> These objectives are in cohesion with Cliven Bundy and the Bundy ranch . . . .

110.    On or about April 10, 2014, and for the purpose of recruiting gunmen and encouraging and inciting others to travel to Bundy Ranch for unlawful purposes, **SANTILLI** broadcasted a message over the internet, stating, among other things: "there is not enough militia here . . . we have thousands of very organized constitutional militia . . . they are trickling in . . . where we will fail is for us not to at least match the overwhelming force . . . we have about 50 members here now . . . where we will fail is for us not to not match the BLM force . . . we need a show of force . . . we did a recon and found that BLM have hundreds of vehicles . . . BLM needs to vacate immediately . . . we need the numbers for the feds to leave . . . they will come back with a bigger force . . . we need tens of thousands of people so they retreat . . . come out here . . . we've all been waiting for the ultimate moment . . . we can win with numbers . . . get out here no matter where you are . . . militia members here are fully armed."

26

111.   On or about April 10, 2014, and for the purpose of recruiting gunmen and encouraging and inciting others to travel to Bundy Ranch for unlawful purposes, **SANTILLI** broadcasted a message over the internet, stating, among other things: "there is a court order, but the court is corrupt . . . BLM believes they are acting constitutionally . . . BLM is in violation of every God-given right of every human being . . . [BLM's] closure orders are 'shelter in place'. . . [BLM] aimed AR-15s at me [during confrontation on April 9] . . . Waco and Ruby Ridge was a show of force by government and violated sovereign rights . . . if we have 10,000 people, [the BLM] will have to get past us."

112.   On or about April 10, **LOVELIEN** traveled from Montana to the Bundy Ranch in Nevada with firearms and with the intent to commit the crimes set forth herein.

113.   On or about April 10, 2014, **O'SHAUGHNESSY** traveled from Arizona to Bundy Ranch in Nevada with firearms and with the intent to commit the crimes set forth herein.

114.   On or about April 10, 2014, **DELEMUS** began to travel from New Hampshire to Nevada with firearms and with the intent to commit the crimes set forth herein.

115.   On the morning of April 11, 2014, **SANTILLI** met with the SAC and threatened him, stating, among other things: "we are going to have a face-to-face confrontation . . . we have thousands of people . . . we are going to come here and it is non-negotiable . . . if that comes about, we want to make sure that any [BLM officer] who wants to stand down will not be retaliated against . . .  this is non-

negotiable . . . if you make the decision to go face-to-face and someone gets hurt we are going to hold you responsible . . . tell D.C. that the justification for this is from a corrupt court . . . I'm relaying a message . . . if anyone is acting unconstitutionally they will be arrested . . . I came here to allow you to prevent a scenario where someone gets hurt."

116.   By on or about April 11, 2014, hundreds of Followers traveled to Nevada, many armed with assault rifles and other firearms (hereinafter also referred to as "gunmen").

117.   By on or about April 11, 2014, **PAYNE** and others working with him, received and organized the gunmen, placing them into camps from which to mobilize and deploy them.

118.   By on or about April 11, 2014, **PAYNE**, and others working with him, organized gunmen into patrols and security checkpoints to provide security to the conspirators and their criminal enterprise.

119.   On or about April 11, 2014, **CAVALIER** and **COOPER** traveled together from Arizona to Bundy Ranch in Nevada with firearms and with the intent to commit the crimes set forth herein.

120.   On or about April 11, 2014, **PARKER, STEWART, DREXLER,** and **ENGEL** traveled from Idaho to Bundy Ranch in Nevada with firearms and with the intent to commit the crimes set forth herein.

121.   On or about April 11 and 12, 2014, **McGUIRE, WOODS,** and **BURLESON** traveled from Arizona to Bundy Ranch in Nevada with firearms and with the intent to commit the crimes set forth herein.

2.     **April 12: The Conspirators Assaulted and Extorted Law Enforcement Officers.**

122.   It was further a part of the conspiracy that on April 12, 2014, the defendants organized, led, and executed a mass assault on federal law enforcement officers in order to obtain the seized cattle, as follows.

123.   By the morning of April 12, the BLM had seized approximately 400 head of cattle and had them corralled at the Impoundment Site, awaiting further shipment out of the state of Nevada.

124.   On the morning of April 12, **BUNDY** led a rally of hundreds of his Followers at the Staging Site where he told them that "God [is] going to be with us" and that it was time "to take our land back." He then commanded his Followers to get the cattle.

125.   **BUNDY** directed gunmen and other Followers that "horse people" (Followers riding horses) would leave the Staging Site and travel a dirt road to the Toquop Wash, the location of the Impoundment Site, a distance of about 3.5 miles. While that was happening, so commanded by **BUNDY**, the gunmen and other Followers were to travel the highway by vehicle, a distance of about 5 miles, and "shut down the freeway" at the Impoundment Site.   The gunmen and other Followers, so directed by **BUNDY**, were then to meet with the "horse people" in the Toquop Wash.

126.   The gunmen and other Followers did as **BUNDY** ordered.   The gunmen, armed with a variety of firearms, including assault rifles, hurriedly loaded themselves into cars and trucks and moved *en masse* to the Impoundment

Site, jamming the roads and slowing traffic on northbound Interstate-15 ("I-15") to a trickle, making it difficult for state and local law enforcement vehicles to respond. When the gunmen and other Followers arrived at the Impoundment Site, they jumped out of their vehicles and many of them moved quickly on foot to a position across from the main entrance.

127.   The few local law enforcement officers who were able to respond formed a human line in the I-15 median to block the Followers, many of whom carried and brandished assault rifles, from entering at the main entrance to the Impoundment Site.

128.   Around 11:30 a.m., **A. BUNDY** directed Followers to follow him from the area across from the main entrance to the Impoundment Site to an area a few hundred yards east and below the main entrance, in the Toquop Wash under the northbound I-15 bridge.   There, **A. BUNDY** waited while gunmen and other Followers, seeing the movement of the others to the wash, moved there to join him.   As gunmen and other Followers gathered in the wash, **A. BUNDY** instructed them that they were to wait there until the Followers on horseback arrived, as his father had stated at the Staging Site.

129.   About 150 yards across from **A. BUNDY**'s position was a makeshift metal rail gate that traversed the wash between the pillars that supported the southbound I-15 bridge, serving to block any unauthorized entrance to the Impoundment Site from the wash. The gate was manned only by two officers who immediately called for backup when they first noticed **A. BUNDY** move to the wash with his Followers.   As the number of Followers in the wash grew, more

30

officers responded to the gate, eventually forming a line that started about 15 to 20 yards behind the gate and extended up the wash, perpendicular to the gate.

130.   By 11:50 a.m., over 400 of **BUNDY**'s Followers had converged upon the Impoundment Site, many of the Followers openly brandishing assault rifles, others bearing side arms, the combined group grossly outnumbering the approximately 50 officers that had moved to the wash to protect the gate.   More and more of the Followers moved to the wash while still others began flooding onto the southbound I-15 bridges and bridge skirts, their movement there facilitated by the Followers having slowed traffic on I-15 to a mere trickle.

131.   Around 12:00 noon, **M. BUNDY** and the 40-or-so Followers on horseback arrived at the wash and joined with **A. BUNDY**'s group.   Then, the combined force of about 270 Followers – a combination of armed and unarmed on foot and on horseback – moved out from under the northbound I-15 bridge and toward the officers at the gate. The officers immediately began ordering the crowd to disperse. Using loudspeakers, they told the Followers that they were in a closed area, in violation of a Court Order.   Still they came.   As the Followers moved closer to them, the officers observed the gunmen moving with them and began calling out their positions to each other and to their dispatch center.   On the loudspeaker, officers told the Followers that they had spotted the gunmen and ordered them all to leave.   The commands went unheeded and the gunmen and other Followers continued toward the gate.

132.   When the Followers got to within 60 yards of the gate, they stopped – then formed a human line that stretched across the bottom of the wash.   There

31

they waited.

133.   **M. BUNDY** led the Followers on horses into a skirmish line formation across the bottom of the wash. **A. BUNDY** and his group quickly filed into the line. At this point, the Followers numbered about 200, and the law enforcement officers numbered about 50. The officers continued to call out any gunmen they observed.  They called out gunmen with "long guns" and sidearms moving in and out among the unarmed Followers on foot, some of them taking high ground.  They called out gunmen with "long guns" moving on the bridges and then disappearing.   One of the officers called out that they soon would be outgunned. As more gunmen moved to the wash, the officers reported that there were "more guns than they could count."

134.   The officers continued to use loudspeakers to command the gunmen and other Followers to disperse.  Their commands were met with angry taunts, the Followers screaming at the officers, demanding that they release **BUNDY's** cattle.

135.   The officers at the gate were dangerously exposed.  They were in the open on low ground at the bottom of the wash, below highway bridges that towered more than 40 feet above them and surrounded on the sides by steep embankments of high ground.  The terrain acted like a funnel with them at the bottom and no natural cover or concealment to protect them from the gunmen on the high ground, their only protection being their body armor and the vehicles they happened to drive to the gate.  At this point, approximately 40 Followers were either carrying or brandishing firearms in front of the officers in the wash

while more than 20 of them carried or brandished firearms on the bridges. The officers at the gate could readily observe gunmen bobbing up and down from behind the concrete barriers that bordered the northbound I-15 bridge, indicating to the officers that the gunmen were acquiring, and determining the range to, their officer-targets.    They observed armed gunmen dressed in military-style tactical gear and wearing body armor, moving in and among the unarmed Followers, using them as human shields to mask their movements while still others took tactically superior over-watch positions on the sides of the wash.

136.    The Followers' close proximity to the officers, their array and formation in the wash, their refusal to disperse upon command, their angry taunts, their numbers carrying or brandishing firearms, the movements of the gunmen in and among the unarmed while brandishing assault rifles and wearing body armor, and the superior position of the gunmen on the bridge above, all caused the officers to fear immediate bodily harm or death.

137.    Around 12:15 p.m. and after hearing from his officers at the gate that there now were "too many guns to count" in front of them, the SAC was forced to decide to give in to **BUNDY**'s demands and release the cattle in order to prevent death or injury to his officers and others.  The SAC moved from the main entrance area, down the wash and to the gate, his purpose being to find a way to create space between his officers and the gunmen and other Followers so the officers could safely disengage and avoid any potential bloodshed while he found a way to release the cattle.

138.    As the SAC approached the gate, he observed assault weapons

33

pointed at him and gunmen moving to higher ground, all causing the SAC to fear immediate bodily harm or death.

139.   When the SAC arrived at the gate, **A. BUNDY** came out from the line and moved to the gate. The line of Followers advanced with him, yelling, screaming, and taunting the officers as they moved, refusing to disperse as ordered. The gunmen on the bridges took sniper positions, some behind the concrete barriers on the bridges and others under the bridges, tucked in the crevice where the bridge skirt connects to the highway.

140.   As **A. BUNDY** moved to the gate, his gunmen in the wash moved with him, openly brandishing their rifles and taking over-watch positions on the high ground within full view of the tactically disadvantaged officers, the snipers on the bridges now aiming their assault rifles directly at the officers below. Seeing the combined force arrayed against them – an organized crowd of more than 400 Followers, more than 270 of the Followers in the wash directly in front of them, more than 60 gunmen among the crowd carrying or brandishing rifles or pistols, 40 Followers on horseback, gunmen/snipers concealed on and under the bridges above them with their rifles zeroed-in on the officers, gunmen intermingled with the crowd using the unarmed Followers to shield their movement, gunmen in over-watch positions on the high ground, all refusing to leave, all of them there to get the cattle – the officers believed they were going to be shot and killed.  They were stymied – prevented from shooting the gunmen who posed such an obvious threat to their lives out of concern they would spark a firefight that would kill or injure unarmed people.  Unable to surgically remove

34

the deadly threats before them, outnumbered, outgunned, and located in a dangerously exposed and tactically inferior position, the officers knew they were easy targets. They still held their ground.

141.   Arriving at the gate, **A. BUNDY** and **D. BUNDY** met with the SAC who explained to **A. BUNDY** and **D. BUNDY** that he would work with him to release the cattle but that they first had to move their Followers back from the gate so the officers could safely disengage. **A. BUNDY** and **D. BUNDY** refused and demanded that the officers leave first, **A. BUNDY** stating, among other things, "You need to leave . . . that's the terms . . . no, you need to leave . . . you are on Nevada State property . . . the time is now . . . no, the time is now."

142.   To prevent the disaster that was sure to follow if the officers remained longer, the SAC was forced to give in to their demands and ordered his officers to leave, abandoning the post, the impoundment site, and the cattle to **BUNDY**.

143.   Having been forced to meet the conspirators' demands, the SAC met with **D. BUNDY** and **R. BUNDY** near the main entrance to the Impoundment Site to negotiate the departure of the law enforcement officers.   While the Followers, including gunmen, held their position below at the gate, **R. BUNDY** demanded that the SAC order his officers leave the Impoundment Site within two hours.

144.   Thereafter, **R. BUNDY** assumed a leadership role in ensuring that the officers left the Impoundment Site quickly and then organized the Followers to release the cattle.

145.   The law enforcement officers were thus forced to abandon the Impoundment Site and the cattle to the conspirators and their Followers. **R. BUNDY, M. BUNDY,** and other Followers promptly gathered at the cattle corrals, where they opened the gates to release the cattle. **M. BUNDY** then led the Followers on horses to drive the cattle out of the Impoundment Site. Thereafter, **A. BUNDY** directed Followers to dismantle the corrals.

3.   **Continuing Conspiracy – Post-Assault to Indictment: The Conspirators Organized Bodyguards, Patrols, and Checkpoints to Prevent and Deter Future Law Enforcement Actions.**

146.   It was further a part of the conspiracy that following the April 12 assault and extortion, the defendants took such other actions as necessary to protect themselves and their ill-gotten gains and to further interfere with and prevent future federal law enforcement actions on the public lands.

147.   From April 12 to at least the end of May 2014, the defendants established, organized, and maintained camps to provide housing and logistical support to armed gunmen who continued to travel to the Bundy Ranch.

148.   From April 12 to at least the end of May 2014, the defendants, including **DELEMUS, CAVALIER** and **COOPER** established armed checkpoints and security patrols to prevent and deter law enforcement actions against the conspirators, including recovering the extorted cattle.

149.   From April 12 to at least the end of May 2014, the defendants established armed checkpoints and security patrols to prevent and deter law enforcement actions against the conspirators, including recovering the extorted

cattle.

150.   From April 12, 2014 through September 2014, the defendants made statements to the SAC, threatening similar assaultive conduct in the event the BLM attempted further law enforcement actions against **BUNDY** and his conspirators.

151.   From April 12, 2014 through the date of this Superseding Indictment, the defendants made public statements threatening that they would continue to interfere with federal law enforcement actions against them or the cattle.

152.   From April 12, 2014 through the date of this Superseding Indictment, the defendants continued to employ armed body guards, including **CAVALIER** and **COOPER**, to protect **BUNDY** and other conspirators from federal law enforcement actions.

153.   From April 12, 2014, through the date of this Superseding Indictment, the conspirators continue to take such actions as necessary to hold, protect, and prevent the impoundment of the extorted cattle and such other trespass cattle that are subject to the 2013 Court Orders.

## COUNT ONE
Conspiracy to Commit an Offense Against the United States
(Title 18, United States Code, Section 371)

154.   Paragraphs 1 through 153 are incorporated herein in full.

155.   Beginning in at least March 2014 and continuing to on or about the date of this Superseding Indictment, in the State and Federal District of Nevada and elsewhere,

CLIVEN D. BUNDY,
RYAN C. BUNDY,
AMMON E. BUNDY,
RYAN W. PAYNE,
PETER T. SANTILLI, Jr.,
MELVIN D. BUNDY,
DAVID H. BUNDY,
BRIAN D. CAVALIER,
BLAINE COOPER,
GERALD A. DELEMUS,
ERIC J. PARKER,
O. SCOTT DREXLER,
RICHARD R. LOVELIEN,
STEVEN A. STEWART,
TODD C. ENGEL,
GREGORY P. BURLESON,
JOSEPH D. O'SHAUGHNESSY,
MICAH L. McGUIRE, and
JASON D. WOODS,

defendants herein, did conspire, confederate and agree with each other, and with others known and unknown to the Grand Jury, to commit an offense against the United States, to wit:

a.    Assault on a Federal Officer, in violation of Title 18, United States Code, Section 111(a)(1) and (b);

b.    Threatening a Federal Law Enforcement Officer, in violation of Title 18, United States Code, Section 115(a)(1)(B);

c.    Use and Carry of a Firearm In Relation to a Crime of Violence, in violation of Title 18, United States Code, Section 924(c);

d.    Obstruction of the Due Administration of Justice, in violation of Title 18, United States Code, Section 1503;

e.    Interference with Interstate Commerce by Extortion, in violation of Title 18, United States Code, Section 1951; and

1      f.      Interstate Travel in Aid of Extortion, in violation of Title 18,

2  United States Code, Section 1952.

3      156.   In furtherance of the conspiracy, the defendants committed,

4  attempted to commit and caused to be committed, the overt acts described herein

5  and all of those comprising the offenses charged in Counts Three through Sixteen.

6  All in violation of Title 18, United States Code, Section 371.

7                         **COUNT TWO**
                 Conspiracy to Impede or Injure a Federal Officer
8              (Title 18, United States Code, Section 372)

9      157.   Paragraphs 1 through 153 are incorporated herein in full.

10     158.   Beginning in at least March 2014 and continuing to on or about the

11  date of this Superseding Indictment, in the State and Federal District of Nevada

12  and elsewhere,

13
                         **CLIVEN D. BUNDY,**
14                       **RYAN C. BUNDY,**
                         **AMMON E. BUNDY,**
15                       **RYAN W. PAYNE,**
                       **PETER T. SANTILLI, Jr.,**
16                       **MELVIN D. BUNDY,**
                         **DAVID H. BUNDY,**
17                      **BRIAN D. CAVALIER,**
                         **BLAINE COOPER,**
18                     **GERALD A. DELEMUS,**
                         **ERIC J. PARKER,**
19                      **O. SCOTT DREXLER,**
                     **RICHARD R. LOVELIEN,**
20                     **STEVEN A. STEWART,**
                         **TODD C. ENGEL,**
21                    **GREGORY P. BURLESON,**
                  **JOSEPH D. O'SHAUGHNESSY,**
22                   **MICAH L. McGUIRE, and**
                         **JASON D. WOODS,**
23

24  defendants herein, did knowingly and willfully combine, conspire, confederate,

1   and agree with each other, and with others known and unknown to the Grand

2   Jury, to prevent by force, intimidation, and threats of violence, federal law

3   enforcement officers from discharging the duties of their office under the United

4   States, and to induce by force, intimidation, and threats, federal law enforcement

5   officers to leave the place where their duties were required to be performed, that

6   is, enforcing and executing federal Court Orders to remove trespass cattle from

7   federal public lands and enforcing federal laws and regulations on federal public

8   lands in and around the Allotment.

9        All in violation of Title 18, United States Code, Section 372.

10                              **COUNT THREE**
                  Use and Carry of a Firearm in Relation to a Crime of Violence
11                   (Title 18, United States Code, Sections 924(c) and 2)

12        159.   Paragraphs 1 through 153 are incorporated herein in full.

13        160.   Beginning in at least March 2014 and continuing to on or about the

14   date of this Superseding Indictment, in the State and Federal District of Nevada,

15   and elsewhere,

16
                              **CLIVEN D. BUNDY,**
17                            **RYAN C. BUNDY,**
                              **AMMON E. BUNDY,**
18                            **RYAN W. PAYNE,**
                        **PETER T. SANTILLI, Jr.,**
19                            **MELVIN D. BUNDY,**
                              **DAVID H. BUNDY,**
20                            **BRIAN D. CAVALIER,**
                              **BLAINE COOPER,**
21                        **GERALD A. DELEMUS,**
                              **ERIC J. PARKER,**
22                            **O. SCOTT DREXLER,**
                          **RICHARD R. LOVELIEN,**
23                            **STEVEN A. STEWART,**
                              **TODD C. ENGEL,**
24

**GREGORY P. BURLESON,**
**JOSEPH D. O'SHAUGHNESSY,**
**MICAH L. McGUIRE, and**
**JASON D. WOODS,**

defendants herein, aided and abetted by each other, and by others known and unknown to the Grand Jury, did knowingly use and carry firearms, which were brandished, during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, that is, conspiracy to impede and injure an officer, in violation of Title 18, United States Code, Section 372, as charged in Count Two of this Superseding Indictment.

All in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii) and 2.

## COUNT FOUR
### Assault on a Federal Officer
(Title 18, United States Code, Sections 111(a)(1), (b) and 2)

161.   Paragraphs 1 through 153 are incorporated herein in full.

162.   On or about April 9, 2014, in the State and Federal District of Nevada, and elsewhere,

**CLIVEN D. BUNDY,**
**RYAN C. BUNDY,**
**AMMON E. BUNDY,**
**RYAN W. PAYNE,**
**PETER T. SANTILLI, Jr., and**
**MELVIN D. BUNDY,**

defendants herein, aided and abetted by each other, and by others known and unknown to the Grand Jury, did use a dangerous and deadly weapon and forcibly assault, resist, oppose, impede, intimidate, and interfere with federal law enforcement officers and intend to forcibly assault, resist, oppose, impede,

intimidate, and interfere with federal law enforcement officers, while they were engaged in and on the account of the performance of their official duties, that is, escorting and providing security for personnel and equipment traveling in a BLM convoy during impoundment operations as described herein.

All in violation of Title 18, United States Code, Sections 111(a)(1) and (b), 1114, and 2.

### COUNT FIVE
Assault on a Federal Officer
(Title 18, United States Code, Sections 111(a)(1), (b) and 2)

163.   Paragraphs 1 through 153 are incorporated herein in full.

164.   On or about April 12, 2014, in the State and Federal District of Nevada, and elsewhere,

**CLIVEN D. BUNDY,
RYAN C. BUNDY,
AMMON E. BUNDY,
RYAN W. PAYNE,
PETER T. SANTILLI, Jr.,
MELVIN D. BUNDY,
DAVID H. BUNDY,
BRIAN D. CAVALIER,
BLAINE COOPER,
GERALD A. DELEMUS,
ERIC J. PARKER,
O. SCOTT DREXLER,
RICHARD R. LOVELIEN,
STEVEN A. STEWART,
TODD C. ENGEL,
GREGORY P. BURLESON,
JOSEPH D. O'SHAUGHNESSY,
MICAH L. McGUIRE, and
JASON D. WOODS,**

defendants herein, aided and abetted by each other, and by others known and unknown to the Grand Jury, did use a deadly and dangerous weapon and forcibly

42

assault, resist, oppose, impede, intimidate, and interfere with federal law enforcement officers while they were engaged in, and on the account of, the performance of their official duties, that is, guarding and protecting the Impoundment Site at or near Bunkerville, Nevada, in furtherance of the execution of federal Court Orders to remove cattle from the Allotment, as described herein.

All in violation of Title 18, United States Code, Sections 111(a)(1) and (b), 1114, and 2.

## COUNT SIX
Use and Carry of a Firearm in Relation to a Crime of Violence
(Title 18, United States Code, Sections 924(c) and 2)

165.   Paragraphs 1 through 153 are incorporated herein in full.

166.   On or about April 12, 2014, in the State and Federal District of Nevada, and elsewhere,

CLIVEN D. BUNDY,
RYAN C. BUNDY,
AMMON E. BUNDY,
RYAN W. PAYNE,
PETER T. SANTILLI, Jr.,
MELVIN D. BUNDY,
DAVID H. BUNDY,
BRIAN D. CAVALIER,
BLAINE COOPER,
GERALD A. DELEMUS,
ERIC J. PARKER,
O. SCOTT DREXLER,
RICHARD R. LOVELIEN,
STEVEN A. STEWART,
TODD C. ENGEL,
GREGORY P. BURLESON,
JOSEPH D. O'SHAUGHNESSY,
MICAH L. McGUIRE, and
JASON D. WOODS,

defendants herein, aided and abetted by each other, and by others known and

43

unknown to the Grand Jury, did knowingly use and carry a firearm, which was brandished, during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, that is, assault on a federal officer in violation of Title 18, United States Code, Section 111(a)(1) and (b), as charged in Count Five of this Superseding Indictment.

All in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii) and 2.

### COUNT SEVEN
Threatening a Federal Law Enforcement Officer
(Title 18, United States Code, Sections 115(a)(1)(B) and 2)

167.   Paragraphs 1 through 153 are incorporated herein in full.

168.   On or about April 11, 2014, in the State and Federal District of Nevada, an elsewhere,

**CLIVEN D. BUNDY,**
**RYAN C. BUNDY,**
**AMMON E. BUNDY,**
**RYAN W. PAYNE, and**
**PETER T. SANTILLI, Jr.,**

defendants herein, aided and abetted by each other, and by others known and unknown to the Grand Jury, did threaten to assault the SAC, a federal law enforcement officer, and such other federal law enforcement officers associated with impoundment operations, with the intent to impede, intimidate, and interfere with said law enforcement officers while engaged in the performance of their official duties and with the intent to retaliate against said law enforcement officers on account of the performance of their duties, in that **SANTILLI** confronted the SAC at the Impoundment Site, threatening with words and actions

to the effect that thousands would confront the officers with the potential for violence, as described herein.

All in violation of Title 18, United States Code, Sections 115(a)(1)(B) and 2.

**COUNT EIGHT**

Threatening a Federal Law Enforcement Officer
(Title 18, United States Code, Sections 115(a)(1)(B) and 2)

169.    Paragraphs 1 through 153 are incorporated herein in full.

170.    On or about April 12, 2014, in the State and Federal District of Nevada, an elsewhere,

CLIVEN D. BUNDY,
RYAN C. BUNDY,
AMMON E. BUNDY,
RYAN W. PAYNE,
PETER T. SANTILLI, Jr.,
MELVIN D. BUNDY,
DAVID H. BUNDY,
BRIAN D. CAVALIER,
BLAINE COOPER,
GERALD A. DELEMUS,
ERIC J. PARKER,
O. SCOTT DREXLER,
RICHARD R. LOVELIEN,
STEVEN A. STEWART,
TODD C. ENGEL,
GREGORY P. BURLESON,
JOSEPH D. O'SHAUGHNESSY,
MICAH L. McGUIRE, and
JASON D. WOODS,

defendants herein, aided and abetted by each other, and by others known and unknown to the Grand Jury, did threaten to assault the SAC, a federal law enforcement officer, and such other federal law enforcement officers associated with impoundment operations, with the intent to impede, intimidate, and

45

interfere with said law enforcement officers while they were engaged in the performance of their official duties and with the intent to retaliate against said law enforcement officers on account of the performance of their duties, that is, guarding and protecting the Impoundment Site in furtherance of the execution of federal Court Orders to remove cattle from the Allotment as described herein.

All in violation of Title 18, United States Code, Sections 115(a)(1)(B) and 2.

## COUNT NINE
Use and Carry of a Firearm in Relation to a Crime of Violence
(Title 18, United States Code, Sections 924(c) and 2)

171.   Paragraphs 1 through 153 are incorporated herein in full.

172.   On or about April 12, 2014, in the State and Federal District of Nevada, and elsewhere,

CLIVEN D. BUNDY,
RYAN C. BUNDY,
AMMON E. BUNDY,
RYAN W. PAYNE,
PETER T. SANTILLI, Jr.,
MELVIN D. BUNDY,
DAVID H. BUNDY,
BRIAN D. CAVALIER,
BLAINE COOPER,
GERALD A. DELEMUS,
ERIC J. PARKER,
O. SCOTT DREXLER,
RICHARD R. LOVELIEN,
STEVEN A. STEWART,
TODD C. ENGEL,
GREGORY P. BURLESON,
JOSEPH D. O'SHAUGHNESSY,
MICAH L. McGUIRE, and
JASON D. WOODS,

defendants herein, aided and abetted by each other, and by others known and unknown to the grand jury, did knowingly use and carry firearms, which were

brandished, during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, that is, threating a federal law enforcement officer, in violation of Title 18, United States Code, Section 115(a)(1)(B), as charged in Count Eight of this Superseding Indictment.

All in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii) and 2.

## COUNT TEN
Obstruction of the Due Administration of Justice
(Title 18, United States Code, Sections 1503 and 2)

173.    Paragraphs 1 through 153 are incorporated herein in full.

174.    On or about April 6, 2014, in the State and Federal District of Nevada and elsewhere,

**CLIVEN D. BUNDY,**
**RYAN C. BUNDY,**
**AMMON E. BUNDY,**
**RYAN W. PAYNE,**
**PETER T. SANTILLI, Jr., and**
**DAVID H. BUNDY,**

defendants herein, aided and abetted by each other, and by others known and unknown to the Grand Jury, did corruptly, and by threats and force, and by threatening communications, influence, obstruct, and impede, and attempt to influence, obstruct, and impede, the due administration of justice, in that the defendants threatened to impede the execution of federal Court Orders when **R. BUNDY, D. BUNDY,** and others working with them, attempted to impede and obstruct a BLM convoy at or near Nevada State Route 170 while the convoy was engaged impoundment operations, as described herein.

All in violation of Title 18, United States Code, Sections 1503 and 2.

1

**COUNT ELEVEN**
Obstruction of the Due Administration of Justice
(Title 18, United States Code, Sections 1503 and 2)

2

3      175.    Paragraphs 1 through 153 are incorporated herein in full.

4      176.    On or about April 9, 2014, in the State and Federal District of

5    Nevada and elsewhere,

6                        **CLIVEN D. BUNDY,**
                        **RYAN C. BUNDY,**
7                        **AMMON E. BUNDY,**
                        **RYAN W. PAYNE,**
8                 **PETER T. SANTILLI, Jr., and**
                        **MELVIN D. BUNDY,**
9

10   defendants herein, aided and abetted by each other, and by others known and

11   unknown to the Grand Jury, did corruptly, and by threats and force, and by

12   threatening communications, influence, obstruct, and impede, and attempt to

13   influence, obstruct, and impede, the due administration of justice, in that the

14   defendants threatened force and violence and used force and violence to impede

15   and thwart the execution of federal Court Orders, in that the defendants did

16   impede and obstruct, and attempt to impede and obstruct, a BLM convoy while it

17   was engaged in impoundment operations near Nevada State Route 170, as

18   described herein.

19      All in violation of Title 18, United States Code, Sections 1503 and 2.

20                        **COUNT TWELVE**
                  Obstruction of the Due Administration of Justice
21                (Title 18, United States Code, Sections 1503 and 2)

22      177.    Paragraphs 1 through 153 are incorporated herein in full.

23
        178.    On or about April 12, 2014, in the State and Federal District of
24

Nevada,

CLIVEN D. BUNDY,
RYAN C. BUNDY,
AMMON E. BUNDY,
RYAN W. PAYNE,
PETER T. SANTILLI, Jr.,
MELVIN D. BUNDY,
DAVID H. BUNDY,
BRIAN D. CAVALIER,
BLAINE COOPER,
GERALD A. DELEMUS,
ERIC J. PARKER,
O. SCOTT DREXLER,
RICHARD R. LOVELIEN,
STEVEN A. STEWART,
TODD C. ENGEL,
GREGORY P. BURLESON,
JOSEPH D. O'SHAUGHNESSY,
MICAH L. McGUIRE, and
JASON D. WOODS,

defendants herein, aided and abetted by each other, and by others known and unknown to the Grand Jury, did corruptly, and by threats and force, and by threatening communications, influence, obstruct, and impede, and attempt to influence, obstruct, and impede, the due administration of justice, in that the defendants threatened force and violence and used force and violence to impede, obstruct and thwart the execution of federal Court Orders by assaulting and extorting federal officers at the Impoundment Site, as described herein.

All in violation of Title 18, United States Code, Sections 1503 and 2.

## COUNT THIRTEEN
Interference with Interstate Commerce by Extortion
(Title 18, United States Code, Sections 1951 and 2)

179.   Paragraphs 1 through 153 are incorporated herein in full.

180.   On or about April 2 and 9, 2014, in the State and Federal District of

49

Nevada, and elsewhere,

**CLIVEN D. BUNDY,**
**RYAN C. BUNDY,**
**AMMON E. BUNDY,**
**RYAN W. PAYNE,**
**PETER T. SANTILLI, Jr., and**
**MELVIN D. BUNDY,**

defendants herein, aided and abetted by each other, and by others known and unknown to the Grand Jury, did obstruct, delay and affect commerce, and attempt to obstruct, delay and affect commerce, and the movement of articles and commodities in such commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, in that the defendants attempted to obtain impounded cattle in the care, custody, and possession of a contract auctioneer in Utah, with his or her consent having been induced by the wrongful use of force, violence, and fear, including fear of economic loss, as described herein.

All in violation of Title 18, United States Code, Sections 1951(a) and 2.

### COUNT FOURTEEN
Interference with Interstate Commerce by Extortion
(Title 18, United States Code, Sections 1951 and 2)

181.   Paragraphs 1 through 153 are incorporated herein in full.

182.   On or about April 12, 2014, in the Federal District of Nevada, and elsewhere,

**CLIVEN D. BUNDY,**
**RYAN C. BUNDY,**
**AMMON E. BUNDY,**
**RYAN W. PAYNE,**
**PETER T. SANTILLI, Jr.,**
**MELVIN D. BUNDY,**
**DAVID H. BUNDY,**
**BRIAN D. CAVALIER,**

**BLAINE COOPER,**
**GERALD A. DELEMUS,**
**ERIC J. PARKER,**
**O. SCOTT DREXLER,**
**RICHARD R. LOVELIEN,**
**STEVEN A. STEWART,**
**TODD C. ENGEL,**
**GREGORY P. BURLESON,**
**JOSEPH D. O'SHAUGHNESSY,**
**MICAH L. McGUIRE, and**
**JASON D. WOODS,**

defendants herein, aided and abetted by each other, and by others known and unknown to the Grand Jury, did obstruct, delay and affect commerce, and attempt to obstruct, delay and affect commerce, and the movement of articles and commodities in such commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, in that the defendants did obtain, and attempt to obtain, approximately 400 head of cattle at or near Bunkerville, Nevada, from the care, custody, and possession of the SAC and such other federal law enforcement officers engaged in impoundment operations, with their consent having been induced by the wrongful use of force, violence, and fear as described herein.

All in violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT FIFTEEN
Use and Carry of a Firearm in Relation to a Crime of Violence
(Title 18, United States Code, Sections 924(c) and 2)

183.  Paragraphs 1 through 153 are incorporated herein in full.

184.  On or about April 12, 2014, in the State and Federal District of Nevada and elsewhere,

CLIVEN D. BUNDY,
RYAN C. BUNDY,
AMMON E. BUNDY,
RYAN W. PAYNE,
PETER T. SANTILLI, Jr.,
MELVIN D. BUNDY,
DAVID H. BUNDY,
BRIAN D. CAVALIER,
BLAINE COOPER,
GERALD A. DELEMUS,
ERIC J. PARKER,
O. SCOTT DREXLER,
RICHARD R. LOVELIEN,
STEVEN A. STEWART,
TODD C. ENGEL,
GREGORY P. BURLESON,
JOSEPH D. O'SHAUGHNESSY,
MICAH L. McGUIRE, and
JASON D. WOODS,

defendants herein, aided and abetted by each other, and by others known and unknown to the grand jury, did knowingly use and carry firearms, which were brandished, during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, that is, interference with interstate commerce by extortion, in violation of Title 18, United States Code, Section 1951, as charged in Count Fourteen of this Superseding Indictment.

All in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii) and 2.

## COUNT SIXTEEN

Interstate Travel in Aid of Extortion
(Title 18, United States Code, Sections 1952 and 2)

185.   Paragraphs 1 through 153 are incorporated herein in full.

186.   On or about and between April 5 and April 12, 2014, in the Federal

District of Nevada and elsewhere,

CLIVEN D. BUNDY,
RYAN C. BUNDY,
AMMON E. BUNDY,
RYAN W. PAYNE,
PETER T. SANTILLI, Jr.,
MELVIN D. BUNDY,
DAVID H. BUNDY,
BRIAN D. CAVALIER,
BLAINE COOPER,
GERALD A. DELEMUS,
ERIC J. PARKER,
O. SCOTT DREXLER,
RICHARD R. LOVELIEN,
STEVEN A. STEWART,
TODD C. ENGEL,
GREGORY P. BURLESON,
JOSEPH D. O'SHAUGHNESSY,
MICAH L. McGUIRE, and
JASON D. WOODS,

defendants herein, aided and abetted by each other, and by others known and unknown to the Grand Jury, traveled in interstate commerce and willfully used a facility in interstate commerce, namely the internet or worldwide web, with the intent to commit a crime of violence to further an unlawful activity, that is, extortion in violation of Title 18, United States Code, Section 1951(a) and Nevada Revised Statute 205.320, and thereafter committed, and attempted to commit, the crime of violence to further such unlawful activity.

All in violation of Title 18, United States Code, Sections 1952(a)(2) and 2.

## FORFEITURE ALLEGATION ONE

(Conspiracy to Commit an Offense Against the United States; Conspiracy to Impede and Injure a Federal Officer; Use and Carry of a Firearm in Relation to a Crime of Violence; Assault on a Federal Officer; Threatening a Federal Law Enforcement Officer; Obstruction of the Due Administration of Justice; Interference with Interstate Commerce by Extortion; and Interstate Travel in Aid of Extortion)

1.     The allegations contained in Counts One through Sixteen of this Superseding Criminal Indictment are hereby re-alleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 924(d)(1) with Title 28, United States Code, Section 2461(c).

2.  Upon conviction of any of the felony offenses charged in Counts One through Sixteen of this Superseding Criminal Indictment,

**CLIVEN D. BUNDY,**
**RYAN C. BUNDY,**
**AMMON E. BUNDY,**
**RYAN W. PAYNE,**
**PETER T. SANTILLI, Jr.,**
**MELVIN D. BUNDY,**
**DAVID H. BUNDY,**
**BRIAN D. CAVALIER,**
**BLAINE COOPER,**
**GERALD A. DELEMUS,**
**ERIC J. PARKER,**
**O. SCOTT DREXLER,**
**RICHARD R. LOVELIEN,**
**STEVEN A. STEWART,**
**TODD C. ENGEL,**
**GREGORY P. BURLESON,**
**JOSEPH D. O'SHAUGHNESSY,**
**MICAH L. McGUIRE, and**
**JASON D. WOODS,**

defendants herein, shall forfeit to the United States of America, any firearm or ammunition involved in or used in any knowing violation of Title 18, United States Code, Section 924(c), or any violation of any other criminal law of the

54

United States, Title 18, United States Code, Sections 371, 372, 111(a)(1), 115(a)(1), 1503, 1951, and 1952: any firearm or ammunition possessed by the above-named defendants on April 12, 2014, at Impoundment Site near Bunkerville, Nevada, including but not limited to the firearms possessed by **CLIVEN D. BUNDY, RYAN C. BUNDY, AMMON E. BUNDY, RYAN W. PAYNE, PETER T. SANTILLI, JR., BRIAN CAVALIER, GERALD DELEMUS, ERIC J. PARKER, O. SCOTT DREXLER, RICHARD LOVELIEN, STEVEN A. STEWART, TODD C. ENGEL, GREGORY BURLESON, JOSEPH O'SHAUGHNESSY, MICAH MCGUIRE,** and **JASON WOODS.**

All pursuant to Title 18, United States Code, Section 924(d)(1) with Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Sections 924(c), 371, 372, 111(a)(1), 115(a)(1), 1503, 1951, and 1952.

## FORFEITURE ALLEGATION TWO
(Conspiracy to Commit an Offense Against the United States; Conspiracy to Impede and Injure a Federal Officer; Use and Carry of a Firearm in Relation to a Crime of Violence; Assault on a Federal Officer; Threatening a Federal Law Enforcement Officer; Obstruction of the Due Administration of Justice; Interference with Interstate Commerce by Extortion; and Interstate Travel in Aid of Extortion)

3.     The allegations contained in Counts One through Sixteen of this Superseding Criminal Indictment are hereby re-alleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 924(d)(1), (2)(C), and (3)(A) with Title 28, United States Code, Section 2461(c).

1     4.   Upon conviction of any of the felony offenses charged in Counts One

2   through Sixteen of this Superseding Criminal Indictment,

**CLIVEN D. BUNDY,**
**RYAN C. BUNDY,**
**AMMON E. BUNDY,**
**RYAN W. PAYNE,**
**PETER T. SANTILLI, Jr.,**
**MELVIN D. BUNDY,**
**DAVID H. BUNDY,**
**BRIAN D. CAVALIER,**
**BLAINE COOPER,**
**GERALD A. DELEMUS,**
**ERIC J. PARKER,**
**O. SCOTT DREXLER,**
**RICHARD R. LOVELIEN,**
**STEVEN A. STEWART,**
**TODD C. ENGEL,**
**GREGORY P. BURLESON,**
**JOSEPH D. O'SHAUGHNESSY,**
**MICAH L. McGUIRE, and**
**JASON D. WOODS,**

defendants herein, shall forfeit to the United States of America, any firearm or

ammunition intended to be used in any crime of violence, Title 18, United States

Code, Sections 371, 372, 111(a)(1), 115(a)(1), 924(c), 1503, 1951, and 1952: any

firearm or ammunition possessed by the above-named defendants on April 12,

2014, at Impoundment Site near Bunkerville, Nevada, including but not limited to

the firearms possessed by **CLIVEN D. BUNDY, RYAN C. BUNDY, AMMON E.**

**BUNDY, RYAN W. PAYNE, PETER T. SANTILLI, JR., BRIAN CAVALIER,**

**GERALD DELEMUS, ERIC J. PARKER, O. SCOTT DREXLER, RICHARD**

**LOVELIEN, STEVEN A. STEWART, TODD C. ENGEL, GREGORY**

**BURLESON, JOSEPH O'SHAUGHNESSY, MICAH MCGUIRE and JASON**

**WOODS.**

1    All pursuant to Title 18, United States Code, Section 924(d)(1), (2)(C), and

2    (3)(A) with Title 28, United States Code, Section 2461(c) and Title 18, United

3    States Code, Sections 371, 372, 111(a)(1), 115(a)(1), 924(c), 1503, 1951, and 1952.

4    <u>**FORFEITURE ALLEGATION THREE**</u>
     (Conspiracy to Commit an Offense Against the United States and
5    Threatening a Federal Law Enforcement Officer)

6        5.    The allegations contained in Counts One, Seven, and Eight of this

7    Superseding Criminal Indictment are hereby re-alleged and incorporated herein

8    by reference for the purpose of alleging forfeiture pursuant to Title 18, United

9    States Code, Section 981(a)(1)(C) with Title 28, United States Code, Section

10   2461(c).

11       6.    Upon conviction of any of the felony offenses charged in Counts One,

12   Seven, and Eight of this Superseding Criminal Indictment,

13                        **CLIVEN D. BUNDY,**
14                        **RYAN C. BUNDY,**
                          **AMMON E. BUNDY,**
15                        **RYAN W. PAYNE,**
                          **PETER T. SANTILLI, Jr.,**
16                        **MELVIN D. BUNDY,**
                          **DAVID H. BUNDY,**
17                        **BRIAN D. CAVALIER,**
                          **BLAINE COOPER,**
18                        **GERALD A. DELEMUS,**
                          **ERIC J. PARKER,**
19                        **O. SCOTT DREXLER,**
                          **RICHARD R. LOVELIEN,**
20                        **STEVEN A. STEWART,**
                          **TODD C. ENGEL,**
21                        **GREGORY P. BURLESON,**
                          **JOSEPH D. O'SHAUGHNESSY,**
22                        **MICAH L. McGUIRE, and**
                          **JASON D. WOODS,**
23

24
                                   57

defendants herein, shall forfeit to the United States of America, any property, real or personal, which constitutes or is derived from proceeds traceable to violations of Title 18, United States Code, Section 115(a)(1), a specified unlawful activity as defined in Title 18, United States Code, Sections 1956(c)(7)(D), or Title 18, United States Code, Section 371, conspiracy to commit such offense, an *in personam* criminal forfeiture money judgment, including, but not limited to, at least $3,000,000 in United States Currency, including any and all cattle on the Bunkerville Allotment and Lake Mead National Recreational Area (property).

7.  If any property subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) with Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty.

it is the intent of the United States of America, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any properties of the defendants for the property listed above and the *in personam* criminal forfeiture money judgment including, but not limited to, at least $3,000,000 in United States Currency.

1   All pursuant to Title 18, United States Code, Section 981(a)(1)(C) with Title

2   28, United States Code, Section 2461(c); Title 18, United States Code, Sections 371

3   and 115(a)(1); and Title 21, United States Code, Section 853(p).

4   ## FORFEITURE ALLEGATION FOUR
    (Conspiracy to Commit an Offense Against the United States and Obstruction of
5   the Due Administration of Justice)

6   8.  The allegations contained in Counts One and Ten through Twelve of this

7   Superseding Criminal Indictment are hereby re-alleged and incorporated herein

8   by reference for the purpose of alleging forfeiture pursuant to Title 18, United

9   States Code, Section 981(a)(1)(C) with Title 28, United States Code, Section

10  2461(c).

11  9.  Upon conviction of any of the felony offenses charged in Counts One and

12  Ten through Twelve of this Superseding Criminal Indictment,

13
    **CLIVEN D. BUNDY,**
14  **RYAN C. BUNDY,**
    **AMMON E. BUNDY,**
15  **RYAN W. PAYNE,**
    **PETER T. SANTILLI, Jr.,**
16  **MELVIN D. BUNDY,**
    **DAVID H. BUNDY,**
17  **BRIAN D. CAVALIER,**
    **BLAINE COOPER,**
18  **GERALD A. DELEMUS,**
    **ERIC J. PARKER,**
19  **O. SCOTT DREXLER,**
    **RICHARD R. LOVELIEN,**
20  **STEVEN A. STEWART,**
    **TODD C. ENGEL,**
21  **GREGORY P. BURLESON,**
    **JOSEPH D. O'SHAUGHNESSY,**
22  **MICAH L. McGUIRE, and**
    **JASON D. WOODS,**
23

24

defendants herein, shall forfeit to the United States of America, any property, real or personal, which constitutes or is derived from proceeds traceable to violations of Title 18, United States Code, Section 1503, a specified unlawful activity as defined in Title 18, United States Code, Sections 1956(c)(7)(A) and 1961(1)(B), or Title 18, United States Code, Section 371, conspiracy to commit such offense, an *in personam* criminal forfeiture money judgment, including, but not limited to, at least $3,000,000 in United States Currency, including any and all cattle on the Bunkerville Allotment and Lake Mead National Recreational Area (property).

10.  If any property subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) with Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants:

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States of America, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any properties of the defendants for the

property listed above and the *in personam* criminal forfeiture money judgment including, but not limited to, at least $3,000,000 in United States Currency.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) with Title 28, United States Code, Section 2461(c); Title 18, United States Code, Sections 371 and 1503; and Title 21, United States Code, Section 853(p).

## FORFEITURE ALLEGATION FIVE
(Conspiracy to Commit an Offense Against the United States; Interference with Interstate Commerce by Extortion; and Interstate Travel in Aid of Extortion)

11.   The allegations contained in Counts One, Thirteen, Fourteen, and Sixteen of this Superseding Criminal Indictment are hereby re-alleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) with Title 28, United States Code, Section 2461(c).

12.   Upon conviction of any of the felony offenses charged in Counts One, Thirteen, Fourteen, and Sixteen of this Superseding Criminal Indictment,

CLIVEN D. BUNDY,
RYAN C. BUNDY,
AMMON E. BUNDY,
RYAN W. PAYNE,
PETER T. SANTILLI, Jr.,
MELVIN D. BUNDY,
DAVID H. BUNDY,
BRIAN D. CAVALIER,
BLAINE COOPER,
GERALD A. DELEMUS,
ERIC J. PARKER,
O. SCOTT DREXLER,
RICHARD R. LOVELIEN,
STEVEN A. STEWART,
TODD C. ENGEL,
GREGORY P. BURLESON,
JOSEPH D. O'SHAUGHNESSY,
MICAH L. McGUIRE, and
JASON D. WOODS,

61

defendants herein, shall forfeit to the United States of America, any property, real or personal, which constitutes or is derived from proceeds traceable to violations of Title 18, United States Code, Sections 1951 and 1952 and Nevada Revised Statute 205.320, specified unlawful activities as defined in Title 18, United States Code, Sections 1956(c)(7)(A) and 1961(1)(A) and (1)(B), or Title 18, United States Code, Section 371, conspiracy to commit such offenses, an *in personam* criminal forfeiture money judgment, including, but not limited to, at least $3,000,000 in United States Currency, including any and all cattle on the Bunkerville Allotment and Lake Mead National Recreational Area (property).

13. If any property subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) with Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States of America, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any properties of the defendants for the property listed above and the *in personam* criminal forfeiture money judgment including, but not limited to, at least $3,000,000 in United States Currency.

1    All pursuant to Title 18, United States Code, Section 981(a)(1)(C) with Title

2   28, United States Code, Section 2461(c); Title 18, United States Code, Sections

3   371, 1951, and 1952; Nevada Revised Statute 205.320; and Title 21, United States

4   Code, Section 853(p).

5        DATED: this _2nd_ day of March, 2016.

6        A TRUE BILL:

7                                              /s/
                                   FOREPERSON OF THE GRAND JURY

8

9   DANIEL G. BOGDEN
10  United States Attorney

11

12  STEVEN W. MYHRE
    NICHOLAS D. DICKINSON
13  Assistant United States Attorneys
    NADIA J. AHMED
14  ERIN M. CREEGAN
    Special Assistant United States Attorneys
15
    Attorneys for the United States.
16

17

18

19

20

21

22

23

24

                            63