UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                                Plaintiff,<br><br>    v.<br><br>RYAN W. PAYNE and JOSEPH D. O'SHAUGHNESSY,<br><br>                             Defendants. | Case No. 2:16-cr-00046-PAL-GMN<br><br>ORDER<br><br>(Mot. Sever – ECF No. 460) |

Before the court is Defendant Ryan W. Payne's ("Payne") Motion to Sever (ECF No. 460). The court has considered the motion, Defendant Joseph D. O'Shaughnessy's ("O'Shaughnessy") Motion for Joinder (ECF No. 468) to Payne's Motion which was granted in an Order (ECF No. 529), the Government's Response (ECF No. 511), Payne's Reply (ECF No. 532), O'Shaughnessy's Joinder to Payne's Reply (ECF No. 534) which was approved in an Order (ECF No. 577), the Government's Motion to Supplement its Response (ECF No. 971), O'Shaughnessy's Response (ECF No. 1050), and Payne's Response (ECF No. 1053).

## **BACKGROUND**

### I.    The Indictment

Defendant Payne and 18 co-defendants are charged in a Superseding Indictment (ECF No. 27) returned March 2, 2016. Payne is charged in all 16 counts with:

- Count One – Conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371. This charge arises from conduct that allegedly occurred sometime between March of 2014 and March 2, 2016.

- Count Two – Conspiracy to impede or injure a federal officer in violation of 18 U.S.C. § 372. This charge arises from conduct that allegedly occurred sometime between March of 2014 and March 2, 2016.

- Count Three – Use and carry of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and § 2. This charge arises from conduct that allegedly occurred sometime between March of 2014 and March 2, 2016.

- Count Four – Assault on a federal officer in violation of 18 U.S.C. § 111(a)(1), (b) and § 2. This charge arises from conduct that allegedly occurred on April 9, 2014.

- Count Five – Assault on a federal officer in violation of 18 U.S.C. § 111(a)(1), (b) and§ 2. This charge arises from conduct that allegedly occurred on April 12, 2014.

- Count Six – Use and carry of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and § 2. This charge arises from conduct that allegedly occurred on April 12, 2014.

- Count Seven – Threatening a federal law enforcement officer, in violation of 18 U.S.C. § 115(a)(1)(B) and § 2. This charge arises from conduct that allegedly occurred on April 11, 2014.

- Count Eight – Threatening a federal law enforcement officer in violation of 18 U.S.C. § 115(a)(1)(B) and § 2. This charge arises from conduct that allegedly occurred on April 12, 2014.

- Count Nine – Use and carry of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and § 2. This charge arises from conduct that allegedly occurred on April 12, 2014.

- Count Ten – Obstruction of the due administration of justice in violation of 18 U.S.C. § 1503 and § 2. This charge arises from conduct that allegedly occurred on April 6, 2014.

- Count Eleven – Obstruction of the due administration of justice in violation of 18 U.S.C. § 1503 and § 2. This charge arises from conduct that allegedly occurred on April 9, 2014.

- Count Twelve – Obstruction of the due administration of justice in violation of 18 U.S.C. § 1503 and § 2. This charge arises from conduct that allegedly occurred on April 12, 2014.

- Count Thirteen – Interference with interstate commerce by extortion in violation of 18 U.S.C. § 1951 and § 2. This charge arises from conduct that allegedly occurred between April 2, 2014, and April 9, 2014.

- Count Fourteen – Interference with interstate commerce by extortion in violation of 18 U.S.C. § 1951 and § 2. This charge arises from conduct that allegedly occurred on April 12, 2014.

- Count Fifteen – Use and carry of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and § 2. This charge arises from conduct that allegedly occurred on April 12, 2014.

- Count Sixteen – Interstate travel in aid of extortion in violation of 18 U.S.C. § 1952 and § 2. This charge arises from conduct that allegedly occurred sometime between April 5, 2014 and April 12, 2016.

O'Shaughnessy is charged in all counts except counts 4,7,10,11, and 13.

The Superseding Indictment (ECF No. 27) in this case arises out of a series of events related to a Bureau of Land Management ("BLM") impoundment of Cliven Bundy's cattle

following a two-decade-long battle with the federal government.  Beginning in 1993, Cliven Bundy continued to graze cattle on land commonly referred to as the "Bunkerville Allotment" without paying required grazing fees or obtaining required permits.  The United States initiated civil litigation against Cliven Bundy in 1998 in the United States District Court for the District of Nevada.  The court found that Cliven Bundy had engaged in unauthorized and unlawful grazing of his livestock on property owned by the United States and administered by the Department of the Interior through the BLM.  The court permanently enjoined Cliven Bundy from grazing his livestock on the Allotment, ordered him to remove them, and authorized the BLM to impound any unauthorized cattle.  Bundy did not remove his cattle or comply with the court's order and injunction. The United States went back to court.  Subsequent orders were entered in 1999 and 2013 by different judges in this district permanently enjoining Bundy from trespassing on the Allotment and land administered by the National Park Service ("NPS") in the Lake Mead National Recreation Area[1], ordering Bundy to remove his cattle, and explicitly authorizing the United States to seize, remove, and impound any of Bundy's cattle for future trespasses, provided that written notice was given to Bundy.

On February 17, 2014, the BLM entered into a contract with a civilian contractor in Utah to round up and gather Bundy's trespass cattle.  BLM developed an impoundment plan to establish a base of operations on public lands near Bunkerville, Nevada, about 7 miles from the Bundy ranch in an area commonly referred to as the Toquop Wash.  On March 20, 2014, BLM also entered into a contract with an auctioneer in Utah who was to sell impounded cattle at a public sale.  Bundy was formally notified that impoundment operations would take place on March 14, 2014.  The following day, Bundy allegedly threatened to interfere with the impoundment operation by stating publicly that he was "ready to do battle" with the BLM, and would "do whatever it takes" to protect "his property."  The superseding indictment alleges that after being notified that BLM intended to impound his cattle, Bundy began to threaten to interfere with the impoundment operation, and

---

[1] By 2012, Bundy's cattle had multiplied and he also began grazing his cattle on land administered by the NPS in the Lake Mead National Recreation Area without obtaining grazing permits or paying grazing fees.

made public statements he intended to organize people to come to Nevada in a "range war" with BLM and would do whatever it took to protect his cattle and property.

The superseding indictment alleges that, beginning in March 2014, the 19 defendants charged in this case planned, organized, conspired, led and/or participated as followers and gunmen in a massive armed assault against federal law enforcement officers to threaten, intimidate, and extort the officers into abandoning approximately 400 head of cattle owned by Cliven Bundy. The removal and impoundment operation began on April 5, 2014. On April 12, 2014, defendants and hundreds of recruited "followers" executed a plan to recover the cattle by force, threats, and intimidation. Defendants and their followers demanded that officers leave and abandon the cattle and threatened to use force if the officers did not do so. The superseding indictment alleges armed gunmen took sniper positions behind concrete barriers and aimed their assault rifles at the officers. Defendants and their followers outnumbered the officers by more than 4 to 1, and the potential firefight posed a threat to the lives of the officers, as well as unarmed bystanders which included children. Thus, the officers were forced to leave and abandon the impounded cattle.

After the April 12, 2014 confrontation with federal officers, the superseding indictment alleges that the leaders and organizers of the conspiracy organized armed security patrols and check points in and around Cliven Bundy's Bunkerville ranch to deter and prevent any future law enforcement actions against Bundy or his co-conspirators, and to protect Bundy's cattle from future law enforcement actions.

## II. Procedural History

An Indictment (ECF No. 5) was returned February 17, 2016, charging Payne and co-defendants Ryan Bundy, Ammon Bundy, Santilli, and Cliven Bundy with 16 felony counts. Payne was arrested on April 15, 2016, in the District of Nevada on a Superseding Indictment (ECF No. 27) returned March 2, 2016, and a warrant issued in this district. O'Shaughnessy is charged in 11 of the 16 counts of the Superseding Indictment[2]. All 19 defendants made their appearances in this

---

[2] O'Shaughnessy is not charged in Counts 4, 7, 10, 11 and 13 which involve conduct occurring between April 2 and April 11, 2014. He self-surrendered to the FBI in Phoenix, Arizona on March 3, 2016, on the arrest warrant issued in this district.

4

case in this district between March 4, 2016, and April 15, 2016. At the initial appearance of each defendant, the government stated its position that this was a complex case that would require special scheduling review. All 19 defendants are currently joined for trial pursuant to the provisions of the Speedy Trial Act. All 19 defendants have been detained pending trial.

In an Order (ECF No. 198) entered March 25, 2016, the court directed the parties to meet and confer as required by LCR 16-1 to discuss whether this case should be designated as complex, and, if so, to attempt to arrive at an agreed-upon complex scheduling order addressing five specified topics for discussion. The order gave the parties until April 18, 2016, to file a stipulated proposed complex case schedule if all parties were able to agree, or if they were not, to file a proposed schedule with supporting points and authorities stating each party's position with respect to whether or not the case should be designated as complex, a proposed schedule for discovery, pretrial motions, and trial, and any exclusions of time deemed appropriate under 18 U.S.C. § 3161.

A Proposed Complex Case Schedule (ECF No. 270) was filed on April 18, 2016. In it, the government and 13 of the 19 defendants agreed that the case should be designated as complex. The 13 defendants who stipulated to the proposed schedule included: Cliven Bundy, Mel Bundy, Dave Bundy, Blaine Cooper, Gerald Delemus, O. Scott Drexler, Richard Lovelien, Steven Stewart, Todd Engel, Gregory Burleson, Joseph O'Shaughnessy, Micah McGuire and Jason Woods. Three defendants, Ammon Bundy, Peter Santilli, and Brian Cavalier, indicated that they would "defer the decision to agree or disagree, pending further consultation with counsel and/or have taken no position as to the filing of this pleading." Three defendants, Ryan Bundy, Eric Parker, and Ryan Payne, disagreed that the case should be designated as a complex case "to the extent time is excluded under the STA."

The same 13 defendants who initially stipulated that the case should be designated as complex, agreed that the May 2, 2016 trial date should be vacated, and that the trial in this matter should be set on the first available trial track beginning "in or around February 2017." Three defendants, Ammon Bundy, Peter Santilli, and Brian Cavalier, "deferred the decision to agree or disagree about a trial date pending further consultation with counsel, or have not taken a position."

The 13 defendants who stipulated the case should be designated as complex and a trial date set in February 2017, stipulated "that all time from the entry of Defendants' pleas in this case until the trial of this matter is excluded for purposes of the STA pursuant to 18 U.S.C. § 3161(h)(7)(A) as the ends of justice outweigh the interest of the public and the defendants in a speedy trial." Ammon Bundy, Peter Santilli and Brian Cavalier "deferred the decision to agree or disagree about the exclusion of time, pending further consultation with counsel, or have taken no position on the matter." Ryan Bundy stated he disagreed "to the extent any exclusion of time denies him the right to a speedy trial under the STA." Eric Parker stated he disagreed "with no further position stated." Ryan Payne stated he disagreed "with the exclusion of time to the extent it denies him the right to a speedy trial under the STA."

The court held a scheduling and case management conference on April 22, 2016, to determine whether this case should be designated as complex. Eighteen of the nineteen defendants appeared with their counsel. Defendant Ryan Bundy appeared pro se with standby counsel, Angela Dows. At the scheduling and case management conference on April 22, 2016, many of the defendants who had initially stipulated to the complex case schedule and a February 2017 trial date, changed positions. The positions of each of the defendants were stated on the record at the hearing and memorialized in the court's Case Management Order (ECF No. 321) entered April 26, 2016. The court found the case was a complex case within the meaning of 18 U.S.C. § 3161(h)(7)(B)(ii), and set the trial for February 6, 2017. The case management order made findings concerning why this case was deemed complex within the meaning of 18 U.S.C. § 3161(h)(7)(B), and the court's findings on exclusion of time for purposes of the Speedy Trial Act. The case management order also set deadlines for filing motions to sever, motions for filing pretrial motions and notices required by Rule 12 of the Federal Rules of Criminal Procedure[3], and LR 12(1)(b). No defendant filed objections to the determination that this case was complex, the court's Speedy Trial Act tolling and exclusion findings, or any other provision of the court's case management order.

---

[3] All references to a "Rule" or the "Rules" refer to the Federal Rules of Criminal Procedure.

### III.    The Parties' Positions

#### A.  The Motion to Sever

Payne seeks an order severing his trial from the trial of his co-defendants arguing a joint trial: (1) will violate his Sixth Amendment right to confront witnesses against him; (2) will violate his Fifth Amendment right to due process; and (3) at a joint trial, one or more co-defendants will present mutually exclusive and/or impermissibly antagonistic defenses to Payne's trial defense. The motion states that Payne cannot state with particularity the grounds necessitating severance because the court established a May 27, 2016 deadline for filing severance motions, and he had not yet had an opportunity to review the voluminous discovery to analyze it for purposes of identifying *Bruton* issues and mutually exclusive and/or impermissibly antagonistic defenses. Additionally, at the time the motion to sever was filed, Payne was detained in the District of Oregon on charges pending there and had no means to review the discovery himself.  Finally, at the time the motion to sever was filed, the government had not yet disclosed all relevant discovery, and had not yet identified which of the co-defendants' statements, if any, the government intends to introduce at trial.

Payne believes that a joint trial with his co-defendants may violate his Sixth Amendment right to confront and cross-examine witnesses against him if inculpatory statements of co-defendants are admitted at trial.  He also argues that the danger of "spillover" is "a viable threat in this case", that is, that evidence against one or more co-defendants may "transfer guilt to him." Spillover prejudice is especially a danger in a complex case with multiple defendants in which a jury may not be able to compartmentalize evidence offered against the respective co-defendants. Payne also argues that he may have an inconsistent or antagonistic defense with the trial of his co-defendants.  At this time, his defense at trial is that he is innocent.  Counsel argues he is unable to determine whether the co-defendants' defenses will be mutually exclusive or impermissibly antagonistic to him because at the time this motion was filed, he had not yet had an opportunity to review the discovery.  He asks that the court allow him to supplement his motion to sever once the defense has completed reviewing discovery to enable him to identify the evidence that supports severance of his trial from the trial of his co-defendants.

O'Shaughnessy filed a two-sentence Joinder (ECF No. 468) asking leave to join in Payne's motion to sever. The joinder was granted in an Order (ECF No. 529).

**B. The Government's Response**

The government opposes the motion arguing the crimes charged in the superseding indictment involve a continuing conspiracy to impede and interfere with federal law enforcement officers. This conspiracy began in at least March 2014, and continued through March 2016, when the superseding indictment was returned. The superseding indictment alleges that during the course of the conspiracy, defendant Cliven Bundy led a criminal enterprise to prevent federal law enforcement officers from taking actions to enforce federal court orders that required the removal of his cattle that had been grazing on public lands unlawfully for more than 20 years. This enterprise was conducted through threats of force and violence, actual force and violence, assault, and extortion.

The superseding indictment alleges that Cliven Bundy began recruiting the members of the conspiracy in March 2014, using social medial to call for gunmen and others to come to Bunkerville, Nevada, the site of the impoundment, to physically confront, impede and interfere with law enforcement officers as they were executing their duties to enforce federal court orders. Ultimately, over 400 of Bundy's followers converged on the site where the officers were impounding cattle on April 12, 2014. The government claims that over 60 of Bundy's followers were either carrying, using, or brandishing firearms, including assault rifles, as they converged on the gate and blocked the entrance to the impoundment site which was guarded by approximately 40 law enforcement officers. The government also maintains that the conspiracy continued after April 12, 2014, because conspirators took concerted action to protect Bundy's cattle from future impoundment and to prevent law enforcement actions against Cliven Bundy.

Cliven Bundy, along with his sons Ammon Bundy and Ryan Bundy, and co-Defendants Peter Santilli and Ryan Payne, are charged in all 16 counts of the indictment. Cliven Bundy, Ryan, Ammon, Mel, and Dave Bundy are alleged to be leaders and organizers of the conspiracy along with co-Defendants Ryan Payne and Peter Santilli. Defendants Blaine Cooper, Brian Cavalier, Joseph O'Shaughnessy and Gerald Delemus are alleged to be mid-level leaders and organizers of

the conspiracy.  The remaining defendants, Eric Parker, O. Scott Drexler, Steven Stewart, Richard Lovelien, Todd Engel, Gregory Burleson, Micah McGuire and Jason Woods were gunmen.

The superseding indictment alleges that Cliven Bundy was the leader, organizer, and chief beneficiary of the conspiracy who possessed ultimate authority over the scope, manner and means of conspiratorial operations. He also received the economic benefits of the extortion plead in the indictment.

The government points out that it made its initial disclosures to the defendants on May 6, 2016, pursuant to the court's Case Management Order (ECF No. 321).  The initial disclosures included the Rule 16 statements of the defendants and other Rule 16 information and materials. The government is withholding disclosure of Jencks materials until 30 days before trial because of serious concerns for witness safety and security.

The government maintains that all of the defendants were appropriately joined for trial pursuant to Fed. R. Crim. P. 8(b) and 14(a).  These rules are designed to avoid multiple trials and promote judicial economy and efficiency.  Defendants charged together and properly joined under Rule 8(b) are generally tried together.  Joinder is "particularly appropriate" in a conspiracy case where all of the co-defendants are members of a conspiracy.  The concern for judicial efficiency is less likely to be outweighed by possible prejudice to the defendants in a joint trial of a conspiracy case because much of the evidence would be admissible against each defendant in separate trials. Joint trials provide the jury with an ability to see the entire picture of the alleged crime, and enable the jury to reach a more reliable conclusion as to the guilt or innocence of the defendants involved. Joint trials also limit the burden of requiring witnesses or victims to testify on multiple occasions in separate trials and avoid "randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand."

The government cites United States Supreme Court and Ninth Circuit authority holding that a party seeking severance must show unusual circumstances in which a joint trial would be "manifestly prejudicial" to warrant severance.  This is a high standard which can be met if a defendant demonstrates that his specific trial rights are compromised, or where a jury would be unable to reach a reliable verdict without severance. It requires a showing that a joint trial would

be so prejudicial that it would deprive the defendant of a fair trial. A showing that jointly charged defendants have varying degrees of culpability or that there is an improved possibility of acquittal in a separate trial is insufficient to warrant severance.

In this case, the government argues Payne has failed to demonstrate any prejudice, let alone manifest prejudice would result from a joint trial. The government characterizes this as a "paradigm case for joinder." Payne is charged as a leader and organizer of a conspiracy where 18 of 19 defendants charged were present in the same place and at the same time, for the same purpose which was to assault and extort law enforcement officers and obtain Bundy's impounded cattle. O'Shaughnessy is charged as a mid-level leader and organizer.

The government points out that Payne is charged with each count of the superseding indictment along with co-defendants Cliven Bundy, Ryan Bundy, Ammon Bundy, and Santilli. The superseding indictment alleges that Payne was one of the leaders and organizers of the conspiracy who committed numerous overt acts to further the conspiracy. Specifically, Payne used the internet to recruit gunmen and other followers to come to the Bundy ranch to confront law enforcement officers, led an assault on a BLM convoy on April 9, 2014, which threatened law enforcement officers, and participated in the "assault and extortion" on April 12, 2014. Payne began recruiting gunmen on April 8, 2014, and continued using various blog sites to issue calls to arms for gunmen to travel to Nevada and stop the impoundment.

O'Shaughnessy is charged as a mid-level organizer and leader who: organized gunmen and other followers; led gunmen in the assault and extortion of law enforcement officers; organized protection for members of the criminal enterprise; and organized armed patrols and security checkpoints.

**C. Payne's Reply**

Payne's reply argues he had no means of reviewing the discovery in this case while detained in the District of Oregon. By contrast, the government investigated this case for more than two years and is in possession of the information the court needs to make a fair decision about severance. Payne cannot identify *Bruton* problems because the government has not yet identified co-defendant statements it will offer at trial and he cannot be blamed for failing to identify the

precise nature of potential antagonistic defenses. However, he argues his defense is wholly different from Cliven Bundy who is alleged to have economically benefitted from the conspiracy and Peter Santilli whose defense will be based almost exclusively on the protections afforded by the First Amendment. It is difficult for Payne to imagine how a single trial could be manageable, efficient or fair. With the court's permission, he asks leave to supplement once the government meets its constitutional and statutory discovery obligations and he has an adequate opportunity to review that discovery.

## D. The Government's Motion to Supplement Responses

The Government's Motion to "Supplement" (ECF No. 971) acknowledges that the government filed oppositions to each of the defendants' severance motions, arguing that the nature of the allegations and charges made this case appropriate for joinder and that defendants had not shown a joint trial would manifestly prejudice them. *Id*. at 6. The governments' responses objected to individual trials, and did not propose an alternative to a single 19-defendant trial.[4] *Id*. The government states it took this position because, when it filed its oppositions to the motions to sever, it was unclear whether all of the defendants would be available for the February 2017 trial as a number of defendants were also charged in the District of Oregon and awaiting trial. The charges against the defendants who were also charged in the District of Oregon have now been resolved, and all of the remaining 17 defendants will be available for the trial set in February 2017. The government has concluded that there is little likelihood that any more defendants will resolve their case short of trial. The government therefore seeks leave to submit a supplemental response to defendants' severance motions and its own request and proposal for severance.

The government now argues the court should exercise its inherent authority to manage its docket and order severance because a joint trial of all 17 remaining defendants would unreasonably increase the amount of time it takes to try all defendants, result in greater delay, confusion and difficulty in maintaining an orderly and efficient proceeding. It seeks to align defendants into proposed groupings of three-tiers for three separate trials:

---

[4] Two of the 19 defendants, Gerald A. DeLemus and Blaine Cooper, have now resolved their cases by entering guilty pleas.

- **Tier 1 – Leaders and Organizers**: Defendants Cliven Bundy, Ryan Bundy, Ammon Bundy, Peter Santilli, and Ryan Payne.

- **Tier 2 – Mid-level Leaders and Organizers and Follower-Gunmen**: Defendants Dave Bundy, Mel Bundy, Joseph O'Shaughnessy, Brian Cavalier, Jason Woods and Micah McGuire.

- **Tier 3 – Follower-Gunmen**: Defendants Ricky Lovelien, Todd Engel, Gregory Burleson, Eric Parker, O. Scott Drexler, and Steven Stewart.

Citing *United States v. Taylor-Prigge*, 830 F.3d 1094, 1098 (9th Cir. 2016) and *United States v. Mancuso*, 130 F.R.D. 128, 130 (D. Nev. 1990), the United States argues that severance is justified where a joint trial would cause manifest prejudice, or irrespective of prejudice, interfere with the court's inherent authority to manage its docket, or both. The government continues to maintain that there would be "no material prejudice attached to the joinder of the defendants here because the charged offenses all arise from a common nucleus of operative fact, and because there is no serious risk of prejudicial 'spillover' of otherwise admissible evidence." However, the government now seeks severance under the second *Mancuso* factor to allow the district court to control its docket.

The government argues that a single 17-defendant jury trial, which none of the defendants initially requested, would unreasonably increase the time it takes to try all of the defendants, result in a greater risk of delay, confusion, and difficulty in maintaining an orderly and efficient proceeding. The government estimates that a 17-defendant trial would, under the best circumstances, likely take between 4 and 6 months to complete, and require the government to call between 60 and 75 witnesses. Cross-examination of each of these witnesses by 17 separate defense counsel would unreasonably extend the length of the trial. Additionally, a joint trial would likely result in delays based on scheduling difficulties and conflicts attendant to so large a number of defendants and their counsel. Under these circumstances, the court may exercise its inherent powers to fashion efficient, smaller trials from an otherwise unwieldly, mass, joint trial.

The government continues to maintain that 17 separate trials would also unreasonably increase the total time required to try all defendants. The government estimates that individual

trials would take a minimum of 3 to 4 weeks each, requiring the government to call from 30 to 45 witnesses to present its case-in-chief for each of the 17 trials, and potentially 17 months to complete all 17 trials. More importantly to the government, separate trials will unreasonably subject victims to being "re-victimized time and again as they are forced to retell the violence and threats of death and bodily injury they faced on April 12, 2014." The government therefore submits its 3-tier severance plan is an attempt to strike a reasonable balance between these two otherwise unreasonable alternatives.

The government argues that its 3-tier proposal groups the defendants in a way that "conforms conceptually to their roles in the conspiracy and aligns with the evidence the government anticipates offering at trial." The defendants in Tier 1 are the leaders and organizers who were involved in most, or all of the critical events leading to the April 12, 2014 assault. This includes the March 28, 2014 blocking of the BLM convoy; the April 2, 2014 threats and interference with the Utah auction barn; the April 8, 9, and 10, 2014 calls to arms; the April 9, 2014 "ambush" of the BLM convoy; the April 9, 2014 threats and interference with the Utah auction barn, the April 11, 2014 threat against the impoundment special agent in charge; and the April 12, 2014 assault.

The same is not true of the Tier 3 defendants who are identified as follower-gunmen, whose involvement in the conspiracy is restricted more to their actions during the assault on April 12, 2014. Similarly, the Tier 2 defendants are identified as mid-level leaders and organizers whose leadership roles involve their "actions on the ground during the April 12, 2014 assault, and less by their pre-assault activities."

The government expects that at a trial of the Tier 1 defendants, it would offer more evidence of the details of the broader conspiracy and the defendants' leadership roles in the conspiracy. While evidence of the broader conspiracy is equally admissible against Tier 2 and 3 defendants, in separate trials, the government would offer this evidence in summary, rather than in detailed form, simply to provide context for the events of April 12, 2014.

The government indicates it is likely to offer more evidence regarding the details of individual movements of Tier 2 and 3 defendants through the wash and over the bridges during

13

the assault to demonstrate their concert of action and intent. By contrast, a trial of the Tier 1 defendants would focus less on the individual movements of the gunmen and on-the-ground leaders, and more on the mass movements of the followers against the BLM position. These examples point out the efficiencies that would be gained through a tiered trial presentation of the 3 proposed groupings.

The government proposes that the cases be tried seriatim, *i.e.*, three trials with intervals of 4 to 6 weeks between each trial. The government has proposed the tiers because the Tier 1 defendants have the most involvement in the broader conspiracy and therefore, greater culpability and responsibility for the actions charged on April 12, 2014. To invert the order would produce "the anomalous and less fair result of trying less culpable actors before the more culpable ones."

The government anticipates that some of the defendants who are not in Tier 2 or 3 may demand that they be tried following other defendants suddenly complaining that they are not ready for trial in February 2017. If these arguments are made, the government will respond. However, the government argues that the defendants should not be allowed to "game the order of the proposed trials using the speedy trial act", or through seeking a continuance to accommodate late-in-the-game trial preparation. With respect to the defendants' anticipated speedy trial arguments, the government cites U.S.C. § 3161(h)(7)(B)(ii) which gives the court authority to exclude time on its own motion where the case is "so unusual or complex due to the number of defendants."

### E. O'Shaughnessy's Response

O'Shaughnessy's response requests to go to trial with the Tier 1 defendants on February 6, 2017. Now that the court has indicated a severance will be ordered, and the only remaining question is how many trials should be ordered and which defendants are appropriately tried together, O'Shaughnessy advised his counsel that he wants to be tried on February 6, 2017. His desire to be tried February 6, 2017 outweighs his desire to be severed as his paramount concern is a speedy trial. A trial after February 6, 2017, will continue to violate his right to a speedy trial. The government argued that this is a classic case for joinder. Its theory has not changed regarding Mr. O'Shaughnessy's role in the protest at the Bundy ranch, and above all, O'Shaughnessy is ready for trial on February 6, 2017.

### F.  Payne's Response

Payne's response points out that the government initially filed an opposition to the defendants' motion to sever which argued all of the defendants should be joined for trial.  The court's case management order applied to the government as well as all of the defendants.  By filing this late supplement to its response to the motions to sever, the government is, effectively, filing an untimely motion to sever couched as a supplement.  The government previously opposed all of the defendants' motions to sever dismissing the notion that a joint trial would create *Bruton* problems.  The government has continued to assert that statements made to "the prosecutorial team" do not create a *Bruton* problem because they are testimonial or statements of co-conspirators.  Defense counsel are in the dark about how the government defines its phrase "prosecutorial team."

Now that the trial in Oregon resulted in verdicts of not guilty, the government's position has apparently changed.  A conviction of some of the defendants in Oregon might have been expected to result in a flurry of negotiations on the part of the co-defendants, and possibly offers of cooperation.  However, the government now seeks to file an untimely motion to sever to "reclaim the advantage of possibly convicting the defendants piecemeal."  The government did not suggest any proposed framework for conducting the trial(s) in this case before the severance motion deadline.

In opposing the defendants' motions to sever, the government relied on Rule 8.  In its supplement, the government now asserts Rule 14 should govern.  Payne agrees.  Payne asks that the court grant him a separate trial from the trial of the other 18 co-defendants.  The government has consistently asserted that Payne belongs among those considered leaders and organizers.  There is no greater prejudice to him than to try him with co-defendants Cliven, Ryan, Ammon, and Mel Bundy.  For these defendants, the relevant evidence might begin as far back as 1998, through at least 2013.  The same is not true for Payne.  There is no relevant evidence that should be considered by the jury that did not begin after April 8, 2014, when Payne is alleged to have entered the picture.

Payne argues that at the very least, the court would have to convene a separate jury to hear evidence against Payne to prevent the spillover from reams of evidence that does not involve Payne in a joint trial. The trial date in this case has been set for many months. Every defense attorney involved, and no doubt the court's staff, have cleared the February 2017 date. The last-minute reshuffling suggested by the government will most likely result in the very problems that Judge Reed was referring to in his decision in *United States v. Mancuso*, 130 F.R.D. 128 (1990) which the government cites in support of its supplement.

Payne reiterates arguments made in other motions that the government brought this indictment and subsequent motions for detention while its companion case was under way in Oregon. The government now confesses that the dual prosecutions meant that trial in this case could not start for all defendants while the Oregon case was ongoing. Now the government suggests groupings which favor their view of the case and pays little heed to the *de facto* extension of imprisonment for most of the "lower tier" defendants.

Finally, Payne argues the government's supplement relies on a red herring argument that betrays their true motive for severance. The government previously argued against the defendants' assertion of their rights to a speedy trial at the beginning of this case, and has consistently taken that position. The defendants have asserted their speedy trial rights and requested complete discovery, or an order limiting admission of late evidence. The government is obviously seeking to obtain its own advantage over Payne after changes in its original plan for this case, and the court is being asked to "blindly acquiesce" and to agree to the government's plan. The government's litigation strategy, or lack thereof, raises serious concerns about Payne's ability to have a fair joint trial. The government has still not provided much relevant discovery regarding the scope of the alleged conspiracy. Therefore, Payne cannot fairly assess the extent to which the government's proposed groupings would create an unfair risk of prejudice. However, Payne believes the risk of prejudice is inevitable. For these reasons, he asks that the court deny the government's untimely severance request, and grant Payne a separate trial from the trial of his co-defendants.

/ / /

/ / /

## DISCUSSION

### I.     Applicable Law

#### A.     Rule 8(a): Joinder

Rule 8 permits joinder of offenses or defendants in the same criminal indictment.  Rule 8(a) allows for joinder of multiple offenses against a single defendant if the offenses are: (i) of the same or similar character; (ii) based on the same act or transaction; or (iii) connected with or constituting parts of a common scheme or plan.  Fed. R. Crim. P. 8(a); *see also United States v. Prigge*, 830 F.3d 1094, 1098 (9th Cir. 2016).  Rule 8 has been broadly construed in favor of joinder.  *See, e.g.*, *United States v. Lane*, 474 U.S. 438, 449 (1986); *United States v. Jawara*, 474 F.3d 565, 572 (9th Cir. 2006).  The public has a substantial interest in joint trials because they conserve government funds, minimize inconvenience to witnesses and public authorities, and avoid delays in bringing a defendant to trial.  *United States v. Washington*, 887 F. Supp. 2d 1077, 1107 (D. Mont. 2012) (quoting *United States v. Camacho*, 528 F.2d 464, 470 (9th Cir. 1976)).  Misjoinder of charges under Rule 8(a) is a question of law reviewed de novo.  *Jawara*, 474 F.3d at 572 (citing *United States v. Terry*, 911 F.2d 272, 276 (9th Cir. 1990)).

Generally, a valid basis for joinder must be discernible from the face of the indictment.  *Jawara*, 474 F.3d at 572–73 (citing *United States v. VonWillie*, 59 F.3d 922, 929 (9th Cir. 1995); *Terry*, 911 F.2d at 276).  Mere factual similarity between the events is not a sufficient basis for joinder.  *United States v. Vasquez-Velasco*, 15 F.3d 833, 843 (9th Cir. 1994) (interpreting Rule 8(b) governing joinder of two or more defendants in the same indictment).  However, the term "transaction" is interpreted flexibly, and determining whether a "series" exists depends on whether there is a "logical relationship" between the transactions.  *Id.*  "A logical relationship is typically shown by the existence of a common plan, scheme, or conspiracy."  *Id.* at 844 (internal citations omitted).  A logical relationship may also be shown if the common activity constitutes a substantial portion of the proof of the joined charges.  *Id.*

#### B.     Rule 14: Severance

Rule 14 governs the severance of both defendants and charges.  *Id*. at 845.  Even where joinder is proper under Rule 8(a), the court may order separate trials of counts or provide other

relief that justice requires if joinder "appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a). The court's power to order severance "rests within the broad discretion of the District Court as an aspect of its inherent right and duty to manage its own calendar." *United States v. Gay*, 567 F.2d 916, 919 (9th Cir. 1978). The court's denial of a motion to sever is reviewed for abuse of discretion. *Prigge*, 830 F.3d at 1098.

The defendant seeking severance bears the burden of showing undue prejudice of such a magnitude that, without severance, he will be denied a fair trial. *See United States v. Jenkins*, 633 F.3d 788, 807 (9th Cir. 2011). Prejudice may arise where: (a) the jury could confuse and cumulate the evidence of one charge to another; (b) the defendant could be confounded in presenting his defenses (*i.e.*, where a defendant wishes to testify in his own defense on one count but not another); and (c) the jury could erroneously conclude the defendant is guilty on one charge and therefore convict him on another based on his criminal disposition. *United States v. Johnson*, 820 F.2d 1065, 1070 (9th Cir. 1987). However, if there is a risk of prejudice, the trial court can neutralize the risk with appropriate jury instructions, and "juries are presumed to follow their instructions." *See, e.g.*, *Zafiro v. United States*, 506 U.S. 534, 540 (1993); *Vasquez-Velasco*, 15 F.3d at 847 (collecting cases regarding jury instructions concerning compartmentalizing evidence and spillover prejudice); *United States v. Patterson*, 819 F.2d 1495, 1503 (9th Cir.1987) (severance is unnecessary when the trial court carefully instructs the jury "because the prejudicial effects of the evidence of co-defendants are neutralized").

Rule 14 does not require severance even if prejudice is shown; rather, the rule leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion. *Zafiro*, 506 U.S. at 538–39. The Ninth Circuit has explained that Rule 14 sets a high standard for showing prejudice "because some prejudice is inherent in any joinder of defendants, if only 'some' prejudice is all that need be shown, few, if any, multiple defendant trials could be held." *United States v. Vaccaro*, 816 F.2d 443, 448 (9th Cir. 1987), *abrogated on other grounds by Huddleston v. United States*, 485 U.S. 681 (1988). The test for determining abuse of discretion in denying severance under Rule 14 is "whether a joint trial was so manifestly prejudicial as to require the trial judge to exercise

his discretion in but one way, by ordering a separate trial." *Jenkins*, 633 F.3d at 807 (citing *United States v. Decoud*, 456 F.3d 996, 1008 (9th Cir. 2006)).

Notably, the Ninth Circuit had acknowledged that a joint trial is "particularly appropriate" when defendants are charged with conspiracy. *Id.* (citing *Zafiro*, 506 U.S. at 536–37). This is so " 'because the concern for judicial efficiency is less likely to be outweighed by possible prejudice to the defendants when much of the evidence would be admissible against each of them in separate trials'." *United States v. Boyd*, 78 F. Supp. 3d 1207, 1212 (N.D. Cal. 2015) (quoting *United States v. Fernandez*, 388 F.3d 1199, 1242 (9th Cir. 2004)).

### C. The *Bruton* Rule

In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held that a defendant's Sixth Amendment right to confront and cross-examine witnesses is violated when a facially incriminating confession of a non-testifying co-Defendant is introduced at a joint trial, even if the jury is instructed to consider the confession only against the co-defendant. To violate the Confrontation Clause, the co-defendant's confession must directly incriminate the objecting defendant. *Id*. at 126. However, the Supreme Court later held that "the Confrontation Clause is not violated by the admission of a non-testifying co-defendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). In *Richardson*, the Supreme Court declined to extend the *Bruton* doctrine to "confessions incriminating by connection."" *Id*. at 209.

A properly redacted confession of a co-defendant does not violate the Confrontation Clause if the confession does not refer to the defendant. *Mason v. Yarborough*, 447 F.3d 693, 695–96 (9th Cir. 2006). However, the redacted confession may not reference the co-defendant by implication, for example, by replacing a name with an obvious blank space or symbol or word such as "deleted." *Gray v. Maryland*, 523 U.S. 185, 196–97 (1998).

In *United States v. Parks*, 285 F.3d 1133 (9th Cir. 2002), the Ninth Circuit held that the trial court erred in admitting an improperly redacted confession which included the term "they" in various places from which the jury could infer the existence of a third accomplice. Parks and co-

defendant Williams were tried and convicted of bank robbery committed by three individuals. Co-defendant Williams gave a statement to the FBI which was admitted in redacted form at trial. Williams confessed to the robbery and stated Parks was the individual who collected the money inside the bank. Although all portions of the statement in which Williams made any reference to Parks or the two of them acting together were redacted, two sentences contained the word "they," indicating at least two other individuals were involved other than Williams. The Ninth Circuit found that the jury would naturally conclude that Parks was the name redacted from the confession. "The combination of an obviously redacted statement with the language implying the existence of a third person reasonably could leave the jury to conclude that the unnamed third person must be the co-defendant before them." *Id.* at 1139. The court held that admission of Williams' redacted statement was error. However, after an exhaustive review of the record it determined that the error was harmless beyond a reasonable doubt because there was substantial evidence of Parks' guilt. *Id.* at 1139–40.

### D. Antagonistic Defenses

Antagonistic defenses, "or the desire of one defendant to exculpate himself by inculpating a co-defendant," is not sufficient to require severance. *United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th Cir. 1996) (citing *United States v. Sherlock*, 962 F.2d 1349, 1363 (9th Cir. 1992)). A defendant will only be entitled to severance based on mutually antagonistic defenses if "the core of the co-defendant's defense is so irreconcilable with the core of his own defense that the acceptance of the co-defendant's theory by the jury precludes acquittal of the defendant." *United States v. Cruz*, 127 F.3d 791, 799 (9th Cir. 1997) (quoting *Throckmorton*, 87 F.3d at 1072; *see also United States v. Tootick*, 952 F.2d 1078, 1081 (9th Cir. 1991) (mutually exclusive defenses said to exist when acquittal of one co-defendant would necessarily call for the conviction of the other); *United States v. Hernandez*, 952 F.2d 1110, 1116 (9th Cir. 1991) (to obtain severance on basis of antagonistic defenses, defendant must show that acceptance of one party's defense will preclude acquittal of the other party). The district court may also "reduce any potential confusion between the defendants by instructing the jury that it should evaluate the evidence against each

defendant separately and that the verdict as to one defendant should not control the verdicts of the others." *Id.* at 800 (citing *Zafiro*, 506 U.S. at 540–41).

### E. Severance for Favorable Testimony from Co-Defendants

A defendant who moves for severance to obtain favorable testimony from a co-defendant must show the following: (1) he would call the co-defendant at the severed trial; (2) that the co-defendant would in fact testify; and (3) that the testimony would be favorable to him. *United States v. Jenkins*, 785 F.2d 1387, 1393–94 (9th Cir. 1986) (citing *United States v. Seifert*, 648 F.2d 557, 563 (9th Cir. 1980)); *see also United States v. Mayo*, 646 F.2d 369, 374 (9th Cir. 1981). The district court then must consider "the weight and credibility of the proposed testimony and the economy of severance." *United States v. Castro*, 887 F.2d 988, 998 (9th Cir. 1989). It is insufficient to state that a co-defendant "likely" would offer exculpatory testimony at a separate trial. *Id.* Additionally, it is well settled that "a defendant has no absolute right to elicit testimony from any witness, co-defendant or not, whom he may desire." *Gay*, 567 F.2d at 919; *United States v. Roberts*, 503 F.2d 598, 600 (9th Cir. 1974). Any witness may invoke his Fifth Amendment privilege against self-incrimination and refuse to testify. *Gay*, 567 F.2d at 919.

### F. Severance for Judicial Economy

A number of circuit courts of appeal, including the Ninth Circuit, have recognized that the district court has broad discretion to organize the size of its cases in the interest of judicial economy and case management. *See, e.g.*, *United States v. Kennedy*, 564 F.2d 1329, 1334 (9th Cir. 1997); *United States v. Casamento*, 887 F.2d 1141, 1151–53 (2nd Cir. 1989); *United States v. Moya-Gomez*, 860 F.2d 706, 754 (7th Cir. 1988). Many district courts have recognized the court's inherent authority to manage its case load and to sever in the interest of efficient administration of justice and judicial economy. *See, e.g.*, *United States v. Mancuso*, 130 F.R.D. 128 (D. Nev. 1990); *United States v. Gallo*, 668 F. Supp. 736, 754–58 (E.D.N.Y. 1987), *aff'd* 863 F.2d 185 (2nd Cir. 1988), *cert. denied*, 489 U.S. 1083 (1989).

In *Mancuso*, 130 F.R.D. 128, Judge Reed recognized the general rule that defendants jointly indicted should ordinarily be tried together, and that co-conspirators in a conspiracy case should ordinarily be tried together. *Id.* at 130–31. However, his decision thoughtfully reviewed

and considered the difficulties of a joint trial in a complex multi-defendant case. The decision pointed out that a complex multi-defendant case is "fraught with problems." *Id.* at 131. He recognized that a single trial of a complex multi-defendant case imposes enormous burdens on the defendants, defense counsel, prosecutors, jurors, the court, and the judge. *Id.* Dozens of people are required to be in court every day. *Id.* Therefore, the absence of any one person may bring the entire trial to a screeching halt. *Id.* Complex multi-defendant cases involve reconciling the individual calendars of the prosecutors and each defense attorney with the court's docket. *Id.* Attorneys carrying a full case load have conflicts with other trials, and the longer the case lingers, the more pronounced these conflicts become. *Id.* Judge Reed noted that a lengthy trial of multiple defendants creates a unique hardship on each party involved. Jurors spend months away from their daily lives, defendants are required to endure months of pretrial incarceration before their case is finally adjudicated, and often significant amounts of time-consuming evidence are presented which are unrelated to a particular defendant. *Id.* Attorneys are unable to spend significant time on their remaining cases. *Id.* The court is forced to expend an exorbitant amount of time on a single case, and other litigants must "queue up for the remaining courtrooms." *Id.* The result is a strain on the court's docket and unconscionable delays of all other cases. *Id.*

*Mancuso* also recognized the personal strain on the trial judge in a long complex case. The trial court is required to make rulings as issues come up which often require frequent adjournments necessitated by unavoidable problems associated with multiple jurors, multiple defendants, and their counsel as well as the witnesses and courtroom personnel who are required to be present at all times. *Id.*

## II.     Analysis & Decision

The court's case management order set an early deadline for filing motions to sever because, at the case management conference conducted on April 22, 2016, counsel for Dave Bundy stated he would be filing a motion to sever on behalf of his client. An early deadline was set so that the court could evaluate if there was some consensus among the defendants concerning severance. There was not. In their motions to sever, the defendants argued that the deadline for filing motions to sever was premature because voluminous discovery had been produced by the

government shortly before the deadline for filing the motions. Virtually all of the defendants' motions to sever indicated they needed time to review the discovery to provide more specific support for their request to sever. Almost all of the defendants asked for leave to supplement their motions to sever after an adequate time to review discovery. As a result, the court held off deciding the motions to sever the defendants filed.

On November 13, 2016, the government filed what it called a "supplement" to its responses to defendants' motions to sever, and its own motion to sever the defendants into three tiers for trial. *See* ECF No. 971. The government's supplement and motion to sever was filed shortly after the acquittal of the defendants who were also charged in the Oregon prosecution. It is clear to the court this is no coincidence. Clearly, the government expected a different result. Clearly, the government believed that a different outcome of some or all of the Oregon defendants' case would prompt non-trial dispositions in this case. The government's motion was not timely filed. Payne and counsel for other co-defendants correctly point out that the case management order required the government to comply with the same deadline for filing motions to sever as the defendants. However, virtually all of the defendants stated they were unable to support their motions to sever by the initial deadline because they had not had an adequate opportunity to review the discovery. Virtually all of the defendants asked for leave to supplement their motions to sever after reviewing the government's voluminous discovery. All of the defendants have now had more than six months to review discovery in this case, yet none of the defendants have supplemented their motions with any specific support for severance based on *Bruton* concerns, or antagonistic or mutually exclusive defenses. None of the defendants have met their burden of establishing that they would call a co-defendant in a severed trial, that a co-defendant would in fact testify, and that co-defendant's testimony would be favorable.

The defendants are also correct that the government has changed its position regarding severance. In opposing the defendants' motions to sever, the government argued that all 19 defendants were appropriately joined for trial and had not shown that a joint trial would be manifestly prejudicial. The government's responses to the various defense motions argued that this was a conspiracy case, and therefore a paradigm case for a joint trial. The government's

responses also argued that the defendants had not met their burden of establishing that any *Bruton* issues, mutually exclusive defenses, or antagonistic defenses precluded a joint trial. Similarly, the government argued that none of the defendants had met their burden of establishing that any co-defendant would testify in a severed trial. The government now argues that joinder of all of the defendants was and is still appropriate and has resulted in efficiently getting this case ready for trial. However, the government now argues that a 17-defendant trial would be too unwieldly. The government asks that the court sever the trial into three groups in the interests of judicial economy and efficient case management. The three tiers suggested correspond to what the government believes the individual defendants' roles in the offenses charged in the indictment were. The three groups are: Tier 1 – Cliven Bundy, Ryan Bundy, Ammon Bundy, Peter Santilli, and Ryan Payne; Tier 2 – Dave Bundy, Mel Bundy, Joseph O'Shaughnessy, Brian Cavalier, Jason Woods, and Micah McGuire; and Tier 3 – Richard Lovelien, Todd Engel, Gregory Burleson, Eric Parker, O. Scott Drexler, and Steven Stewart.

The defendants have also changed their positions with respect to severance. The majority of the defendants filed motions to sever requesting individual trials. Ammon Bundy and Ryan Bundy argued that all of the Bundy brothers should be tried together. Mel Bundy initially indicated he was not willing to be tried with his other brothers. Now that the government is seeking a severance of this case into three separate trials, the majority of the defendants now want a joint trial. Because the court has already indicated that severance will be ordered, the majority of the defendants want to be tried first. A number of defendants who had previously asked to be severed and tried individually now take the position that being tried on February 6, 2017, outweighs their desire to be severed. Those defendants are Eric Parker, Richard Lovelien, Steven Stewart, Joseph O'Shaughnessy, Micah McGuire, and Jason Woods. Some of the defendants are amenable to going to trial with any group of co-defendants as long as they are in the first group set for trial.

In light of the court's indication that the trial would be severed, Ammon and Ryan Bundy requested in their supplements that they be moved to a later group for trial because they have recently returned from defending themselves in Oregon. Brothers Mel Bundy and Dave Bundy want to go to trial first.

Cliven Bundy initially asked the court to sever his case from the trial of all of his co-defendants. His response to the government's motion to supplement now states the opposite. He now seeks a joint trial. His response to the government's proposal argues it is the responsibility of the court to ensure a venue for a joint trial of all 17 defendants. He asks the court to prove it is not logistically possible to try all 17 defendants in a joint trial. However, if the court is not going to hold a joint trial, he asks that he be severed and tried last. During oral argument on December 9, 2016, counsel for Bundy stated that he was requesting to go last if any severance was ordered because he expects the defendants will be acquitted and he did not want his co-defendants and their families and loved ones to undergo the hardship of waiting for trial.

During oral argument on December 9, 2016, counsel for the government argued that the government's proposal was the most logical, would result in judicial economy, and conserve resources. The court inquired of counsel for the government why it would be fair to make the defendants in its proposed Tier 3 wait the longest for trial when these were the individuals the government regarded as least culpable. Counsel for the government responded that the sequence of the trial suggested would, in counsel's view, be most logical and conserve resources because trying the Tier 1 leaders and organizers first would give the court an overview of the entire case. Additionally, trying the Tier 1 defendants first would likely resolve a number of legal issues that could be applied to the defendants awaiting trial. The court inquired whether it made more sense to try the Tier 3 defendants first as the evidence in that case would be narrower than the evidence introduced in the trial of the Tier 1 and Tier 2 defendants. The government responded that it was not "wed" to the sequence of the trials. However, government counsel believed trying the Tier 1 defendants first would be most efficient and conserve the most resources.

The court also inquired whether two trials, rather than three trials, would be more efficient. The government responded that it would, of course, try the case in the manner in which the court determined the case should be severed. However, the government believed that a joint trial of the Tier 1 and Tier 2 defendants would be cumbersome and involve a large number of limiting instructions that the jury might find confusing.

The court will order severance in the interests of judicial economy and efficient case management.  The court finds that three trials in the groupings proposed by the government is the most logical and will result in the most efficient manner of trying the 17 defendants awaiting trial in this case.  However, the court disagrees with the government that it would be less fair to try the least culpable defendants first.  The court will order that the Tier 3 defendants be tried first.  These are the defendants the government contends are the least culpable of the 3 groups of defendants.  In the absence of any compelling reasons for trying Tier 1 or Tier 2 defendants earlier, it seems more fair to try the Tier 3 defendants first.  The trial of the Tier 3 defendants will likely be a shorter trial than the trial of either the Tier 1 or Tier 2 defendants.  These defendants are primarily involved with the events on April 12, 2014.  They are not alleged to be involved in the broader overall conspiracy, or events before or after April 12, 2014.  Trial of the Tier 3 defendants will focus on their individual positions and involvement in the events on April 12, 2014.  Evidence of the involvement and actions of those the government alleges are the leaders and organizers of the conspiracy can be presented in more summary fashion in a trial of the Tier 3 defendants.

## CONCLUSION

Having reviewed and considered all of the moving and responsive papers in connection with the severance issue, the court agrees that the most logical, efficient, and manageable way to try this case is to separate the defendants into three groups corresponding to their alleged roles in the offenses charged in the superseding indictment.

**IT IS ORDERED** that:

1. The trial of the 17 defendants awaiting trial shall be severed into three groups for three separate trials consisting of:

    a. Tier 1: Cliven Bundy, Ryan Bundy, Ammon Bundy, Peter Santilli, and Ryan Payne;

    b. Tier 2: Dave Bundy, Mel Bundy, Joseph O'Shaughnessy, Brian Cavalier, Jason Woods, and Micah McGuire; and

    c. Tier 3: Richard Lovelien, Todd Engel, Gregory Burleson, Eric Parker, O. Scott Drexler, and Steven Stewart.

2. The Tier 3 defendants will proceed to trial February 6, 2017.

3. The Tier 1 defendants will proceed to trial 30 days after the conclusion of the trial of the Tier 3 defendants.

4. The Tier 2 defendants will proceed to trial 30 days after the conclusion of the trial of the Tier 1 defendants.

5. All pending severance motions, responses, replies, supplements and joinders are terminated.

6. Any specific request for relief not addressed in this order is denied.

DATED this 12th day of December, 2016.


_____
PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE