# Exhibit 5

RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
BRENDA WEKSLER
State Bar No. 8124
Assistant Federal Public Defender
RYAN NORWOOD
Assistant Federal Public Defender
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577/Phone
(702) 388-6261/Fax
Brenda_Weksler@fd.org

Attorneys for Ryan W. Payne

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>RYAN W. PAYNE,<br><br>        Defendant. | Case No. 2:16-cr-046-GMN-PAL<br><br>**DEFENDANT RYAN W. PAYNE'S MOTION FOR APPOINTMENT OF A SPECIAL MASTER TO OVERSEE DISCOVERY** |

**Certification**: This motion is timely filed.

Defendant Ryan W. Payne, by and through his counsel of record, Assistant Federal Public Defenders Brenda Weksler and Ryan Norwood, hereby moves for appointment of a special master to oversee discovery between the parties. This motion is based on the Points and Authorities attached hereto.

DATED this 12th day of July, 2017.

                                      RENE L. VALLADARES
                                      Federal Public Defender

                                      By: */s/ Brenda Weksler*
                                      BRENDA WEKSLER
                                      Assistant Federal Public Defender


                                      By: */s/ Ryan Norwood*
                                      RYAN NORWOOD
                                      Assistant Federal Public Defender

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. STATEMENT OF FACTS

On October 12, 2016, Payne filed a motion requesting an order from this Court regarding discovery matters. ECF No. 862. At that point, Payne argued the Court's previous order on matters of discovery (ECF No. 321) addressed issues respecting Phases I and II[1] of discovery, but was silent regarding Phase III discovery and other discovery-related matters (such as summaries the government sought to rely upon; Federal Rule of Evidence 404(b) material; *Brady*, *Giglio*, and *Henthorne* material; and co-defendant statements that could implicate *Bruton* issues). ECF No. 862. Payne also requested (1) a deadline for the government to disclose all discovery it intended to rely upon so the defense could properly prepare for trial, and (2) that the Court determine what consequences there would be for failure to comply.

This request was referred to the magistrate judge, who, on November 22, 2016, issued an order explaining it would "set deadlines for certain discovery, expert disclosures and notices of defense to facilitate the timely and orderly preparation of this case for trial . . . applicable to the defendants the court determines will proceed to trial on February 6, 2017." ECF No. 1017 at 6-8. The Court ordered the government to disclose all Federal Rule of Criminal Procedure 16(a) material no later than December 5, 2016, and all *Henthorne* material no later than January 6, 2017. ECF No. 1017 at 7-8.

---

[1] Phase I and Phase II discovery included:
- all search warrants, applications and affidavits relating to the search and seizure of documents, property, or things belonging to the defendants (Phase I);
- all statements, documents, and objects, including audio or video recordings, required to be disclosed under Federal Rules of Criminal Procedure 16(a)(1)(A)-(B) and (D) (Phase I); and
- all documents, property, or things required to be disclosed under Federal Rule of Criminal Procedure 16(a)(1)(E) (Phase II).

3

The magistrate judge also explained it would "enter a scheduling order applicable to the remaining defendants once severance has been decided and the date(s) for any subsequent trial set." ECF No. 1017 at 6. To date, no such scheduling order has been issued with regards to Groups 2 and 3. Payne recognizes there is no "set" trial date for Groups 2 and 3, making the magistrate judge's task hard to accomplish. Nevertheless, the problem raised back in October of 2016 still remains: there is no deadline issued by the Court regarding disclosure of evidence or repercussions for failure to meet those deadlines.

This concern is heightened by the fact that evidence falling within the magistrate judge's November 2016 deadlines for Group 1, which should have been turned over no later than December 5, 2016 (or January 6, 2017, in the case of *Henthorne* material), was turned over after the deadline—and, in some cases, after the completion of the first trial. Worse, some evidence is still to be disclosed. The history behind this case requires this Court to take a closer look at discovery matters. The nature of the discovery that was disclosed late, the fact that evidence has come to light that should have been disclosed pursuant to previous orders, the fact that there are discovery requests that are still outstanding—all these factors weigh in favor of appointing a special discovery master to (1) ensure government compliance with its disclosure obligations and (2) set firm deadlines for disclosure with attendant consequences for failure to abide by such deadlines.

A.   **Late Disclosures**

The Threat Assessment Report and the Operational Component Plan were not disclosed until May 25, 2017, after the verdict in the first trial.[2] These reports contain key evidence that could have been used to cross-examine several witnesses.

---

[2]This Report is contained in the batch of discovery labeled as GB 02193-22542.

4

### 1. Operational Component Plan

The Operational Component Plan describes the function of those in the "First Amendment Team" as being "responsible for collecting, updating, and disseminating information/intelligence gathered during the operation." These individuals are also described as being "responsible for conducting plain clothes investigations/operations in designated demonstration areas."

The testimony at trial has consistently been that the "First Amendment Areas" were in place simply to provide a safe space for individuals to protest that would not interfere with the impoundment operation. This testimony is consistent with the Threat Assessment Plan, but not with the Operational Component Plan. These reports reveal there was another purpose assigned to those areas and those manning them. This fact was not disclosed and there was no cross-examination on this issue at the first trial.

### 2. Threat Assessment Plan

This report clearly states that the BLM believed Cliven Bundy's threats to "do whatever it takes" appeared to be "more reactive than proactive" and that he was "not likely planning any preemptive strike against [their] operation." The report contradicts the government's narrative that the incident at the wash was pre-meditated and that the Bundy family had actively recruited individuals to aid in that plan. There was no opportunity to confront witnesses with this information at the first trial.

Group 1's defense was that it was the actions of BLM and the intimidating atmosphere BLM had created that drew people to Bunkerville and that there was no pre-planned conspiracy to assault federal officers. The Threat Assessment Plan shows BLM's own intelligence supported this position. And this report also makes clear that the Bundy residence was being surveilled 24/7 by means of a covert LP/OP Team. These teams were equipped with spotting scopes, night vision goggles, thermal imaging devices, and rifles at all times. This is precisely the type of information that was being disseminated throughout Bunkerville that contributed to

the enormous response from individuals. Yet, the defense at the first trial was not able to point out this evidence of intimidation to the jury.

The above information is clearly discovery covered by this Court's November 22, 2016, order as it clearly falls within Rule 16(a)(1)(E): the government relied on the threat assessment during its case in chief and it is material to preparing a defense. Yet, this document was not turned over until May 25, 2017, well past the December 5, 2016 deadline and, worse, after the completion of the first trial.

**B.    No *Henthorne* Disclosure for "Charles Johnson"**

As this Court is aware, "Charles Johnson" was arrested while posing as a reporter in Glendale, Colorado. The facts surrounding that arrest and investigation are detailed in a Motion to Dismiss for *Brady*, *Henthorne* and *Giglio* violations filed by defendants Drexler, Stewart, and Parker. *See* ECF No. 2087. The government specifically requested that the defense not be told "Charles Johnson's" real name and that no questions regarding past investigations be asked of him during cross-examination. Interestingly, the government never revealed all of the information that has since come to light about "Charles Johnson"—information that the defense could have used for impeachment during the first trial and that was due December 5, 2016.[3] The government represented it will make its position on this matter known when it responds to current litigation involving this issue.

**C.    Other Matters Involving Requested Discovery**

On May 30, 2017, Payne requested the 302s regarding Brandon Rappolla[4], an individual present at Bunkerville who has appeared prominently in documentaries regarding this case as well as the Oregon case. On July 5, 2017, Payne followed up on this request and also requested

---

[3] It is not clear whether the government has submitted this information for in camera review or whether the Court made any decisions regarding whether it fell within *Henthorne* as there is nothing on the docket indicating such review.

[4] Payne has confirmed federal agents have spoken to him on more than one occasion.

information on phone calls and conversations among key players in the Bunkerville operation that took place on April 11 and 12, 2014 (discussing factors that led to the shutting down of the operation); additional threat assessments prepared by the FBI or BLM throughout the operation; and Burleson's history of cooperation with the federal government. The government responded that it would disclose the requested information should it fall under categories requiring disclosure.

It appears the government's position is that it does not have a duty to disclose information involving individuals it does not plan on calling during its case in chief (as such information does not fall under *Jencks*), so long as the government deems it not to fall within *Brady*. The problem is that the government has shown its approach to *Brady/Giglio* is not as inclusive as it should be. The government erroneously believes interviews about Dan Love's ethics and credibility (of individuals who were working under his command and were witnesses during the first trial) does not qualify as *Brady/Giglio*. And the government failed to disclose the Threat Assessment and Operational Component Plans (material that falls within FRCP 16(a)) and other *Brady/Giglio* material until after the first trial. The government will likely assert that information underlying "Charles Johnson's" arrest is not *Henthorne* and need not be disclosed under any other doctrine. As a result, the defense is left in the dark time and time again and becomes aware of information not through the government, but through news outlets, which reported on the OIG Report regarding Dan Love and on "Charles Johnson" arrest. It is for all these reasons that a special discovery mater is being requested.

II.     ARGUMENT

        A.      This Court has Inherent Authority to Appoint a Special Master.

Although the Federal Rules of Criminal Procedure do not expressly authorize the appointment of special masters in criminal cases, the Ninth Circuit has held the Rules give district courts substantial "discretion" to manage their dockets. *United States v. Hernandez*, 251 F.3d 1247, 1251 (9th Cir. 2001). Under Federal Rule of Criminal Procedure 57(b), a "judge

7

may regulate practice in any manner consistent with federal law, these rules, and the local rules of the district." This rule recognizes "[c]ourts have (at least in the absence of legislation to the contrary) inherent power to provide themselves with appropriate instruments required for the performance of their duties." *United States v. Ray*, 375 F.3d 980, 993 (9th Cir. 2004) (quoting *In re Peterson*, 253 U.S. 300, 312 (1920)).

The Ninth Circuit has construed this "inherent power" liberally:

> It is recognized that wide latitude is reposed in the district court to carry out successfully its mandate to effectuate, as far as possible, the speedy and orderly administration of justice. A federal court has the responsibility to supervise the administration of criminal justice in order to ensure fundamental fairness. It would be ill-advised to limit improvidently this inherent power for fear of misuse. The firing point of the legal system is with the trial judge who is best situated to administer the law and protect the rights of all.

*United States v. Richter*, 488 F.2d 170, 173-74 (9th Cir. 1973) (internal quotation marks omitted).

Included within this inherent power is the authority to appoint special masters. *See Ruiz v. Estelle*, 679 F.2d 1115, 1161 n.240 (5th Cir. 1982) ("[T]here has always existed in the federal courts an inherent authority to appoint masters as a natural concomitant of their judicial power." (internal quotation marks omitted)), *amended in part and vacated in part on other grounds*, 688 F.2d 266 (5th Cir. 1982); *First Iowa Hydro Elec. Co-Op. v. Iowa-Ill. Gas & Elec. Co.*, 245 F.2d 613, 627 (8th Cir. 1957) ("[T]he Court may, in its discretion, make appointment of a Master to assist in any of the incidents of a proceeding before it, whether civil or criminal, so long as there is no infringement upon the right of trial by jury or any prejudice to other substantive right."); *Powell v. Ward*, 487 F. Supp. 917, 935 (S.D.N.Y. 1980) (ordering appointment of special master and observing "[c]ourts have inherent authority to appoint nonjudicial officers to aid in carrying out their judicial functions"), *aff'd as modified*, 643 F.2d 924 (2d Cir. 1981) (per curiam); *United States v. Black*, No. 2:16-cr-20032-JAR, ECF No. 146 at 2 n.2 (D. Kan. Oct.

11, 2016) (pointing to "inherent power" and holding "[i]t is clear a court may appoint a Special Master in a criminal case").

Without discussing the source of such authority, several circuits have recognized district courts have the power to appoint special masters in criminal cases. *See, e.g.*, *In re Grand Jury Subpoenas*, 454 F.3d 511, 524 (6th Cir. 2006) ("mandat[ing] that the district court employ a Special Master" to assist in privilege review of documents subject to a grand jury subpoena); *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1068 (D.C. Cir. 1998) (describing issue on appeal as whether a show-cause hearing below should take the form of "a full-scale adversarial evidentiary proceeding or . . . an *in camera* inquiry by the trial judge and/or any special master or counsel it might appoint to assist the court in the task"); *see also United States v. Stewart*, 2002 WL 1300059, at *10 (S.D.N.Y. June 11, 2002) (appointing special master in a criminal case); *United States v. Abbell*, 914 F. Supp. 519, 520 (S.D. Fla. 1995) (same); *United States v. Hunter*, 13 F. Supp. 2d 574, 583 n.2 (D. Vt. 1998) ("It may be preferable for the screening of potentially privileged records to be left not to a prosecutor behind a 'Chinese Wall,' but to a special master or the magistrate judge.").

The Ninth Circuit, too, has approved the district court's appointment of a special master to handle discovery in a criminal case. *See United States v. Griffin*, 440 F.3d 1138, 1140-41, 45 (9th Cir. 2006). Accordingly, this Court has inherent authority to appoint a special master to resolve recurring discovery disputes between the government and the co-defendants in this case.

**B. District Courts Appoint Special Masters to Assist with Discovery Disputes in Criminal Cases.**

Because the Federal Rules of Criminal Procedure do not expressly provide for special masters, the circumstances that justify their appointment in a criminal case are not clearly defined. The Federal Rules of Civil Procedure, which do contemplate a role for special masters, are instructive, however. *See United States v. Loera*, 182 F. Supp. 3d 1173, 1201 (D.N.M.

9

2016) ("While the civil rules are not expressly applicable to criminal cases, the courts have used the principles somewhat interchangeably."); *United States v. Rollins*, 607 F.3d 500, 502 (7th Cir. 2010) (explaining that although criminal rules, unlike civil rules, do not expressly provide for motions to reconsider, the Supreme Court has "concluded that motions to reconsider in criminal prosecutions are proper and will be treated just like motions in civil suits").

Under Federal Rule of Civil Procedure 53, district courts may appoint a special master to "address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. P. 53(a)(1)(C). "Although the rule does not specify the meaning of 'effectively' or 'timely,' past practices provide a useful guide." 9C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 2602.1 (3d ed., April 2017 Update). For example, "[t]he functions of a pretrial master may include discovery related matters that under normal circumstances could be addressed by a judge." *Id.*

Courts rely on special masters to manage discovery in two circumstances relevant to this case.

<u>First</u>, "the appointment of a master may be necessary at times to resolve protracted disagreements between counsel and to alleviate the burdens on the district judge." *Id.* The master's involvement may help solve "problems associated with compliance with the district court order[s]." *United States v. Suquamish Indian Tribe*, 901 F.2d 772, 775 (9th Cir. 1990). For example, one of the parties in *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81 (D.N.J. 2006), had "ignored a prior Court Order" and exhibited "recalcitrance in complying with [other] Court Orders." 239 F.R.D. at 112. The district court therefore found "the need is clear for help in the form of a separate Special Master to monitor discovery compliance to ensure that *all* documents ordered to be produced have been produced and that *all* of the Court's discovery Orders have been complied with." *Id.* (emphasis in original). Similarly, the district court in *Multiven, Inc. v. Cisco Systems, Inc.*, 2010 WL 2813618 (N.D. Cal. July 9, 2010), appointed a special master

10

1      "[i]n light of the past failures of the parties to resolve discovery issues amicably." 2010 WL 2813618, at *3. The parties had "already resorted to th[e] Court to resolve a number of discovery disputes," and the court was therefore "pessimistic about the parties' ability to resolve further discovery issues without some sort of judicial intervention." *Id.* at *2.

     Other courts have appointed special masters to oversee discovery under similar circumstances. *See, e.g., ASIS Internet Servs. v. Active Response Grp.*, 2008 WL 2129417, at *5-6 (N.D. Cal. May 20, 2008) (appointing special master because "the parties have not shown a willingness or ability to solve such [discovery] problems cooperatively"); *Moreland v. State Farm Mut. Auto. Ins. Co.*, 2007 WL 1033453, at *3-4 (D. Colo. Apr. 3, 2007) (finding "compelling" need to appoint special master where each party accused the other of "obstructionist behavior and tactics during depositions" and "counsel for both parties . . . created an environment during depositions which . . . made it difficult to complete depositions in an orderly and timely fashion"); *Harmston v. City & Cty. of S.F.*, 2007 WL 3306526, at *9 (N.D. Cal. 2007) (finding "'exceptional conditions' which require the appointment of a special discovery master" because "the pretrial discovery period has not reflected the finest professional hour of either counsel").

     <u>Second</u>, resort to a special master may be appropriate where a case involves "complex issues" and numerous parties. *See* Wright & Miller § 2602.1. The Ninth Circuit, for instance, has "affirmed the use of special masters repeatedly" in cases involving "comprehensive and complex" factual issues, such as disputes over Indian tribes' fishing rights. *United States v. Washington*, 157 F.3d 630, 660 (9th Cir. 1998) (citing *Suquamish Indian Tribe*, 901 F.2d at 775); *see also Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 515-16 (9th Cir. 2013) (reversing "district court's denial of class certification because of manageability concerns" and noting knotty factual issues such as individual damages could be resolved through appointment of special master); *Nat'l Org. for the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 543 (9th Cir. 1987) (noting "complexity of consent judgment warrants appointment of master").

11

1  Likewise, the Second Circuit has affirmed appointment of a special master where "proceedings
2  had become sufficiently complicated with a sufficient number of parties and different motions
3  that it appeared as though it might have to be postponed so as not to interfere with the trial of a
4  criminal matter where the defendant was in custody." *Civil Aeronautics Bd. v. Carefree Travel,*
5  *Inc.*, 513 F.2d 375, 382 (2d Cir. 1975) (footnote omitted).

6  District courts in this Circuit frequently rely on special masters to adjudicate disputes
7  involving voluminous discovery or other complex issues. *See, e.g.*, *Lloyd v. Valley Forge Life*
8  *Ins. Co.*, 2007 WL 906150, at *1 (W.D. Wash. Mar. 23, 2007) (noting that under local rules,
9  "where anticipated discovery is unusually complex, or where it appears that disputes over
10 matters relating to discovery will be numerous, the Court may point a special master pursuant
11 to Fed. R. Civ. P. 53"); *Tatung Co., Ltd. V. Hsu*, 2015 WL 11116906, at *1 (C.D. Cal. Feb. 12,
12 2015) (explaining special master was appointed to handle discovery disputes because case was
13 "exceedingly complex, with over 30 defendants, and an operative complaint of over 200
14 pages"); *Tech. Licensing Corp. v. Thomson, Inc.*, 2010 WL 843560, at *8 (E.D. Cal. 2010)
15 ("Due to the complex and highly technical nature of the '411 and '412 patents, the court
16 believes that appointment of a special master pursuant to Federal Rule of Civil Procedure
17 53 would be helpful and appropriate to assist the court . . ."); *St. Jude Med. S.C., Inc. v. Janssen-*
18 *Cuonotte*, 305 F.R.D. 630, 641-42 (D. Or. 2015) (appointing special master because addressing
19 parties' "specific" discovery objections would "require[] someone to become quite familiar
20 with the underlying technologies, businesses and business affiliations, global markets and
21 marketing strategies, and the specific document retention and ESI practices at issue," which
22 would "require more time than this Court (or a Magistrate Judge in this District) currently has
23 available"); *City of Colton v. Am. Promotional Events, Inc.*, 2011 WL 2222133, at *1 (C.D.
24 Cal. June 7, 2011) (explaining special master "conducted a hearing to resolve certain discovery
25 disputes" between the parties); *Red Rock Commc'ns, Inc. v. Am. Telecasting, Inc.*, 2006 WL
26 2524195, at *1-2 (D. Nev. Aug. 30, 2006) (summarizing proceedings before special master in

case where party requested appointment "to resolve this complex computation of the appropriate setoff to which [it was] entitled").

    C.  **This Court Should Appoint a Special Master to Oversee Discovery in This Case.**

"The discovery system depends absolutely on good faith and common sense from counsel. The courts, sorely pressed by demands to try cases promptly and to rule thoughtfully on potentially case dispositive motions, simply do not have the resources to police closely the operation of the discovery process." *In re Convergent Techs. Sec. Litig.*, 108 F.R.D. 328, 331 (N.D. Cal.1985).

It is clear the government has a very guarded approach towards discovery and that its views of what constitutes *Brady/Giglio* material differs substantially from that of the defense. Whether the government intentionally kept discovery from the defense is not a pre-requisite to the appointment of a special master. *See Mullen*, 828 F.2d at 543 ("There are no judicial decisions requiring a final determination of constitutional violation before an 'exceptional condition' justifying reference to a master can arise under Rule 53(b). . . . Similarly, there is no circuit authority that requires a determination of intentional disregard of court orders before a special master may be appointed under Rule 53(b)."). Were it not for the ease with which information can be uncovered through mass media, the defense would not know that Dan Love was (or is) under investigation for unethical conduct and that he has lied in the course of that investigation. Neither would the defense know about the arrest of a key witness for the government's case—"Charles Johnson." The government has a duty to provide *Brady/Giglio* information. Past conduct demonstrates it has not complied with this duty.

Given the complexity of this case—nineteen defendants and a docket with over 2,100 entries to date—as well as the government's refusal to comply with its discovery obligations, Payne requests appointment of a Special Discovery Master to resolve the current discovery disputes and provide a system through which any additional disputes can be resolved quickly.

III. CONCLUSION

Based on the government's past failures to provide timely discovery and its position regarding what constitutes *Brady/Giglio* material, Payne respectfully requests this Court appoint a Special Discovery Master.

DATED this 12th day of July, 2017

          Respectfully submitted,
          RENE L. VALLADARES
          Federal Public Defender

          By: */s/ Brenda Weksler*
          BRENDA WEKSLER
          Assistant Federal Public Defender

          By: */s/ Ryan Norwood*
          RYAN NORWOOD
          Assistant Federal Public Defender

14

# CERTIFICATE OF ELECTRONIC SERVICE

The undersigned hereby certifies that she is an employee of the Federal Public Defender for the District of Nevada and is a person of such age and discretion as to be competent to serve papers.

That on July 12, 2017, she served an electronic copy of the above and foregoing **DEFENDANT RYAN W. PAYNE'S MOTION FOR APPOINTMENT OF A SPECIAL MASTER TO OVERSEE DISCOVERY** by electronic service (ECF) to the person named below:

>STEVEN W. MYHRE
>Acting United States Attorney
>ERIN M. CREEGAN
>Assistant United States Attorney
>NADIA JANJUA AHMEN
>Assistant United States Attorney
>NICHOLAS DICKINSON
>Assistant United States Attorney
>501 Las Vegas Blvd. South
>Suite 1100
>Las Vegas, NV 89101

>*/s/ Lauren Pullen*
>Employee of the Federal Public Defender