RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
BRENDA WEKSLER
State Bar No. 8124
Assistant Federal Public Defender
RYAN NORWOOD
Assistant Federal Public Defender
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577/Phone
(702) 388-6261/Fax
Brenda_Weksler@fd.org

Attorneys for Ryan W. Payne

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>RYAN W. PAYNE<br><br>　　　　Defendants. | Case No. 2:16-cr-00046-GMN-PAL-4<br><br>**DEFENDANT RYAN PAYNE'S SEALED MOTION TO DISMISS BASED ON DISCOVERY PROVIDED ON NOVEMBER 21, 2017**<br><br>**(Expedited Treatment Requested)** |

**Certification:** This Motion is timely filed.

Defendant Ryan Payne, through his counsel of record, Assistant Federal Public Defenders Brenda Weksler and Ryan Norwood, moves this Court to dismiss the instant case based on discovery that was provided on November 21, 2017. A Memorandum of Points and Authorities is attached.

DATED this 27th day of December, 2017.

           RENE L. VALLADARES
           Federal Public Defender

       By: */s/ Brenda Weksler*
           BRENDA WEKSLER
           Assistant Federal Public Defender

       By: */s/ Ryan Norwood*
           RYAN NORWOOD
           Assistant Federal Public Defender

**MEMORANDUM OF POINTS OF AUTHORITIES**

The government has disclosed additional discovery after the defense filed its Motion to Dismiss on November 20, 2017. ECF 2883. These late disclosures continue to prejudice the defense's ability to properly prepare, investigate and present its case to the jury. This is offered as a supplement to an already long list of untimely disclosures.

I.   **DISCOVERY RECEIVED TUESDAY NOVEMBER 21, 2017**

   1.   **BLM OLES Threat Assessment—Exhibit A[1]**

- The government's position, when turning over this particular report, and while explaining why there was no failure on its part to turn it over previously, is that, ultimately, all of the reports disclosed to the defense are consistent in that they adopt the same position. The defense explained that there is a difference in perspective and findings regarding the type of threat Bundy posed when comparing the FBI Threat Assessments to those of the BLM's. The defense theorizes that, in light of recent revelations that the OIG may have found the BLM dragged its feet in enforcing the court orders to impound cattle, the BLM may have an inherent bias in trying to make Bundy seem more threatening and dangerous than he really is as a way of justifying its lack of action for the previous decade. The defense agrees with the government that this particular defense evolved as a result of information contained in recent disclosures (FBI Joint Terrorism Task Force Memorandum (attached as Exhibit B) and BLM OLES Threat Assessment (Exhibit A p. 1).[2] Nevertheless, that does not excuse the untimely disclosure of the Threat Assessment Reports disclosed during

---

[1] All exhibits referenced in this pleading are filed under seal in ECF No. 2906, pursuant to the Protective Order (ECF No. 609).

[2] The BLM OLES Threat Assessment, believed to have been prepared between 2011 and 2012, ████████████████████████████████████████████████████████████████ Exhibit B p. 3. The government has made very interesting remarks concerning this report. On November 21, 2017, the government stated that, based on information that is being texted to them, this was "not an OIG report, it is a GAO report stating they need to pursue long-term trespassers," and later, "it appears Dan Love misspoke when he said it was an OIG report." On November 22, 2017, the government stated this report "is an urban legend," and described it as a "shiny object" used by the defense. Meanwhile, two different reports refer to this as an *OIG* report or finding. The fact that the government continues to be to so brazen in its proffers is baffling given the less than stellar track record regarding representations over the last two weeks about the existence, location and operation days of the FBI surveillance camera, notations involving surveillance, use of snipers, and the disclosure date of 2014 BLM Threat Assessment to Trial 1 defendants, among other inaccurate proffers.

the last two weeks, including the one in question here, as they constituted *Giglio* material well before this new defense theory arose as explained below.

- The government has relied, time and time again in pleadings and prior trials, on findings that Cliven posed a threat as a means to explain the overwhelming presence of law enforcement in the area. As it pertains to this trial, the government presented its opening statement by relying on this theory and noticed an expert in this regard. *See* ECF 2350. While the government may be correct in stating that it does not need to justify the overwhelming presence of law enforcement in the area (as explained on November 21, 2017), the fact is that the government has chosen to justify it by referring to the threat that Cliven Bundy posed and by eliciting testimony from witnesses in this regard.[3] *Giglio* material is any information that would allow the defense to impeach the government's witnesses by showing bias or interest. *See Giglio v. United States*, 405 U.S. 150 (1972). These additional reports received in the last two weeks fall in this category.

- These reports are particularly material to the cross-examination of BLM SA Rand Stover, who in Trial 1 justified the need for such a large number of law enforcement in the area by pointing to the threat that Cliven and his followers were believed to pose. The need to cross-examine Stover on this particular point is not a novel concept and one the government is well aware of. ███████████████████████████████████████████ *See* Exhibit C. It also cites to several sources to justify that assessment. *Id.* Importantly, the 2014 BLM Threat Assessment does not contain much of the mitigating information contained in the BLM OLES Threat Assessment (believed to have been prepared sometime in either 2011 or 2012, Exhibit A), the 2011 FBI BAU Threat

---

[3] During its opening, the government made it a point to link the need to have law enforcement present to execute the 2013 impoundment orders with Cliven's proclivity for violent behavior by referring to "whatever it takes," WACO, and Gillespie's 2014 visit with Cliven and his concern that there was a potential for violence. During the examination of Ms. Rugwell, the government pointed out the two instances where the 1998 court order refers to anticipation of a physical confrontation on the part of Cliven Bundy. The government also elicited the importance of having METRO involvement and Ms. Rugwell explained that it was due to Cliven's use of the phrase "whatever it takes" and several other things she found in the civil litigation file. When this line of questioning was objected to on relevance grounds, the government explained "there could be nothing more relevant." Ms. Rugwell also made reference to Cliven's mention of WACO and Ruby Ridge as another concerning factor necessitating the involvement of law enforcement. During the examination of Mr. Petrie, the government highlighted the portion of the deposition stating that "whatever it takes" included a physical response, and once again highlighted the portion of the 1998 order stating that "law enforcement support would be particularly important given United States' concern about a confrontation with Bundy in the event of a seizure and impoundment." In addition, the government went over instances involving behavior on the part of Cliven Bundy (e-mail composed by Mr. Petrie) that would tend to support the conclusion that there may be a confrontation in order to support his position and request for an order authorizing the involvement of METRO.

Assessment (Exhibit D), or the 2012 Southern Nevada Counterterrorism Threat Assessment (Exhibit E), all of which were relied upon prior to the preparation of the 2014 BLM Threat Assessment, and all of which were received in the last two weeks.[4] The table below incorporates some of the mitigating information available in those reports, which are absent in the 2014 BLM Threat Assessment, and which constitute impeachment information with regards to BLM SA Stover. This is information that law enforcement in the area should have been provided in order to provide a more complete and accurate picture of the person they were dealing with. Keeping this information from the rest of law enforcement has a direct impact on the way that law enforcement perceived the Bundys and their supporters, and why they would be more likely to interpret the events at the wash on April 12, 2014 as an assault—as opposed to what it was.



| BLM OLES—███ (possibly prepared between 3/15/11 and 3/7/12) (Exhibit A) | FBI BAU—███ (3/15/11) (Exhibit D) | S. NV Counterterrorism—█ ███ (3/7/12) (Exhibit E) |
|---|---|---|
| ███ | ███ --------------------------- 2014 FBI BAU report relies on the 2012 assessment.[5] | ███ |

---

[4] The defense concedes that not everything in the newly disclosed reports is favorable, but the reports do not need to be comprised of entirely favorable information to constitute *Giglio* material. *Bailey v. Rae*, 339 F.3d 1107, 1115 (9th Cir. 2003). Of note, it is not the conclusion that each of these reports arrives to that is important, although there is a significant difference, but the content in them.

[5] As to the 2014 FBI BAU Threat Assessment, which was timely provided by the government, ███

1  • In addition, to the impeachment value these reports have as to BLM SA Stover, the 2011 FBI BAU Threat Assessment explains that Bundy ███████████████ ███████████████████████████████ Yet, we know that the Bundy ████████████████████████ that used snipers, and that the ████████████████████ In essence, the BLM ignored the suggestions made in the FBI BAU report. This is *Brady/Giglio* material as it further supports the defense's theory of the case. It demonstrates that the BLM chose a specific course of action (contrary to that suggested by the FBI BAU) that had a direct link to the militia response. The defense has always claimed that the militia responded to a perceived need to protect the Bundys, and not to an opportunity to mount an armed assault against the government, as charged in the Indictment. This is all information that the defense could have used as part of its opening statement, and was precluded from doing so.

## II. DISCOVERY RECEIVED WEDNESDAY NOVEMBER 22, 2017

### 1. 11/20/17 302 of BLM SA Scott Swanson—Exhibit G

This 302 prepared by FBI Agent ████████████████████████████████████████████████████████████████████████████████████████████████████ His job according to the report was ████████████████████████████████

• This is *Brady* information that the defense did not have prior to this disclosure. This is another instance the defense would rely upon when defending the overt acts charged in the Indictment by explaining the defendants were not falsely stating they were surrounded (as charged in the Indictment). The defense was unable to rely on this information when it did its opening statement to further develop why Payne disseminated information about the Bundys being surrounded.

• While the government may contend that it cannot turn over that which it does not have, given that this report was prepared on November 20, 2017, it is important to remember the government's representations regarding this particular BLM officer on November 8, 2017. During that hearing, when the defense was voicing its concerns about the disclosure of an FBI 302 report the day prior (concerning Delmolino's LPOP

---

████████████████████████████████████████████████████████████████████████████. *See* Exhibit F.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓), the government defended the late disclosure by stating it had already turned over information that should have put the defense on notice that there were LPOP assignments by the Bundy house. The government pointed out that it had gone so far as to have "Agent ▓▓▓▓ testify about his positioning." The defense immediately pointed out that SA ▓▓▓▓ never testified to any such thing. It appears the government was relying on specific information concerning SA ▓▓▓▓ back on November 8, 2017, that was just now disclosed to the defense in the report prepared by FBI SA ▓▓▓▓ Given that this particular 302 was not prepared until November 20, 2017, the defense questions what material the government was relying upon when it made those representations in court on November 8, 2017. It appears there may be other reports concerning SA ▓▓▓▓ that the government has not turned over and that this 302 prepared by FBI SA ▓▓▓▓ incorporates into the November 20, 2017 report.

### 2. 11/20/17 302 of BLM SA Edward Delmolino—Exhibit H

This is a 302 prepared by FBI SA ▓▓▓▓ on November 20, 2017 which expands upon information concerning BLM SA Delmolino turned over to the defense on November 7, 2017 (*see* Exhibit I to sealed Motion ECF 2883). This new FBI 302 indicates that when Delmolino would perform his ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

- The defense was not able to incorporate in its opening statement ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

- This report tends to indicate there is a degree of collusion between the FBI and the BLM that is greater than that which previous reports and representations indicate. The FBI was not there simply to guard against and involve itself in the case of an "AFO"

---

[6] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

1   (Assault of a Federal Officer) (*See* 2014 BLM Operation Plan Exhibit C p. 15). This is clear given the coordination between ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[7]

There have to be logs kept by the FBI indicating who was driving these BLM agents to their LPOP positions. Information that is yet to be turned over.

### III.  OUTSTANDING DISCOVERY

- Dan Love e-mails and related materials as ordered by this Court on November 13, 2017.

- Reports prepared as a result of phone call conversation on April 11, 2017 and April 12, 2017 with D.C., requested in July 2017. *See* Exhibit J.

- Name of individual who prepared the TOC log (Exhibit K to sealed motion 2883) as requested November 13, 2017 and November 14, 2017.

- Reports regarding ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

- Names of individuals who ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and any reports that may have been prepared in connection with FBI activities conducted during the days in question, including training activities.

- Logs and reports kept by the FBI FOB ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

- Name of individual who presented/prepared the power point indicating that a surveillance camera would be part of the operation.

---

[7] The 2014 BLM Threat Assessment Plan indicates ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See* Exhibit C. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ This is a good example of previous references ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ nce between what an Operation Plan or a Threat Assessment Plan might predict will happen in its planning stage and what is actually effectuated as part of the operation. This is why, despite the government's assertions to the contrary, neither the Operation Plan nor the Threat Assessment are conclusive evidence that the BLM undertook certain actions. In any event, the government's understanding of its disclosure obligations is perplexing given (1) the government has a duty to disclose irrespective of what other information the defense may have already been provided and (2) the government's baseline positon that, although it disclosed the Operation Plan or Threat Assessment Plan in May of 2017, it was not obligated to.

- OIG reports/findings ████████████████████████████████████
  ████████████████████ To the extent the government cannot decipher which entity prepared this report or states that no such report exists, the defense requests an evidentiary hearing at which Dan Love and the author of the 2012 BLM OLES report testify in order to probe this issue further. This is something the defense should have been able to do well in advance of trial.

- Information regarding ████████████████████████████████████
  ██████

- Any information ████████████████████████████████████████
  ██████

- Information regarding ██████████████████████████████████
  ████████████████████████████

- Maps referenced by ███████████████████████████████████████
  ████████████████████ in order for the defense to be able to determine each assignment vis a vis the proximity to the Bundy house, the type of activity, and the number and names of officers tasked with this assignment.

- Any reports of interviews ██████████████████████ as the defense believes they contain *Brady/Giglio* material as previously requested by counsel (Exhibit J p.3).

- Reports, names of individuals, dates, and positions of those assigned to ████████ ████████ surrounding Bundy residence.

- Reports, names of individuals, dates, and positions ███████████████████
  ██████████

As previously explained, there appear to be several files containing exculpatory information, including the "investigative file," the "police cooperation file," the "administrative file," and possibly a "JTTF file". The defense requests that this Court appoint a discovery master to ensure the defense is being provided all relevant information or that this Court undertake an in-camera review of all undisclosed files connected to this case.

## IV. CLARIFICATIONS FOR PURPOSES OF THE RECORD

On Monday, November 20, 2017, the government represented to this Court that counsel for Payne had indicated (on Thursday, November 16, 2017) she had previously specifically requested the FBI BAU reports from the government. The government reported it disclosed that particular report over the weekend and continued to maintain the position that the report was not relevant or material to any counts in the Indictment and that this was all information the defense already possessed given the similarity between the reports disclosed over the weekend and those previously disclosed (2014 BLM Threat Assessment and 2014 FBI BAU Threat Assessment).

Counsel for Payne explained that she could not remember exactly what representations she made the previous Thursday, but that she could represent that she had previously requested the FBI threat reports from the government. As it turns out, counsel for Payne never stated she specifically requested the FBI BAU report from the government. *See* Exhibit L, pp. 190-194 certified transcript November 16, 2017). The e-mail sent to the government (attached as Exhibit J) on July 5, 2017, requests "all threat assessments prepared in this case" (which would necessarily include the disclosure of the FBI BAU report) and goes on to mention a specific FBI report the defense believes needs to be disclosed. This same request is referenced in ECF 2159 p. 6 and ECF 2847 p. 12, as indicated by counsel for Payne. *See* Exhibit L, pp. 190-191. For the reasons explained above, the government is incorrect in stating that these reports were not requested. And, as explained below, even if they had not been requested, the government's duty to disclose Brady/Giglio information does not turn on whether the defense makes the specific request. *United States v. Bagley,* 473 U.S. 667, 680–82 (1985).

Their fallback position that they are not relevant is equally unavailing for reasons discussed above.

## V. APPLICABLE LAW

A *Brady* claim of prosecutorial misconduct requires a petitioner to show that the evidence suppressed by the prosecutor satisfies three elements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [government], either willfully or inadvertently; and prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (*quoting Strickler*, 527 U.S. at 281–82).

Prosecutors are constitutionally obligated to disclose "evidence favorable to an accused ... [that] is material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Favorable evidence is not limited to evidence that is exculpatory as it includes that which impeaches a prosecution witness. *Giglio v. United States*, 405 U.S. 150, 154 (1972).

In terms of what qualifies as "material" evidence, *United States v. Olsen* offers some guidance in setting forth the different approach district courts and reviewing courts might undertake in determining materiality. *United States v. Olsen*, 704 F.3d 1172, 1183 n. 3 (9th Cir. 2013). In this vein, *Olsen* cites to trial courts which have concluded that the retrospective definition of materiality is appropriate *only* in the context of appellate review, and that trial prosecutors must disclose favorable information without attempting to predict whether its disclosure might affect the outcome of the trial.[8] *Id.*

---

[8] The Olsen Court favored decisions indicating that, the retrospective definition of materiality is appropriate only in the context of appellate review, and that trial prosecutors must disclose favorable information without attempting to predict whether its disclosure might affect the outcome of the trial. *See Price*, 566 F.3d at 913 n. 14 (noting favorably "the thoughtful analysis set forth by two district courts in this circuit" on the matter and citing *United States v. Acosta*, 357 F.Supp.2d 1228, 1239–40 (D.Nev.2005) ("[T]he 'materiality' standard usually associated with Brady for pretrial discovery purposes ... should not be applied to pretrial discovery of exculpatory materials."), and *United States v. Sudikoff*, 36 F.Supp.2d 1196 (C.D.Cal.1999) (The standard of whether evidence would have changed the outcome "is only appropriate, and thus applicable, in the context of appellate review.... [I]t obviously cannot be applied by a trial court facing a pretrial discovery request.")). *See also United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C.2005) ("The prosecutor cannot be permitted to look at the case pretrial through the end of the telescope an appellate court would use post-trial. Thus, the government must always produce

"[B]ecause the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure." *United States v. Agurs*, 427 U.S. 97, 108 (1976). The mixed significance of evidence does not relieve a prosecutor of the obligation to disclose the evidence. Thus, a prosecutor may not "cherry-pick[] isolated references" in a report or statement in order to characterize it as inculpatory and therefore not subject to *Brady* disclosure. *Bailey v. Rae*, 339 F.3d 1107, 1115 (9th Cir. 2003). "To say that evidence is 'exculpatory' does not mean that it benefits the defense in every regard or that the evidence will result in the defendant's acquittal. Rather, the preliminary inquiry in a *Brady* claim has always been whether the evidence in question is 'favorable' to the accused." *Id.*

The prosecution's duty to reveal favorable, material information extends to information that is *not* in the possession of the individual prosecutor trying the case. *Kyles v. Whitley*, 514 U.S. 419, 441–42 (1995). Interpreting *Kyles*, the Ninth Circuit has observed that "[b]ecause the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned." *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir.1997) (en banc). The duty to disclose this information exists regardless of whether the defense made any request of the prosecution; the prosecution is required to provide material, favorable information even "where the defendant does not make a Brady request." *United States v. Bagley,* 473 U.S. 667, 680–82 (1985).

---

any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed—with the benefit of hindsight—as affecting the outcome of the trial."). *United States v. Olsen*, 704 F.3d 1172, 1183 n. 3 (9th Cir. 2013).

Each of the items disclosed to the defense during the last two weeks constitute a violation of Rule 16, *Brady* or *Giglio*. For reasons this Court is already familiar with, the defense seeks the dismissal of this case.

DATED this 27th day of December, 2017.

<div style="margin-left:3em">

Respectfully submitted,
RENE L. VALLADARES
Federal Public Defender

By: */s/ Brenda Weksler*_____
BRENDA WEKSLER
Assistant Federal Public Defender
Attorney for Ryan Payne

By: */s/ Ryan Norwood*_____
RYAN NORWOOD
Assistant Federal Public Defender
Attorney for Ryan Payne

</div>

**CERTIFICATE OF ELECTRONIC SERVICE**

The undersigned hereby certifies that she is an employee of the Federal Public Defender for the District of Nevada and is a person of such age and discretion as to be competent to serve papers.

That on December 27, 2017, she served an electronic copy of the above and foregoing **DEFENDANT RYAN PAYNE'S SEALED MOTION TO DISMISS BASED ON DISCOVERY PROVIDED ON NOVEMBER 21, 2017 (Expedited Treatment Requested)** by electronic service (e-mail) to the persons named below:

>STEVEN W. MYHRE
>Acting United States Attorney
>ERIN M. CREEGAN
>Assistant United States Attorney
>NADIA JANJUA AHMEN
>Assistant United States Attorney
>DAN SCHIESS
>Assistant United States Attorney
>501 Las Vegas Blvd. South
>Suite 1100
>Las Vegas, NV 89101

>>*/s/ Lauren Conklin*
>>Employee of the Federal Public Defender