# (Sealed) Brief Exhibit No. 21



U.S. Department of Justice

Federal Bureau of Investigation

In Reply, Please Refer to
File No.

Critical Incident Response Group
Behavioral Analysis Unit
FBI Academy
Quantico, VA 22135
April 05, 2012

CLIVEN BUNDY - SUBJECT;
DOMESTIC TERRORISM MATTERS;
BUREAU OF LAND MANAGEMENT,
LAS VEGAS, NEVADA;
03/15/2011;
THREAT ASSESSMENT

The following report was prepared by Supervisory Special Agent (SSA) Angela M. Sercer of the Federal Bureau of Investigation (FBI), Behavioral Analysis Unit 1 (BAU-1), National Center for the Analysis of Violent Crime (NCAVC), Critical Incident Response Group (CIRG), in consultation with SSA Joseph A. Bertoldi and Crime Analyst Janice M. Dylewski, also of BAU-1, and SSA Michelle R. Pluta of the Crisis Negotiation Unit (CNU). This analysis is based upon a review of case materials and other information submitted by SSA Roland D. Swanson II, FBI Las Vegas, Joint Terrorism Task Force.

The observations, opinions, and suggestions contained herein are the result of the knowledge drawn from the personal investigative experience, educational background, specialized training, and research conducted by members of the NCAVC and others. This analysis is not a substitute for a thorough, well-planned investigation, and should not be considered all-inclusive.

The analysis is based upon information available at the time this report was prepared and assumes that the information set forth is valid and complete. Should additional information or case materials become available at a later date, certain aspects of this analysis may be subject to modification or change.

This document is the property of the FBI. It contains information of a confidential and sensitive nature, and is provided exclusively for your investigative assistance. It should not be disseminated except to other criminal justice agencies with a legitimate investigative or prosecutorial interest in this matter. Any other dissemination is governed by federal law (28 CFR 16.21 et seq., pursuant to 5 USC 301), and must be coordinated with the CIRG Chief Division Counsel.

Cliven Bundy

Concerning threat assessments, it is difficult to predict future behavior with any degree of certainty. This threat assessment serves as an investigative and operational tool which may assist in identifying possible areas of risk using probabilistic guides based on research and experience. The assessment does not produce conclusive evidence of violence risk and is not testimonial in nature. No member of the BAU-1 has personally interviewed the subject of this assessment, and no such contact was attempted. The assessment is conducted in order to guide the appropriate allocation of law enforcement resources and the prioritization of investigative tasks. All threats should be taken seriously, and all reasonable measures to minimize the risk of violence should be considered.

A threat assessment is only valid for the period of time assessed. Environmental changes, medical conditions, neurocognitive impairments, medication (or the lack thereof), alcohol consumption, illegal drugs, personal conflicts, psychological disorders, traumatic events, etc., can affect the thought process of an individual. These changes can result in violent acts when none were anticipated and complicate the process of accurately predicting violent behavior.

### Administrative

At the request of the Las Vegas (LV) Division, on 03/06/2012, BAU-1 and CNU participated in a telephonic conference with FBI SSA Roland Swanson, Bureau of Land Management (BLM) SAC Daniel Love, BLM Investigator Erika Schumacher, Las Vegas Metropolitan Police Department (LVMPD) Captain Al Salinas, LVMPD Lieutenant Greg Damarin, and LVMPD Sergeant Andy McDermott. The assessment offered in this document is based on the limited information available at the time of the assessment.

This analysis is based on concerns that Cliven Bundy could potentially pose a concern for risk of violence during a BLM cattle roundup scheduled for April 7, 2012.

It is noted that BLM and LVMPD also expressed concerns that Bundy's immediate family members, their associates, and other states' rights groups with no ties to Bundy, may also pose a concern for risk of violence during the cattle round up. While BAU-1 is generally able to address these areas related to the assessment of Cliven Bundy, BAU-1 does not have enough background information to provide threat assessments on each family member

2

GB.023905

Cliven Bundy

and associate, and is unable to provide broad brush assessments of extremist groups.

## Background

Since the early 1990's, BLM has had ongoing conflicts with rancher Cliven Bundy. These conflicts are related to Bundy's perceived rights to allow his cattle to graze on federally protected land, and refusal to recognize federal officers and their jurisdiction in the matter of his trespassing cattle.

Cliven Bundy and his wife, Carol Bundy, reside on Gold Butte Road in Bunkerville, Nevada, which is situated near federally protected BLM land. Bundy has approximately 8 biological children and 4 step-children, which are Carol Bundy's biological children from a previous relationship. The majority of Bundy's children are adults and have children of their own, with the exception of one 14 year old son who resides with Bundy and his wife.

Bundy reportedly embraces the concepts of the Patriot Movement, but does not claim affiliation with any particular group within the movement. The Patriot Movement is centered on a belief that individual liberties are in jeopardy due to unconstitutional actions taken by federal government officials, to illegally accumulate power and control over U.S. land. As such, Bundy only recognizes state and County Sheriff authorities, and does not recognize federal law or authority.

Based on his beliefs, Bundy has repeatedly stated that he has the right to continue to allow his cattle free range on federal BLM land, since state authorities have not declared the land protected. Bundy has been afforded numerous opportunities to remove his cattle, but persists that he has rights to the land, and refuses to remove them.

Since the 1990s, Cliven Bundy has been involved in civil disputes involving the BLM, related to land rights issues. In 1998, Bundy lost a civil suit, and was ordered to pay financial and punitive sanctions, and to remove his cattle from BLM land. Bundy has continued to file appeals and civil suits regarding the BLM land dispute, and has refused to remove his cattle from the area. He has accumulated fines and sanctions in excess of $500,000, but refuses to pay them, stating that he does not recognize them since they were imposed by federal authorities.

3

Cliven Bundy

       Despite the ongoing issues since the 1990s, and court adjudications in favor of BLM, BLM personnel have not made efforts to enforce the collection of the substantial fines owed by Bundy, or the removal of Bundy's cattle from the protected land.

       On April 7, 2012, BLM intends to conduct a roundup of cattle illegally grazing on BLM land, and anticipate the removal of approximately 900 head of cattle that are believed to be the property of Cliven Bundy. Once the cattle are removed, Bundy has the opportunity to pay a fine for the return of each head of cattle. If he does not do so, the cattle will be slaughtered.

       BLM personnel do not believe Bundy will make efforts to move the cattle because he only has enough land to handle less than 100 head of cattle, and does not appear to have any associates able to hold such a large herd of cattle.

       BLM management is concerned about escalation of Bundy's behavior towards BLM and the federal government during the cattle roundup. Furthermore, BLM personnel have expressed concern that the lack of enforcement by BLM to date may enhance the threat, as Bundy has not been held accountable for his actions through the years. BLM requested that BAU-1 conduct a threat assessment in reference to Cliven Bundy, and provide risk management suggestions related the impending cattle round up.

### Analysis

       When conducting a threat assessment to determine the propensity for violence, BAU-1 considers many factors, such as: the type of threat, the motive of the offender, the offender's ability to carry out the threat, and whether the offender has demonstrated a willingness to carry out a violent act. If known, the emotional stability of the offender is also considered, including indicators of balance between reason and emotion as demonstrated through the offender's verbal and/or physical behavior. These factors will be referred to as *Threat Mitigators* and *Threat Enhancers*.

       When conducting a threat assessment, it is difficult to predict future behavior with any degree of certainty. However, it may be possible to identify and address the existence of certain elements or criteria that should elevate prudent concern for potential dangerousness.

### Threat Mitigators

4

Cliven Bundy

  Healthy emotional attachments to family members may often act as an inhibitor against violence, as the offender logically and correctly perceives that an attack will lead to forced separation from family members. Bundy has a wife, numerous children, and grandchildren. While he may have distant relationships with some of his children, Bundy appears to have healthy relationships with many of them. Furthermore, many of them have expressed respect and support for their father.

  Documented research suggests that generalized risk of violence tends to be the highest in the 15-24 range, *(Reid Meloy, "Violence Risk and Threat Assessment," page 21)*. Given that Cliven Bundy is currently 66 years of age, statistically, he may be less likely to resort to a violent attack on BLM and/or LVMPD personnel.

  Bundy has no criminal record, and although he has a history of making veiled threats against others he believes have infringed on his perceived constitutional rights, there is no evidence to suggest that Bundy has ever acted on any of his threats and engaged in violent behavior. Research suggests that the best indicator of future behavior is past behavior. Bundy's past behavior does not appear to include violent activity, therefore, BAU-1 considers this a mitigator.

  During recent interviews with Bundy by LVMPD, Bundy made numerous statements that appear to contain "leakage" (nuances of true intentions which are inadvertently released) indicative of a desire for a non-violent resolution. For example, in reference to a rumor he heard about BLM wanting to negotiate with him, Bundy stated that if BLM wants to purchase the rights to the land he will "have to think about it", but was not certain whether he could "sink that low". Furthermore, he mentioned on numerous occasions that he wanted to avoid violence if possible, and stated "I'm not figuring on hurting anybody, and I don't want any of my friends to get hurt over a damn cow either". While these statements are not necessarily predictors of a non-violent encounter, such leakage may indicate that Bundy truly is seeking alternatives to violence.

  Bundy has a long history of seeking alternatives to violence, including numerous court filings and processes, many of which have resulted in substantial fines for Bundy. Furthermore, Bundy has turned to the media, and appears to embrace being in the media spotlight on this and other constitutional matters. During a recent interview, Bundy outlined a "step-by-step" plan

5

Cliven Bundy

for how he may respond to BLM. This includes serving "constructive notices" on the contractors and numerous federal and law enforcement entities, going to the media, and appearing on talk shows to draw attention to the issue. This plan is consistent with Bundy's history of seeking non-violent, legal means to respond to the situation, which should be considered a mitigator.

Based on the information available at the assessment, albeit limited, Bundy does not appear to be currently engaging in substance abuse, or have a history of substance abuse, which should be considered a threat mitigator. According to research, substance abuse can be associated with violent behavior, therefore, Bundy's apparent lack of substance abuse concerns is considered a mitigator. (Substance Abuse and Violence "Cause and Consequence", Johnson and Belford, CSAP, USDHHS, 1995)

Threat Enhancers

Bundy is known to have access to numerous firearms. While it is not surprising that Bundy would maintain firearms, given his lifestyle as a rancher and game hunter, weapon access and familiarity is generally regarded as a risk-enhancing characteristic.

Bundy appears to be experiencing a great deal of stress related to this dispute. In the experience of the BAU-1, contextual stress and perceived failures in an offender's life may often serve as "triggers" to propel them towards violence. Having exhausted all legitimate alternatives, a triggering event may be so profound as to wipe away any remaining buffers to violence.

Bundy seems to exhibit signs consistent with thoughts of paranoia or persecutory ideation. He appears to believe that many individuals or organizations are aligned against him in a grand conspiracy to infringe upon his perceived constitutional rights. Paranoia causes a person to feel distrust and suspiciousness of others, such that the motives of other persons are viewed as malevolent (DMS-IV, page 690). Paranoid ideation may prompt an individual to direct blame for such ideations outward, thereby potentially justifying accompanying violence committed by the individual.

Bundy appears to have developed a false sense of entitlement, based on his perception that the Sheriff's

6

Cliven Bundy

Department and LVMPD have actively protected him from BLM activity in the past, even though that is not the case. Furthermore, Bundy recently questioned whether BLM would actually follow through with the cattle round up, since they have threatened to do so in the past, but have failed to follow through. This false sense of reality may escalate the impact of the situation on Bundy, once he becomes aware that BLM fully intends to follow through with plans to round up the cattle, despite decisions not to follow through in the past.

There are many unknown factors regarding Bundy's historical, clinical, and contextual behaviors that limit the confidence of the BAU-1's assessment. The BAU-1 opines that there is a **low to moderate risk of significant or imminent violence** at this time. This opinion is based on Bundy's history of making ominous threats without subsequent action; leakage indicative of desire for a non-violent outcome; and Bundy's likely attachment to his family.

It is noted that the term "significant or imminent violence" is used here to generally represent predatory acts of targeted violence versus more emotionally spontaneous acts of violence. Given Bundy's reported propensity to escalate to anger during previous interactions with BLM, and potential false assumption that BLM will not follow through with the round-up, there is a greater likelihood that Bundy might engage in more affective, spontaneous, and opportunistic acts of violence in the future.

In order to identify any potential signs of escalation, BLM should remain vigilant for the following risk-enhancing factors:

1) Any unexpected effort by Bundy to physically approach BLM personnel, contractors, or area law enforcement personnel either at work or at home, is more reliably predictive of a subsequent act of violence than a communicated threat;

2) Any communications by Bundy that include suicidal or ominously nihilistic phrases should be considered to represent an escalated risk;

3) Any suspicious activities (vandalism, evidence of surveillance, etc) or items left at or around the area BLM intends to engage in the round-up, or in areas related to the contractors or officials participating in

7

Cliven Bundy

the roundup, should be treated as an extreme escalation in the potential risk of violence.

### Suggested Threat Management Strategies

The BAU-1 offers the following suggested threat management strategies to support the minimization of potential violence by Bundy against BLM personnel:

2) As long as Bundy believes that he has options to pursue that will lead to a favorable resolution of his grievance, he will likely channel any violent energy in pursuit of these options. If all channels of communication are closed to Bundy, there may be no siphon for this energy which may lead to more acute frustration. Maintaining some form of communication may also allow the communicator to monitor Bundy for signs of escalation/de-escalation.

3) It appears that BLM has the justification to pursue criminal charges against Bundy and impose additional, significant fines. In the opinion of the BAU-1, BLM may wish to consider waiving the existing fines, as a gesture of willingness to participate in discussions geared toward negotiations

Establish a neutral point of contact during the cattle roundup, preferably someone who has been able to establish a level of rapport and/or trust with Bundy, to serve as a "navigator". This person(s) can serve as the guide that can help Bundy through the roundup process, and most importantly, provide him with a "reality Check" that the BLM operation is, in fact, going to take place. The navigator can provide a human face to the process, and can also function as a "temperature taker" who can be in position to observe when Bundy is escalating or de-escalating. In reference to Bundy's comment that BLM will show up with a uniformed "army", it is suggested that the navigator dress in plain clothes, in an effort to alleviate the appearance that the navigator is part of the expected "army". Of course, all reasonable precautions should be taken to ensure the safety of the navigator.

4) Any investigators who will be interacting with Bundy may

8

GB.023911

Cliven Bundy

wish to consider the following:

  a. Approach in a non-threatening, low-key manner. Bundy already appears to be suspicious and convinced that many are actively colluding against him, and is highly unlikely to be receptive to attempts to convince him that the operation is lawful.

  b. Prepare for venting. Bundy will likely engage in loud and anger-filled rants. The interviewer should be prepared for this venting, and should respond in a calm manner.

  c. Avoid humiliating or disrespectful statements. Bundy is likely hyper-sensitive and will seek to over-compensate for a perceived power disparity. It is suggested that any interactions with Bundy be handled with a great deal of finesse, with every attempt made to ensure that compassion and respect are maximized to the fullest possible extent.

  d. Any actions that can be taken to reduce the stress in Bundy's life, such as the dismissal of existing fines and not pursuing criminal charges should be considered. If BLM authorities can offer services that will offer Bundy relief in any areas of his life, this may reduce his stress which may, in turn, reduce the risk of a violent act.

  e. Provide Bundy with a means of "saving face". As previously stated, Bundy seems to have embraced his status as a public figure for the common man, fighting against the federal government's perceived efforts to diminish their rights. However, he did provide leakage that he may be willing to cooperate to a certain degree, but has concerns of "sinking that low", or being "the only one with something to lose". If interviewers are able to provide a way for Bundy to maintain his status as a leader, and the last one to "fold" on a decades-long issue, despite the fact that BLM moves forward with the round-up, the risk of violence could be significantly mitigated.

  For example, focusing on his continued resolve, but ultimate decision to protect his family members and friends from potential harm, instead of allowing

9

GB.023912

Cliven Bundy

them to risk their lives over "a few damn cows", was the mark of a true leader, and that it is no wonder his family, friends, local Sheriff's department and LVMPD have such admiration for him.

Furthermore, investigators should also consider whether it would be appropriate to provide the media with similar positive statements about Bundy, so the media can present positive messages about Bundy's decision to prioritize the safety of others. It is recommended that the media air such positive messages before, during and after the round-up, to assist in alleviating any concerns Bundy may have about backing down from confrontation.

Additionally, this strategy may make it difficult for Bundy to act out violently, or encourage others to do so, without appearing to have no concern for the safety of his family and friends. In fact, it could serve as an encouragement for him to continue to act as a leader, and strongly discourage others from acting out violently.

f. Participating agencies may wish to consider having an investigator trained in crisis negotiations participate, or on immediate standby, throughout the cattle roundup process.

BAU-1 remains available to provide assistance as needed. Please direct any future requests for assistance to SSA Angela M. Sercer, BAU-1, at ▓▓▓▓▓▓▓▓., or via email at ▓▓▓▓▓▓▓▓

10