RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
RYAN NORWOOD
Assistant Federal Public Defender
BRENDA WEKSLER
Assistant Federal Public Defender
Nevada State Bar No. 8124
411 E. Bonneville Avenue, Suite 250
Las Vegas, Nevada 89101
(702) 388-6577/Phone
(702) 388-6261/Fax
Brenda_Weksler@fd.org

Attorneys for Ryan W. Payne

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-046-GMN-PAL |
| Plaintiff, | **MOTION TO DISMISS** |
| v. | |
| RYAN W. PAYNE, | |
| Defendant. | |

<u>**Certification**</u>: This Motion is timely filed.

Defendant, Ryan W. Payne, through his counsel of record, Brenda Weksler and Ryan Norwood, Assistant Federal Public Defenders, files the following Motion to Dismiss based on the following points and authorities and all pleadings on file herein.

DATED this 29th day of December, 2017.

RENE L. VALLADARES
Federal Public Defender

By: _/s/ Brenda Weksler_

BRENDA WEKSLER
Assistant Federal Public Defender

By: _/s/ Ryan Norwood_

RYAN NORWOOD
Assistant Federal Public Defender

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**INTRODUCTION**

This Court declared a mistrial on December 20, 2017, almost a month and half into trial. As the Court's findings made clear, the mistrial was the result of numerous, willful discovery violations by the government.

The Court should now dismiss the indictment against the defendants with prejudice. This remedy is justified as both a remedy for outrageous government misconduct and an exercise of this Court's supervisory powers. *See United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008). The Court should also rule that the double jeopardy clause bars retrial.

While the violations already found by this Court are more than enough to justify dismissal, there remain other issues that have yet to be explored—notably those arising from BLM SA Wooten's memo ("Wooten memo) provided to the defense on December 8, 2017. The information therein provides further evidence of flagrant government misconduct and a pervasive, willful failure to provide the defense exculpatory evidence. The Court should direct an extensive inquiry into the matter if it does not dismiss the indictment.

**I.      THE INDICTMENT SHOULD BE DISMISSED WITH PREJUDICE**

This Court may dismiss an indictment with prejudice under two different theories: "[First, a] district court may dismiss an indictment on the ground of outrageous government conduct if the conduct amounts to a due process violation. [Second, i]f the conduct does not rise to the level of a due process violation, the court may nonetheless dismiss under its supervisory powers." *United States v. Chapman*, 524 F.3d 1073, 1084 (9th Cir. 2008) (quoting *United States v. Barrera–Moreno,* 951 F.2d 1089, 1091 (9th Cir.1991). Under either theory, however, because "[d]ismissing an indictment with prejudice encroaches on the prosecutor's charging authority," such a sanction is permitted only "in cases of flagrant prosecutorial misconduct." *United States v. Simpson,* 927 F.2d 1088, 1090 (9th Cir.1991).

Under the first theory, a district court may dismiss an indictment for outrageous government conduct that amounts to a due process violation. *Barrera-Moreno*, 951 F.2d at 1091. To violate a defendant's due process rights, a government must conduct itself in such a way that is "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States*

*v. Restrepo*, 930 F.2d 705, 712 (9th Cir.1991).  Such conduct must be inherently wrong or amount to "the engineering and direction of the criminal enterprise from start to finish." *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991).  Such decisions are reviewed de novo on appeal.  *Id.*

Under the second theory, a district court may exercise its supervisory power to dismiss an indictment to "implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct." *Chapman*, 524 F.3d at 1085 (quoting *U.S. v. Simpson,* 927 F.2d 1088, 1090 (9th Cir. 1991)).  Courts are not limited to these three grounds[1], however, and they must consider whether to exercise their supervisory power to dismiss an indictment on a fact-specific, case-by-case basis. *United States v. De Rosa*, 783 F.2d 1401, 1406 (9th Cir. 1986); *United States v. W.R. Grace*, 526 F.3d 499, 511 n. 9 (9th Cir.2008).  Additionally, a court may dismiss an indictment under its supervisory powers only when the defendant suffers "substantial prejudice," and where "no lesser remedial action is available." *Chapman*, 524 F.3d at 1087.  Such decisions are reviewed for an abuse of discretion on appeal.  *Id.* at 1084–85.

### A.      The *Chapman* Standard for Dismissal

*United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008), provides the standard for determining whether a court should dismiss an indictment under its broad supervisory powers.  Under *Chapman*, a court must consider whether there is flagrant prosecutorial misconduct, whether the defendant will suffer substantial prejudice if retried, and whether a lesser remedial action is available.  524 F.3d at 1085–1087.

### 1.      This Court's broad supervisory powers

The *Chapman* court, citing *U.S. v. Simpson,* 927 F.2d 1088, 1090 (9th Cir. 1991), recognized only three grounds for which a court may exercise its supervisory power to dismiss an indictment: "to implement a remedy for the violation of a recognized statutory or constitutional

---

[1] Seven days after *Chapman* issued, the 9th Circuit issued another opinion, *United States v. W.R. Grace*, which abrogated *Simpson*. 526 F.3d 499, 511 n. 9 (9th Cir.2008).  In *Grace*, the Ninth Circuit explained that the *Simpson* court had read its previous decisions overly-narrowly, and its supervisory powers were not limited to three grounds. *Id.* Thus, although a finding of one of these grounds is sufficient to justify a dismissal with prejudice, they do not provide the only grounds for doing so.

right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct."

### a.    Vindicating constitutional rights

A court may dismiss an indictment to remedy a violation of the defendant's constitutional rights, such as the right to pre-trial discovery under *Brady* and *Giglio*. *See Chapman*, 524 F.3d at 1085 (rejecting prosecution's argument that *Brady* and *Giglio* violations cannot justify dismissing an indictment).

Under *Brady v. Maryland*, a prosecutor violates the defendant's constitutional due process rights when it fails to disclose evidence that is material and favorable to the defendant. 373 U.S. at 83, 87 (1963).   Under *Giglio v. United States*, favorable material includes evidence of government incentives or promises offered to a witness.   405 U.S. 150, 154–55. (1972). The prosecution's obligation to disclose extends to *Brady* material within the control of any federal agency participating in the investigation of the defendant. *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989).

### b.    Preserving judicial integrity

Another ground for dismissing an indictment is to preserve judicial integrity. *Simpson*, 927 F.2d at 1090 (9th Cir. 1991).  This ground vindicates a district court's substantial discretion over what happens inside the courtroom. *See id*. at 1091. ("The supervisory power comprehends authority for the courts to supervise their own affairs, not the affairs of the other branches; rarely, if ever, will judicial integrity be threatened by conduct outside the courtroom that does not violate a federal statute, the Constitution or a procedural rule."). Thus, due to a court's independent interest in fair and ethical criminal trials, federal courts have discretion to act in manners they deem appropriate to discipline prosecutors.   *United States v. Lopez*, 4 F.3d 1455, 1463–64 (9th Cir. 1993) (declining to dismiss an indictment because the defendant did not suffer prejudice from prosecutorial misconduct, but nevertheless recognizing that "we have no doubt but that federal courts are empowered to deal with such threats to the integrity of the judicial process.").

### c.    Deterring future illegal conduct

Yet another ground for dismissing an indictment is to deter future illegal conduct. *Simpson*, 927 F.2d at 1090 (9th Cir. 1991). Dismissal pursuant to this ground is appropriate when a court has determined that the prosecution engaged in illegal conduct and wishes to deter future illegal conduct by dismissal.  *United States v. Struckman*, 611 F.3d 560, 576–77 (9th Cir. 2010) ("a finding that the government has broken the law in the past is a necessary predicate to dismissal on the basis of deterrence of illegal government conduct."); *see also United States v. Matiz*, 14 F.3d 79, 83 (1st Cir. 1994) (declining to dismiss the indictment because the defendant failed to show a specific violation of a statutory or constitutional right).  In such cases, dismissal under the court's supervisory powers "is used as a prophylactic tool for discouraging future deliberate governmental impropriety of a similar nature." *United States v. Owen*, 580 F.2d 365, 367 (9th Cir. 1978).

### 2.    Flagrant prosecutorial misconduct

No matter what ground upon which this Court chooses to exercise its supervisory powers, it must determine whether prosecutorial misconduct was "flagrant". *Chapman*, 524 F.3d at 1805. Flagrant prosecutorial misconduct is misconduct that surpasses mere accidents or ordinary negligence.  *Id*.  Misconduct of this nature does not encompass mistakes made in good faith.  *See United States v. Williams*, 547 F.3d 1187, 1202 (9th Cir. 2008) (declining to find that one *Brady* violation constituted flagrant prosecutorial misconduct where a district ourt found that the government did not act in bad faith for an untimely delivery of the exculpatory evidence).  Instead, prosecutorial misconduct is flagrant when it evidences a "reckless disregard" for the prosecution's constitutional obligations." *Chapman,* 524 F.3d at 1085–86.

In *Chapman*, the Ninth Circuit upheld the district court's finding of flagrant misconduct based on the government's *Brady* and *Giglio* violations. *Id*. 1085.  The court noted that it found it "particularly relevant" that the prosecution had received "several indications, both before and during trial, that there were problems with its discovery production" and yet continued to withhold discovery despite repeated complaints from the defense. *Id*. at 1085. Similarly, in *United States v. Lopez-Avila*, 678 F.3d 955, 965 (9th Cir. 2012), in reviewing whether the Double Jeopardy clause operated to bar a retrial, the court found the prosecution's actions in misreading a transcript in

open court and the "government's continuing failure to acknowledge and take responsibility for [the prosecutor's] error" so troubling, it ordered the district court to consider dismissal of the indictment on remand. The court explained that "[t]he remedy of dismissal with prejudice, which is strong medicine for the entire prosecutorial group, is available pursuant to a district court's supervisory powers over the attorneys who practice before it." *Id.* at 966. On remand, the district court dismissed the indictment with prejudice, finding that the government's misconduct was indeed flagrant, the defendant would suffer substantial prejudice if retried, and no lesser sanction was available. *See United States v. Lopez-Avila*, CR1-00035-TUC-CKJ (Doc. 112).

### 3. Availability of a lesser sanction

Before dismissing an indictment, a court must be satisfied that there are no lesser sanctions available. *Chapman*, 524 F.3d at 1087. The *Chapman* court discussed the appropriateness of dismissal and explained that relevant considerations included the prosecution's willfulness in committing the misconduct, as well as willingness to accept responsibility for the misconduct. 524 F.3d at 1087. The court then upheld the district court's finding that the prosecution's "flagrant[], willful[], and…bad faith" conduct, together with its lack of remorse at trial, justified the harsh sanction of dismissal. *Id.* at 1088. Specifically, the district court had emphasized that:

> [F]or over two weeks of trial, the prosecutor consistently claimed that he had disclosed the required material to the defendants.... And I accepted that, I accepted [the AUSA's] statement as an officer of the Court and overruled the objection on several occasions.... Only after I excoriated the Assistant U.S. Attorney in the strongest terms did he then offer an apology to the Court, not a heartfelt apology, but simply a response to me. And finally I said, be quiet and listen to me because he was just saying, yeah, I'm sorry, I'm sorry, I'm sorry, and not really meaning it.

The Ninth Circuit noted that it was also "troubled, both by the AUSA's actions at trial and by the government's lack of contrition on appeal" before concluding that the "although dismissal of the indictment was the most severe sanction available to the district court, it was not an abuse of discretion." *Id.*

Similarly, in *United States v. Kojayan*, 8 F.3d 1315, 1325 (9th Cir. 1993), the court vacated a conviction and remanded to the district court to consider whether to dismiss an indictment with

prejudice. The court recounted how the prosecution withheld *Brady* evidence regarding a co-conspirator's cooperation with the government and made false representations to the jury regarding that co-conspirator's ability to testify. *Id*. at 1321–22. The court expressed several times that it was "troubled" with the conduct of the prosecutor and concluded that the government had "deprived the defendants of an opportunity to put on what could have been a powerful defense." *Id*. at 1322–24. The court went on to condemn the AUSA office as a whole, and explained that the "normal rule" favoring retrial may not apply in light of prosecutorial misconduct because "[q]uite as important as assuring a fair trial to the defendants now before us is assuring that the circumstances that gave rise to the misconduct won't be repeated in other cases." *Id*. at 1324.

### 4.     Substantial prejudice to the defendant

A finding of substantial prejudice to the defendant is required before dismissing an indictment. *See United States v. Tucker*, 8 F.3d 673, 674–75 (9th Cir.1993) (describing prejudice as "a trigger to the exercise of supervisory power"). In *Chapman*, the court discussed whether the defendant would suffer substantial prejudice if the case were retried. *Chapman*, 524 F.3d at 10857. In rejecting the government's contention that a mere mistrial declaration was an adequate sanction for its conduct, the court offered the district court's findings that a retrial would only advantage the government, who had poorly prosecuted the case thus far. *Id*. Specifically, the district court had explained that:

> If this case were to be retried, the government and its witness will not make that mistake again, and that's the advantage that the government gains by its actions here. It gets a chance to try out its case[,] identify[ ] any problem area[s], and then correct those problems in a retrial, and that's an advantage the government should not be permitted to enjoy.

*Id*. The Ninth Circuit concluded that, based on the district court's findings, the district court did not abuse its discretion in by concluding that dismissal was the only means of avoiding prejudice to the defendants. *Id*.

### B.     The government's flagrant misconduct requires the dismissal of the indictment with prejudice

This Court has found numerous instances in which the government has suppressed *Brady* material, and has done so "willfully." All of the material in question undermines the government's

theory of prosecution or rebuts overt acts charged in the indictment in furtherance of the conspiracy. Yet the government has continually stated it has no obligation to produce these materials, blaming the defendants for their "imagined theory" of defense, ECF 2914 p. 20, and claiming the materials at best supports defenses that are "non-cognizable," "contrived" and "made-up." ECF 3005 p. 7-8. The scope, flagrancy, and harm caused by this conduct mandates dismissal.

### 1.      There is no appropriate lesser sanction than dismissal

In discussing the appropriateness of dismissal, *Chapman* explained that relevant considerations included the prosecution's willfulness in committing the misconduct, as well willingness to accept responsibility for the misconduct. *Chapman*, 524 F.3d at 1087.

This Court has already found that the misconduct in this case was willful.  And, much like in *Chapman*, the government failed to accept any responsibility for its missteps, choosing instead to shift blame to the defense.  The government's irresponsible and, at times, false proffers to this Court as well as its dismissiveness toward the defense inspires no confidence in the prospect of fairness.  There is ample evidence of "flagrant prosecutorial misconduct" in this case.  A dismissal is necessary to remedy the constitutional violations, to preserve the integrity of this Court's processes, and to deter future misconduct.  Anything short of a dismissal is tantamount to condoning the government's behavior in this case.

### a.      Willful conduct

On December 20, 2017 this Court found the government was responsible for numerous *Brady* violations. This Court made clear that each of these constituted a willful *Brady* violation despite the fact that it did not have to make such finding: "it doesn't matter for this purpose whether it's willful or inadvertent, but the Court does analyze that and wants to provide that information to the parties." December 20, 2017 p. 9.

- <u>Information relating to surveillance camera: FBI Law Enforcement Operation Order and FBI 302 prepared by SA Egbert</u>

This Court found this was a willful *Brady* violation based on the contents of the reports, the dates on which these reports were prepared (2014), the fact that the FBI, who is part of the

prosecution team[2], prepared both of these reports, the fact that the U.S. Attorneys were aware of the existence of the surveillance camera and failed to provide information about it when Ryan Bundy made his request, and because the government "falsely represented that the camera view of the Bundy home was incidental and not intentional, and claimed that the defendants' request for the information was a 'fantastic fishing expedition." Transcript December 20, 2017, p. 10.

- "BLM snipers": FBI 302s Delmolino, Felix, and Racker[3]

This Court found this was a willful *Brady* violation based on the content of these reports and dates on which they were prepared (2014 and 2015) and the fact that the FBI, who is part of the prosecution team, prepared these report. This Court found important that one of the prosecuting attorneys on this case was present during the interview which was later memorialized in the FBI 302 concerning Delmolino. In essence, this Court found that the government was "aware of the evidence and chose not to disclose it." Transcript December 20, 2017, p. 12.

- Unredacted TOC log

This Court found this was a willful *Brady* violation, citing the date on which the log was prepared and its content, and the fact that the FBI, who is part of the prosecuting team, created the document and was aware of it (the FBI knew this log was saved on a thumb drive and located in the TOC vehicle). This Court associated the content of the TOC log ("snipers inserted', "deployed") and its suppression with the fact that the FBI and the U.S. Attorneys prosecuting this case were present at the interview of BLM Ranger Brunk for the purpose of clarifying whether he was acting as a "spotter" to a "sniper." These factors combined with "the Government's strong insistence in prior trials that no snipers existed justifies the Court's conclusion that the nondisclosure was willful." December 20, 2017, p. 14.

---

[2]   *See* https://www.justice.gov/usam/criminal-resource-manual-165-guidance-prosecutors-regarding-criminal-discovery (defining "prosecution team" to include federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant.).

[3]   The defense brought to the attention of this Court the Felix and Racker FBI 302s on December 18, 2017. ECF 3027 p. 19 n. 8. The defense agrees with this Court's determination as it cannot conceive of any reason why these reports were not turned over earlier. Nevertheless, should the government advance arguments regarding its failure to disclose these reports, the defense requests that this Court incorporate those arguments and make new findings so that the record is clear in that regard.

- Maps

This Court found the government acted willfully in withholding this information based on the fact they were prepared in 2014, were helpful to the defense, and were not disclosed until December 15, 2017.

- Threat assessments: 2012 FBI BAU Threat Assessment, 2012 Southern Nevada Counter-terrorism Threat Assessment, FBI Law Enforcement Operation Order, Gold Butte Impound Risk Assessment, and BLM OLES Threat Assessment

Most, if not all, of these reports were in the possession of the prosecution team. That was one of the bases upon which this Court found the suppression to be "willful." Transcript December 20 2017, p. 17. In addition, the defense requested these reports in July 2017, as well as during and after Ms. Rugwell's testimony. *Id*. The government continuously maintained that these reports were not relevant, despite their obvious relevance. *Id.*

- Internal Affairs information[4]

This Court found this was a willful suppression based on the fact that the government "knew right away" what the defense was seeking had been "misidentified by Dan Love as an OIG report" and yet represented to this Court that the information requested by the defense was an "urban legend" and a "shiny object to distract the Court." Transcript December 20, 2017, p. 19.

### b.   Failure to accept responsibility

The government has consistently failed to accept responsibility for any of its failure to disclose evidence. Quite to the contrary, the government has consistently denied its materiality and sought to shift the blame to the defense.

The government has taken a firm stand in explaining that "[n]one of the government's disclosures is either untimely or in violation of the government's discovery obligations." ECF 2914

---

[4] During the December 20, 2017 hearing, this Court stated the Internal Affairs report documented the fact that Dan Love had requested the FBI to place a surveillance camera. The defense wanted to correct the record by noting that the report in which that information is located is the FBI JTTF report prepared on March 14. 2014 (attached as Exhibit L to ECF 2883). The defense believes the other bases cited for the finding of a *Brady* violation re sufficient and agrees with this Court that it was willful.

Should this Court wish to make additional findings, the defense believes this FBI JTTF report also constitutes a Brady violation as it was information favorable to the defense and in the possession of the FBI (created by them) as of March 2014.

p. 2. With respect to the report and log that flowed from the presence of the surveillance camera, it wrongfully put the onus on the defense: "the existence of the surveillance camera was known to the defendants…the government having disclosed the undercover interview of Ryan Bundy back in May 2016." ECF 2914 p. 7. It adopted the same posture with regards to the FBI 302 regarding Delmolino: "defendants again expressed outrage over the documents produced, claiming this was information that had been 'withheld' from them. However, they failed to acknowledge or show, that they ever previously made a specific request for this information—or demonstrated its materiality." ECF 2914 pp. 8-9. Even worse, the government called Ryan Bundy's request for information involving the surveillance camera a "fantastical fishing expedition." ECF 2340 p. 3.

Shifting the blame to the defense started almost as early as the late disclosures. On November 13, 2017, the government explained that their disclosures had been "extremely fulsome throughout this" and found it "disconcerting to have some of these allegations leveled against [them]." Sealed Transcript November 13, 2017, pp. 61-62. The government's state of denial extends to *anybody* involved in its case, to the point of disagreeing with this Court that there had been findings—not just allegations—regarding Dan Love's conduct: "Your Honor, we totally disagree with the characterization of those as findings." Transcript October 24, 2017, p. 190-91.

The government persisted in its position that any wrong-doing was the defense's doing *even after* the Court expressed its concerns at the December 11, 2017 hearing. At the hearing, the government immediately expressed that counsel for Payne was "both factually incorrect and legally incorrect" and that their discovery practice "ha[d] been appropriate, that it ha[d] been based upon the timing of …[the defendants'] evolving defenses." Transcript December 11, 2017, p. 90.

The government has also sought to delay responding to the defense's discovery requests. In response to Payne's motion for discovery regarding matters in the OIG attachments (ECF 2727), the government initially sought a continuance of two months, a timeline that would have made the value of any information derived meaningless to the defense. Transcript November 25, 2017, p. 164. This Court shortened the response time to 30 days. *Id.* at p. 165. The government later complained that a timely response would create an enormous burden for them for a motion that

had "no merit." Transcript November 7, 2017, p. 42. As it turns out, the motion was granted and the information derived, including Dan Love's emails, was favorable for the defense.

The government has repeatedly professed surprise and confusion over the relevance of the withheld materials, even though they rebutted the very theories the government sought to advance at trial.  While the government's theory of prosecution has relied extensively on the threat that the Bundys posed during the attempted 2012 impound and the 2014 impound, the government's position has been that the threat assessments disclosed in the last month are "not relevant" (ECF 3005 p. 29) and "immaterial to any issue in this case" (ECF 2914 pp. 14-15). In addition to explaining how the relevance of these reports  is not "readily apparent to the government," (ECF 2914 p. 14) the government  states that in order to decipher their relevancy it would be forced to make "obtuse connections" (ECF 3005 p. 35).  The government, likewise, has claimed "the rebuttal of a single allegation in two overt acts in a 63-page Indictment…does not…constitute a defense to any element of the offenses; thus rebuttal evidence related to a single allegation is not *Brady/Giglio*." ECF 3005 p.6; "Evidence of snipers is not material just because defendants want to use it to rebut an over act." ECF 3005 p. 13.  The government has professed similar confusion over the relevance of the surveillance camera evidence.  Transcript November 8, 2017, p. 19.

The government's behavior shows *at least* recklessness or unwillingness in its ability to recognize quintessential *Brady* material—material that directly contradicts factual allegations in the indictment. As such, the government's inability to discharge its obligations under *Brady* affects cases beyond the one in question and is emblematic of a much larger problem.

It may become convenient for the government to *now* accept some level of responsibility for its repeated failures to provide material exculpatory evidence.  But any such representation should be viewed as too little and too late.  The government has had numerous opportunities prior to and during this trial to accept responsibility for its discovery violations, and has declined to do so at any point prior to this Court's declaration of a mistrial.  Dismissal is the only way to ensure that such conduct will not happen again.

### c.      Irresponsible proffers to this Court

In this district, almost every phase of a criminal case relies, in great part, on government proffers: from detention hearings to sentencings. The number of inaccurate government proffers in the last two months has been astounding, especially when considering the impact some of these statements may have had were it not for this Court's insistence in probing further[5].  Dismissal of the indictment is appropriate to protect the integrity of the Court's proceedings in this district.

The government  has offered varied explanations regarding the number of days and the purpose the surveillance camera served—in an attempt to downplay its potential import to the defense. First the government indicated it had been set up for a half day or full day, and that it was immediately taken down once it was rendered inoperable. Transcript November 7, 2017, p. 14. After this Court noted the inconsistency, given the information provided by Ms. Hinson, the government, once again, indignantly offered reasons for its prior misrepresentations regarding the time period the surveillance camera had been operating. Transcript November 13, 2017 pp. 137-139. The government insinuated the purpose of the camera was something other than to surveil the Bundy household, when records provided in the last month confirm that is not the case. Transcript November 3, 2017, p. 134-35 (cross-examination of Ms. Rugwell eliciting the purpose of the surveillance camera was to provide a general view of the area and that it "happened" to include the Bundy residence); Transcript November 8, 2017, p. 28 (government's representation that it did not want to "give the impression" that the camera "was fixed on the Bundy residence.").

Additionally, the government side-stepped the value of the surveillance camera to the defense by disassociating it from its context : "Not sure how the existence of a surveillance camera translates into snipers, being isolated, and wanting someone dead" (Transcript November 8, 2017, pp. 68-69); "Certainly it's not obvious to the Government how the existence of a surveillance camera… sitting in the middle of hundred is of thousands of acres of public land somehow equates

---

[5] "It's difficult for the Court to imagine that there would be a camera placed, with no one watching it and making notes and not recording it." Transcript November 7, 2017, p. 29; "I'm not convinced that it doesn't exist. That something doesn't exist. Something. You don't set up a surveillance camera for nothing." *Id.* at p. 32.

to that's a sniper" (*Id.* at p. 69); "there's not one iota of evidence that the Government is aware of that militia members came to Bundy's property because of the existence of surveillance cameras. (*Id.* at p. 20).

Subsequently, when this Court requested the government to investigate whether any notes were derived from this surveillance camera, the government made representations, which—had this Court taken at face value—would have barred the defense from key information for its defense[6]. For example, the government represented that "nothing of evidentiary value whatsoever was derived from it, whether through video, audio recording, or handwritten notes, or anything of that nature." Transcript November 7, 2017, p. 34.

The first TOC log disclosed to the defense was a redacted version on November 11, 2017. SA Gavin's FBI 302 was also disclosed that day with assurances that snipers were never deployed during the Gold Butte operation, and explaining how the reference in the TOC log to "snipers inserted" meant something other than the insertion of snipers in the area. Payne presented opening statements three days later, on November 15, 2017. Two days after that, on November 17, 2017, the government provided the underacted version of the TOC log making it exceedingly clear that snipers were in fact inserted in the area and, in fact, mobile: they were standing by the helicopter at the time the BLM was dealing with Dave Bundy (TOC log entry 84), and were also deployed in relation to Ammon Bundy looking in the direction of the FOB (TOC log entry 49).

When this Court probed the government's reason for not disclosing information that would suggest there were snipers involved and specifically asked what the government's understanding was when the defendants referred to "snipers," the government gave an extremely narrow interpretation and explained that BLM did not employ individuals fitting that definition. Transcript November 29, 2017, p. 76. Interestingly, when pressed further, the government conceded "it knew" and was aware the defendants perceived certain individuals as "snipers" irrespective of their precise designation and gave the example of the BLM over-watch men present on April 6, 2014, as individuals the defendants referred to as "snipers." Transcript November 29, 2017, p. 85.

---

[6] The notations involving the surveillance camera were kept in the TOC log which indicated snipers had been inserted and deployed.

As to the threat assessments, the government repeatedly and incorrectly stated the defense had not requested them. November 20, 2017 p. 10 ("to the extent that the defendants are claiming that they had specifically requested this and we failed to turn it over, that simply is not the case"); *see also* Transcript November 20, 2017 p.9. Moreover, the government represented multiple times that these reports were irrelevant, even after they relied on one of them during its direct examination of Ms. Rugwell: "So I'm not quite sure what the relevance of the BAU would be to the Threat Assessment for the 2014 or 2012. We provided the 2014 Threat Assessment to the defense. What the BAU has to do with that I'm not quite tracking what the materiality of it is" (Transcript November 16, 2017, p. 232, which is the day Ms. Rugwell testified); "As I said, Your Honor, these risk assessments/threat assessments are not material to any of the counts in the Indictment" (Transcript November 20, p. 7); "[W]e've been hearing now that prior threat assessments are somehow relevant in this case—and again, we don't believe that they are" (Transcript November 21, 2017, p. 47-48). Next, the government minimized the significance of the contents in these reports by explaining that they were consistent with each other. November 21, 2017 p. 96 ("[T]he BAU 2014 threat assessment is consistent with the BLM 2014 threat assessment. In fact, it says the BAU agrees with the threat assessment of the BLM.").

The government's failure to be candid with this Court and opposing counsel about the threat assessments was evident during the cross examination of Ms. Rugwell. During a side-bar regarding the need for the government to disclose to the 2012 FBI BAU Threat Assessment, the government remained silent despite the fact that Ms. Rugwell relied on it during her testimony and had discussed this report in preparation for trial—a fact the defense learned when the government disclosed *Jencks* material after Ms. Rugwell had been dismissed as a witness. Transcript November 16, 2017, pp. 182-188.

In addition, on November 29, 2017 the government represented to this Court it understood the defense's request for "all threat assessments in this case" to be circumscribed only to the year 2014. Transcript November 29, 2017, p. 71. This representation was made notwithstanding the fact that the 2014 assessments specifically cite, rely, and mention the earlier ones, and the fact that the government's email response to the July 5, 2017 request for these reports suggests it believed

the requested threat assessments did not fall into any category of disclosure "appropriate by Rule, Statute and the U.S. Constitution." *See* ECF 2988 Exhibit A. And, despite the fact that the government fought the defense at every stage[7] in an attempt not to disclose these reports, it ultimately suggested that if the defense had simply asked for them, the government would have provided them. *Id*. p. 82.

Equally troubling was the government's attempt to remedy its failure to disclose evidence by suggesting the overt acts charged did not focus on the "falsity" of the information being disseminated: "Moreover, the validity of the overt act is not whether the statement was true or false, but that it was published to induce people to travel to Bunkerville." ECF 3005 p. 6. This is simply not a correct description of either the government's indictment or the theories it has relied upon over the past two years. *See* ECF 3027, pp. 9-12 (citing multiple allegations in indictment that defendants disseminated false information); and pp.13-16 (citing numerous instances where prosecution has argued defendants disseminated false information).

### 2.    The government's conduct has prejudiced the defense

Absent dismissal, the defendants in this case will suffer "substantial prejudice." *Chapman*, 524 F.3d 1087, citing *United States v. Jacobs*, 855 F.2d 652, 655 (9th Cir. 1988).  The defendants have already been forced to show much of their strategy in the month and half this case was tried. The prosecution's insistence that the defendants were not entitled to the withheld discovery has required the defendants to repeatedly set forth the legal and factual particulars of their defense. *See e.g.* ECF 3027.  The defendants have revealed their *voir dire* strategy, and have revealed what sort of jurors they wish to keep and remove.  Three of the defendants gave detailed opening statements outlining the evidence they expected to support their defense.  The defendants have further revealed and discussed their defense strategy in cross-examination of the prosecution's witnesses.

---

[7]  On July 5, 2017 the government responded to the e-mail request for these reports by stating it did not have to disclose them pursuant to any statutory or constitutional duty. *See* ECF 2988 Exhibit A. The government stated the reports were not material during and after the examination of Ms. Rugwell. Transcript November 16, 2017 pp. 192-212 and 231-235. The government next stated it would have to consult with the FBI regarding their release. *Id.* at p. 233.

The prosecution could now use of all this information to their advantage in a retrial, which would afford them yet another opportunity to try and correct its "faltering" case. *Chapman*, 524 F.3d at 1087. The government has already repeatedly failed to meet it burden of proof against the indicted defendants. In the first two trials, against the "Tier 3" defendants, the government was unable to secure any conviction against four of the six defendants, and the second jury fully acquitted two of them. The instant trial was not going any better for the government. Despite having over a year and a half to prepare for trial since the indictment, the prosecution unsuccessfully sought to continue trial for a week immediately prior to opening arguments. Transcript November 14, 2017, pp. 6-8. The government's case proceeded haltingly—the prosecution called 3 ½ witnesses in 16 official days of trial—in large part because the Court was continually forced to address discovery issues arising from the government's conduct and the testimony of its own witnesses. The government has already repeatedly complained about and sought to preclude defense arguments to the jury; indeed, they have filed at least three "motions in limine" or "bench memos" to that effect during the course of the trial. *See* ECF 2880, 2899, 3028.

Despite the government's objections to evidence and questions about these matters, the jury was plainly interested in the defense theories involving land and water rights, and concerned about the potential overreach and misconduct of the government. Many of the jury's questions inquired about these matters. The jury asked the prosecution's first witness, Mary Rugwell, numerous questions about the land and water rights issues raised by the Bundys[8]:

> Was there are study or examination of any new improvements placed on public land? And if so, were they marked or made or noted – made note of in an official capacity?

[Question 2]

> Who is in the authority of the water rights?
> Was it possible to own the land as well as the water?

{Question 3]

> Who specifically makes the final decision for land use in the process planning meeting?
> Who's the person?

[Question 4]

---

[8] Although the Court did not ask the witnesses all of the submitted questions from the jury, the questions demonstrate what matters the jury was interested in, and provide a window into their ongoing view of the case.

Were there actually any desert tortoise or petroglyphs found in
Bundy's allotment?
Are you in charge of water rights?
Who is responsible for maintaining the allotment borders?
Are they fenced?
What other efforts were made by the BLM other than impoundment
or fees to lessen the potential harm to the land or animals?
Was Bundy's allotment overgrazed?
Can the allotment be repositioned or boundaries repositioned?
And what other efforts were made by the BLM other than
impoundment fees to lessen the potential harm to the land or
animals?

[Question 6]

The jury asked witness Terry Petrie questions about Ryan Bundy's constitutional and legal

views about land ownership, and asked numerous questions about water rights.

What are the articles from [the] Constitution Ryan Bundy presented
in Court?

[Question 7]

Can you explain 1967 vs. 2016 water rights further?

[Question 8]

Water rights for State of Nevada
Stockton Water rights?

[Question 11]

Water rights:  How far does the Bundy's water rights go . . . beyond
their land?

[Question 14]

What good is a permit for grazing w/out water rights?

[Question 15]

With respect to Agent Robert Shilaikis, the jury was still interested in the Bundys' legal

views, as well as the honesty of the government agents, and the potential for BLM misconduct and

mistakes:

Why did the BLM law enforcement and security department bring
in new agents not familiar with the case to talk with the Bundys and
not agents who already knew the case?

[Question 18]

. . . Why would you not need and understand the order(s) you were
tasked to serve/enforce

[Question 20]

Does BLM have the authority to instruct the county sheriff to not
interfere with the impoundment?

[Question 21]

> Was it planned to not record Mr. Cox's call on the morning of the 18th?  If so why or why not?

[Question 22]

> What was your opinion about special agent Michael Johnson telling Ryan Bundy that the previous conversation on March 17th was not record[ed]
> To your knowledge did Michael Johnson report that he told Ryan Bundy that their conversation on March 17th was not record[ed]

[Question 27]

The government could not have been happy with the jury's repeated focus on matters that it sought to preclude from the trial entirely.  Although the first three witnesses were called to testify about the Bundys' purported misconduct, the jury was more interested in other matters.  As in *Chapman*, the government's case was going poorly; a retrial would essentially serve to rescue them.

The government should not be allowed a fresh start with a new jury because of its own misconduct.   As observed by the trial court in *Chapman*, a retrial means the government "gets a chance to try out its case, identify any problem areas, and then correct those problems in a retrial and that's an advantage the government should not be permitted to enjoy."  *Chapman*, 524 F.3d at 1087.  As in *Chapman*, the Court should rule that a dismissal is "the only means of avoiding prejudice to the defendants." *Id.*

### 3. The facts relied upon by the *Chapman* court to dismiss the case with prejudice pale in comparison to the facts in this case

This District ruled dismissal was the only appropriate remedy for the government's discovery violations in *Chapman*.  The facts of this case closely parallel *Chapman.*  To the extent they differ, it is because the violations here are far more flagrant and egregious.

Both *Chapman* and this case were large, complex prosecutions involving multiple defendants.  In *Chapman*, as here, the government had almost two years to meet its discovery obligations prior to trial.  *Chapman*, 524 F.3d at 1078.  The government, as here, agreed to disclose *Brady, Jencks,* and *Giglio* information prior to trial, and indeed disclosed "close to 400,000 pages of documents" over a span of 22 months.  *Id*.  Yet as trial began, there were "early indications that

the government had not fully complied with its discovery obligations." *Chapman* at 1078.  In response to defense complaints and other "hints of discovery violations," the Court had to remind the prosecution of their discovery obligations on a few occasions.  *Id.*

Here, there were more than mere "hints" of discovery issues on the eve of trial.  The defense had repeatedly raised issues about missing discovery in pre-trial litigation.  On October 3, 2017 this Court granted some of the defense motions, ordering the government to provide extensive materials from Dan Love's OIG reports, and setting an evidentiary hearing to address issues regarding the destruction of the evidence.  Following this hearing, this Court raised concerns about the surveillance camera that Ms. Hinson mentioned in her testimony. Prior to opening statements, the Court repeatedly apprised the government of its discovery concerns concerning the surveillance camera and other matters.

> It doesn't make sense to me to have a camera and have nobody watching it or making notes or recording it . . . I think this is an issue that hasn't been, to my satisfaction presented properly in a way that I can make a determination that I can sleep with.

Transcript November 7, 2017 pp. 29-30.

> I'm not convinced that it doesn't exist. That something doesn't exist. Something. You don't set up a surveillance camera for nothing . . . and I think the burden is on the government to explain whether to not it exists…and whether to not it's discoverable pursuant to the discovery scheduling plan or any other case under Brady or otherwise.

*Id.* at p. 32.

> "So essentially that was the Court's concern. Number one, whether or not it exists. And, number two, if it does exist, is it discoverable, is not discoverable. If it is discoverable, why hasn't it been timely provided, and whether there's negligence or bad faith, etc., and then that would lead into whether or not a motion to dismiss should be granted."

Transcript November 8, 2017 p. 5-6.

> So I am concerned with these late disclosures and representations made by the government that things did not exist but ultimately were found to exist and were provided this late and why it was provided so late.

21

Transcript November 13, 2017 p. 134.

> So, yes, Mr. Myhre, how -- what can you say to explain to me why this information is all coming about so late other than because I ordered you to produce it, by why wasn't it reviewed before or located before? What made it difficult for the government?

*Id.* p. 137.

As in *Chapman*, the discovery issues continued despite the Court's expressed concerns.  In *Chapman*, the defense eventually received 650 pages of discovery in the third week of trial.  524 F.3d at 1079.  Here, as noted previously, the defense received over 1000 pages of discovery between November 8, 2017 and December 15, 2017, including information this Court has already found constitutes *Brady* material or material that should have been disclosed pursuant to other obligations.  In *Chapman*, the prosecution offered various excuses for its failure to provide the information, initially claiming that much of it had already been provided to the defense, *Id.* at 1079, and later insisting that it did not need to be provided under *Brady/Giglio*, *Id.* at 1088.  The prosecution has offered the same excuses here.

While declining to find that the prosecutor acted "intentionally," the district court in *Chapman* dismissed the case after finding that the prosecution acted "flagrantly, willfully, and in bad faith."  *Id.* at 1080 & fn. 2.  The Circuit affirmed, noting that a prosecutor could be responsible for "flagrant" misconduct based on his "reckless disregard for constitutional obligations," even if he did not act intentionally.  *Id.* at 1085.

Here, the Court's findings show a "reckless disregard for constitutional obligations" that even more pervasive and clear than that in *Chapman*.  The Court has concluded the government "willfully" failed to disclose numerous materials that supported the defense and undermined the prosecution's theory. The Court found that (1) the FBI (who is part of the prosecution) team knew about or had control of most of the information in question (November 29, 2017 transcript p. 9), (2) prosecuting attorneys were present during many of the interviews resulting in FBI 302s that should have been disclosed earlier (*Id.* at p. 12), (3) the U.S. Attorney's office knew about the surveillance camera at least as of the time that Ryan Bundy requested information and suggested it was a "fantastical fishing expedition" (*Id.* at p. 10) , (4) the United States "falsely represented"

that the camera was incidental and not intentional (*Id*.), (5) the government continuously representations that the threat assessments sought were not material despite their obvious relevance and despite the defense's request to turn them over, and (6) the government misled the defense and the Court by calling the "OIG" report an "urban legend" and a "shiny object" and then pretending to look for the report the defense sought when it knew all along it had been misnames and would not be found in any "OIG" report (*Id*. at 19)

*Chapman* recognized that any remedy short of dismissal would condone the government's flagrant misconduct, and indeed, serve to rescue their flailing prosecution by giving them another trial in which "the government and its witness[es] will not make [the same] mistake[s] again." *Chapman,* 524 F.3d at 1080.  As explained infra, the same is true here.  The government cannot be fairly given another bite at the apple as a result of its own flagrant misconduct.

In *Chapman*, as here, the government had undoubtedly invested a great deal of resources in prosecuting the defendants, who were accused of committing serious crimes.  But *Chapman* recognized that the importance of a prosecution was not a reason to excuse the government's conduct.  Indeed, the attention focused on this case makes the government's failure to meet its basic discovery obligations all the more brazen and inexcusable.  Dismissing this indictment will send a strong and necessary message that the government must obey the constitution and meet its duty to perform justice for all.

## C.    Dismissal for Outrageous Conduct

Aside from a court's authority to dismiss an indictment under its supervisory powers, a court may also dismiss an indictment in the face of outrageous government conduct amounting to a due process violation. *United States v. Barrera–Moreno,* 951 F.2d 1089, 1091 (9th Cir.1991). To constitute sufficiently outrageous conduct, a government must conduct itself in such a way that is "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir.1991).  Such conduct must be inherently wrong or amount to "the engineering and direction of the criminal enterprise from start to finish." *United States v. Smith,* 924 F.2d 889, 897 (9th Cir. 1991).

The typical "outrageous government conduct" argument focuses on misdeeds by law enforcement agents. *See e.g. United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991) (listing factual scenarios that were upheld as not sufficiently outrageous, such as: undercover agents using false identities supplying the contraband at issue in the offense charged, commission of serious offenses by an undercover agent during an investigation, introducing drugs into a prison to identify a distribution network, assisting and encouraging escape attempts, and using an informant who was a prostitute, used heroin, whose own activities were under investigation, and who regularly engaged in sexual activity with the defendant). However, even if actions by a law enforcement agency do not constitute "engineering a criminal enterprise," this ground for dismissal does not foreclose the possibility that *malum in se* acts by a prosecutor may be "so grossly shocking and so outrageous as to violate the universal sense of justice." *Smith*, 924 F.2d 889, 897 (9th Cir. 1991) ("Government's involvement must be malum in se *or* amount to the engineering and direction of the criminal enterprise from start to finish.") (emphasis added). Although what constitutes *malum in se* has not been well-developed in the dismissal context, in the immigration context it is often defined as "an act which is per se morally reprehensible and intrinsically wrong." *See e.g. Uppal v. Holder*, 605 F.3d 712, 716 n. 2 (9th Cir. 2010) (discussing crimes involving moral turpitude) (quoting *Matter of Fualaau,* 21 I. & N. Dec. 475, 477 (BIA 1996)).

Here, the government's repeated, willful refusal to provide exculpatory evidence is sufficiently outrageous to justify dismissal as a due process violation. The government's untimely disclosures came almost four years after the government began its investigation, and almost two years after the government secured its indictment. Based on the indictment, the defendants lost almost two years of their lives in custody. Prior to the disclosure of the evidence, the government obtained convictions against two defendants at a trial, and obtained convictions against seven more by means of securing pleas and/or cooperation agreements. The government's conduct over an extended period of time was intrinsically wrong, and has defeated the ends of justice.

The Wooten email and Kleman memo raise even graver concerns about the government's conduct. *See* section III, *infra*. These documents reveal the government discharged their lead investigator from the case after he raised concerns about the prosecution. These concerns, as

documented in his email, include the bias the government agents held against the Bundys, the government's misconduct during the cattle gathering operation, and the government's failures to provide exculpatory evidence to the defense.  According to Kleman's memo, the government immediately removed Wooten from the investigation and directed him not to speak with anyone. The government then concealed Wooten's concerns and his dismissal for over nine months, over the span of three trials.  Both the conduct noted by Wooten, and the government's attempt to cover-up his concerns, raise concerns about outrageous government misconduct that should justify dismissal, even if, for argument's sake, the existing record did not already justify it.

## II.   RETRIAL IS BARRED BY THE DOUBLE JEOPARDY CLAUSE

Even if this Court determined dismissal of the indictment was not warranted, retrial would be barred under the Fifth Amendment of the United States Constitution.

The Fifth Amendment's Double Jeopardy Clause protects a criminal defendant from multiple prosecutions for the same offense. *United States v. Dinitz*, 424 U.S. 600, 606 (1976).  The Double Jeopardy Clause recognizes that a criminal defendant has a "valued right to have his trial completed by a particular tribunal." *Wade v. Hunter*, 336 U.S. 684, 689 (1949).  "If a case is dismissed after jeopardy attaches but before the jury reaches a verdict, a defendant may be tried again for the same crime only in two circumstances: (1) if he consents to the dismissal; or (2) if the district court determines that the dismissal was required by 'manifest necessity." *Chapman*, 524 F.3d 1073, 1081 (9th Cir. 2008); *Oregon v. Kennedy*, 456 U.S. 667, 672 (1982).

Here, the Court granted the defendants' motions for a mistrial.  However, the Supreme Court has recognized that double jeopardy must still bar retrial when the "prosecutor's actions giving rise to the motion for mistrial were done "in order to goad the [defendant] into requesting a mistrial." *Kennedy, 456 U.S.* at 673, citing *Dinitz* at 611. This test requires a district court to make a finding of fact, where it can "infer[] the existence or nonexistence of intent from objective facts and circumstances" *Id.* at 675.  A prosecutor's bad-faith conduct, harassment, or attempts to win by "methods foul" is insufficient to meet this standard, but misconduct that "aims to 'burn' the jury" is. *United States v. Lopez-Avila*, 678 F.3d 955, 962 (9th Cir. 2012).

1    Throughout the trial, the prosecution has engaged in behavior that evinces an intent to goad

2  a mistrial rather than seek a conviction.  The prosecution had repeatedly and willfully failed to

3  produce exculpatory evidence to the defense prior to the trial.  As this exculpatory information

4  began to be revealed during the trial (as a result of the defendants' litigation), and as this evidence

5  began to damage the prosecution's case, the government repeatedly sought continuances.  The

6  prosecution's ongoing discovery issues had already compelled delaying trial for a week after the

7  empaneling of the jury on November 2, 2017. Transcript November 7, 2017 p. 46.  When the

8  parties returned for opening arguments on November 14, 2017, the prosecution unsuccessfully

9  sought a continuance of *another* week. Transcript November 14, 2017, pp. 6-8.  Trial progressed,

10  with the government repeatedly complaining about the defendants' examination and presentation

11  of evidence about government misconduct and about the Bundy's legal views.  The jury repeatedly

12  expressed interest in these matters through their own questions.

13    In a December 22 email to the defense, the prosecutors acknowledge they received the

14  Wooten memo from DOJ attorney Andrew Goldsmith on November 29, 2017.  Yet the prosecutors

15  waited until the afternoon of Friday, December 8 to provide this email (and the February 18, 2017

16  Kleman MOA) to the defense.  When trial resumed on December 11—after a 12-day recess—the

17  prosecution represented that *further* continuances were needed so the Court could have hearings

18  and arguments on how to "handle and address"  the allegations in the Wooten memo, prior to

19  continuing with evidence in the case. Transcript December 11, 2017, pp. 79-80; *see also* ECF

20  3000, p. 38 (stating continuance is the proper remedy).

21    The government's repeated requests for continuances in the face of their own discovery

22  violations and faltering prosecution should be recognized as an attempt to goad a mistrial, in the

23  hopes of having a fresh start to their case. *See People v. Dawson*, 427 N.W.2d 886, 898 (Mich.

24  1988) (inferring that prosecutor has intended to goad mistrial by asking improper question when

25  his "case was going badly," and when the prosecutor "appeared to be stalling for time, apparently

26  hoping that the court would declare a recess and thereby enable the prosecutor to marshal his forces

27  over the weekend."); *State v. Parker*, 707 S.E.2d 799 at 800, 803 (S.C. 2011) (inferring that

prosecutor intended to goad mistrial by introducing improper evidence and making improper

26

argument, based upon totality of the circumstances, including defense counsel's observations that "the solicitor's case was not going well, and the State was now privy to his defense tactics") , *see also* ECF 3027 (arguing that "government deliberately engaged in misconduct with the intent to goad or provoke Payne's request for mistrial."). This Court itself recognized that "a continuance would effectively lead to a mistrial" because of the delays that had already happened, and because of the demands on the jury's time. Transcript December 20, 2017, pp. 22-23; *see* also *Chapman*, 524 F.3d 1073 at 1083 (mistrial necessary because "jury's attention span could not withstand" further delay). The government certainly understood this as well. Given their truncated presentation of the case, the obvious interest of jurors in the defense's theory, and the jury's concerns over the government's proper use of authority and power, the government had every incentive to seek a "do-over" with a different jury. Allowing the government to again place the defendants in jeopardy would be fundamentally unfair and unconstitutional.

## III.   IF THE INDICTMENT WERE NOT DISMISSED, FURTHER PROCEEDINGS ARE NECESSARY TO EXPLORE THE SERIOUS ISSUES RAISED BY THE WOOTEN EMAIL AND KLEMAN MEMO

The Court's findings that the government willfully failed to disclose material evidence and that a mistrial was necessary did not consider the most serious indication of government misconduct: the disclosures in the Wooten email (*see* ECF 2978 Exhibit A) and the accompanying BLM SA Kleman Memorandum of Activity ((MOA) (ECF 2978 Exhibit B). The Wooten evidence was not considered by this Court previously because it only became known to the defense on December 8, 2017, just days before the court directed briefing on December 11, 2017.

Even if dismissal were not the only appropriate remedy based on the existing violations found by the Court, further proceedings are necessary to explore the serious issues raised by Wooten's expressed concerns and by his dismissal from the case.

### A.   The Wooten materials

Larry "Clint" Wooten was a BLM special agent assigned to the criminal investigation of the defendants. His email describes himself as a case agent and lead investigator, although he

notes that his BLM ASAC supervisor worked alongside him as his co-case agent.[9]  *See* ECF 2978 Exhibit A p. 6. Wooten's description of his role is consistent with his September 2, 2015 grand jury testimony, which the defense was provided in January 2017 (Attached as Ex. A).  There, Wooten testified that he had worked on the case since the beginning of investigation in May of 2014. Ex. A at p.  5. Wooten had worked in law enforcement for 12 years, previously as a special agent with the DEA. *Id*. at p. 4.  His role was "to conduct long-term, complex investigations." *Id*. at p. 5. His duties in the investigation included gathering a "significant amount of historical data" which he compiled "into a form, which was easily searchable and understandable," and interviewing witnesses.  *Id*. at p. 4.  He appears to have been the government's first grand jury witness—his testimony was an unremarkable overview of the history of conflicts between the Bundys and the BLM.

At some point, however, Wooten developed serious concerns about the government's handling of the cattle gather operation, and its investigation and prosecution of the Bundys.  In his November 2017 memo, he described the cattle gathering operation as most "intrusive, oppressive, large scale, and militaristic trespass cattle impound possible." *Id*. at p.5.  He was concerned about "Dan Love's misconduct and likely civil rights and excessive force issues."  *Id*. at p. 8.  He noted that his investigation revealed "at least one school trained Federal sniper in addition to those in "over watch positions" and that the FBI and METRO "had snipers/ designated marksmen on hand for possible deployment" *Id*. at p. 9.  Wooten's email voices concerns about bias harbored by the BLM investigators against "the defendants, their supporters and Mormons."  *Id*. at p. 4.   He describes "an atmosphere of cover-ups, harassment and retaliation for anyone that questioned or reported former BLM SAC Dan Love's misconduct."  *Id*. at p. 8.  And throughout his email, Wooten voices concerns that the prosecution has not turned over exculpatory evidence to the defense. Wooten's email points to e-mails he sent to the U.S. Attorney's office documenting the information he believed would be necessary to make available to the defense. *Id*. at p. 14-15.

---

[9] Although not named in Wooten's email, it appears that this person was Agent Kleman.

Kleman's MOA confirms that Wooten was removed from the Bundy investigative team on February 17, 2017, at the request of Acting U.S. Attorney Myhre.  According to the MOA, Wooten's removal followed "recent statements that Wooten believes the BLM lacks law enforcement authority," and followed Wooten's statements to prosecutors "that in Wooten's opinion the government withheld exculpatory involving Special Agent-in-Charge (SAC) Dan Love." *See* ECF 2978 Exhibit B p. 1.  Wooten believes he was a "victim of whistleblower retaliation."  *See* ECF 2978 Exhibit A p. 8.

Kleman's MOA states that Wooten's electronic and hand-written materials were collected from him, and he was asked to provide his notes.  Kleman told Wooten that "he is not to have any contact with any outside party about the Bundy case," and that any inquiries were to be forwarded to Kleman to handle.    ECF 2978 Ex. B p. 1.

Kleman's memo purports to document an investigation of some of Wooten's concerns, focusing on a comment he attributed to Dan Love about "kick[ing] Cliven Bundy in the teeth." ECF 2978 Exhibit B pp. 2-3. He spoke with BLM SA Rand Stover (who had just testified in the first trial) and Kyle Gandiaga, both of whom recalled a "motivational" speech that Dan Love gave to his men at the start of the gather operation, in which he voiced an intent to "go into the belly of the beast" and gather the cattle in the "wide open," and "right in front of Cliven Bundy." *Id*. Gandinga agreed that "it was like Love was saying to the officers that they were not going to take any interference from Bundy and that they were going to kick him in the mouth," but said that exact phrase wasn't used. *Id*.

Wooten eventually wrote his email, entitled "Discovery Issues within the Las Vegas Cliven Bundy Trial," to Associate Deputy Attorney General Andrew Goldsmith, who serves as the National Criminal Discovery Coordinator. Wooten had obtained his contact information at a training.  He notes that he had previously and unsuccessfully sought to resolve the matter within his chain of command.  Wooten's email appears to be dated November 27, 2017.  The prosecution has represented to the defense that it received the Wooten Memo on November 29, 2017 from Andrew Goldsmith.  This was on Day 14 of the trial, immediately before the Court's pre-scheduled

12-day recess. The prosecution, however, did not forward the email and the Kleman memo to the defense until the afternoon of December 8, 2017.

### B.    Issues raised by the new materials

The Wooten materials add troubling context to the "willfulness" of the discovery violations found by the Court. As noted above, the government should have been perfectly aware that the withheld evidence was material to the defense and important to rebut the government's theory. The fact that the government's *own case agent* was raising these concerns some eight months before the instant trial began belies any notion that the relevance of these materials was unknown to the government until recently. Notably, the concerns raised by Wooten in his notes (*see* ECF 2978 Exhibit A p. 2) and in his email are precisely the same concerns raised by the defense throughout their discovery requests and motions—i.e. the misconduct of Dan Love, the heavy-handedness of the operation, the presence of snipers, and the bias of the BLM against the Bundys.

Much as the government sought to ignore the defense discovery requests and motions, it appears the government did nothing of substance to address Wooten's concerns, and indeed sought to cover them up. Wooten was immediately removed from the case and directed not to speak with anyone. Kleman purports to have investigated these concerns, but it appears this investigation was at best cursory.[10] And the *Brady/Giglio* information that Kleman did obtain from this investigation—i.e. the statements of SAs Stover and Gandiaga—was not immediately disclosed to the defense. Neither Wooten's concerns, nor the fact of his removal, nor the information in the Kleman memo was disclosed to the defense until December 8, and *only after* Wooten had sent his email directly to the Department of Justice.

Even if all of the potentially exculpatory evidence that led to Wooten's concerns were included in the government's late disclosures, that would not excuse the government's failure to timely disclose all of the evidence when it clearly came to their attention in February 2017, in the

---

[10] Kleman's memo documenting his investigation is dated February 18, 2017, the day after Wooten was removed from the investigation. This date may be in error, as Kleman refers to actions he took on February 21, 2017, but in any event the investigation documented in this three-page memo could hardly have resolved the wide-ranging concerns expressed by Wooten. It is notable that Wooten was removed at Attorney Myhre's direction *prior* to the commencement of this investigation.

middle of the first trial, and prior to the two subsequent trials. Instead, the defense had to seek out these materials on their own, and the government went to great lengths to obfuscate the importance of these materials without informing anyone that *their own case agent* had expressed concerns that this very evidence could undermine their case.

And given the scope of the concerns outlined in Wooten's email, there is no reason to assume that the government has disclosed all exculpatory evidence in its possession. For one thing, Wooten's email describes the bias harbored by multiple (unnamed) members of the investigative team against the Bundys and their supporters. *See e.g.* ECF 2878 Exhibit A pp. 4-5. The Ninth Circuit has recognized that evidence of bias can be crucial to impeach the testimony of law enforcement officers. *See United States v. Kartman*, 417 F.2d 893, 897 (9th Cir. 1969) (reversing conviction when court did not allow defendant a full opportunity to cross-examine law enforcement officer about bias he held against defendant in a politically motivated protest). Wooten's concerns about the BLM operation and Dan Love's conduct are obviously based on the information he learned in the course of an investigation that lasted almost three years. Given the history here, the defense has every reason to believe that much of that information still has not been disclosed.

### C.   Further inquiry into the Wooten matter is necessary if the Court does not dismiss the indictment

There is more than enough to dismiss the indictment based on the existing record, for all the reasons set forth *supra*. But even if there were not, further inquiry is needed into the issues raised by Wooten and his removal, to determine (1) whether there is additional exculpatory evidence that has yet to be disclosed and (2) the extent to which the government has engaged in "flagrant" and/or "outrageous" prosecutorial misconduct that necessitates dismissal. The government itself acknowledged at the December 11, 2017 hearing that Wooten's email merits further inquiry before any continuation of the trial. The very fact that the government failed to disclose Kleman's MOA or Wooten's removal for over nine months is alarming, and the defense has every reason to believe that further inquiry will uncover further concerns.

First, the government should be ordered to disclose all of Wooten's investigative materials, including but not limited to the "electronic and hand-written case materials" referred to on page 1

of Kleman's MOA, and Wooten's notes referred to on pp. 1-2 of the Kleman MOA.   The government should provide any and all work product that Wooten compiled during his time as a case agent, including the searchable database that he refers to on p. 4 of his grand jury testimony. Even if Wooten's concerns about the BLM's conduct were "opinions" (*see* Kleman MOA, ECF 2978 Exhibit B p. 3), it is essential to know what facts he based those opinions on.  The government should provide all emails and communications between Wooten and other members of the investigative and prosecution team.   The government should provide all documentation in its possession regarding Wooten's dismissal from the investigative team.  Prior to giving testimony in this matter, Wooten should be afforded an opportunity to review his emails and investigate materials (which he no longer has access to, *see* ECF 2978 Exhibit A p. 15).

Second, Wooten should testify.  His testimony should encompass the exculpatory evidence he learned of during his investigation, issues of bias and cover-up involving the investigative and prosecution teams, his communications with the investigative and prosecution teams about his concerns, and the circumstances of his dismissal.  The Court should also hear evidence from the other parties directly involved with his dismissal, including ASAC Kleman and Acting U.S. Attorney Myhre.

A fair inquiry into the circumstances of Wooten's dismissal will make the U.S. Attorney a necessary witness, and will require their recusal from the case.   NRCP 3.7 generally provides that a "lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness."  Although not defined under Nevada law, other jurisdictions have defined a "necessary witness" as someone whose testimony "is relevant, material, and unobtainable elsewhere." *Brown v. Spectrum Networks, Inc.*, 2008-Ohio-6687, ¶ 14, 180 Ohio App. 3d 99, 104–05, 904 N.E.2d 576, 580–81; *see also Sec. Gen. Life Ins. Co. v. Superior Court In & For Yuma Cty.*, 149 Ariz. 332, 335, 718 P.2d 985, 988 (1986) ("First the proposed testimony must be relevant and material. Then it must also be unobtainable elsewhere.").

In *Tomlin v. State*, 407 P.2d 1020, 1022 (1965), the Nevada Supreme Court recognized that compelling a prosecutor to testify as a necessary witness should be "strictly limited," but nevertheless recognized that "[i]f [the prosecutor] is aware, prior to the trial, that he will be a

32

necessary witness, or, if he discovers this fact in the course of the trial, he should withdraw and have other counsel prosecute the case." The court ultimately held that it was not reversible error for the prosecutor to testify at trial because of a witness's surprise testimony and the inability of the District Attorney's Office to locate another prosecutor. *Id*. However, in so holding, the court took pains to clarify that "the better practice would have been for the prosecuting attorney to have stepped out of the case when it became necessary for him to testify." *Id*. If further proceedings are to be held in this case on issues concerning discovery and/or prosecutorial misconduct, the U.S. Attorneys Office for the District of Nevada should be recused.

Indeed, Attorney General Jeffrey Sessions has ordered an investigation into the prosecution of this case following this Court's ruling on December 20, 2017.[11]  According to a DOJ spokesman, "The Attorney General takes this issue very seriously and has personally directed than an expert in the Department's discovery obligations be deployed to examine the case and advise as to the next steps."  In light of the DOJ's own pending internal review of this matter, it is not clear how the U.S. Attorney's Office in Nevada could afford the defendants a speedy and fair retrial in this matter, even if such a thing were possible.

If the Court does not dismiss this case, it must immediately direct additional discovery and hearings so that these matters may be fully explored.

## CONCLUSION

The government has had almost two years to meet its discovery obligations and provide the defendants a fair trial.  It has failed to do so.  The government's willful failure to meet its discovery obligations necessitated a mistrial seven weeks into trial, and have now irreversibly compromised the integrity of this prosecution.   The government should not be permitted to profit from its misconduct by again placing the defendants in jeopardy, and by further occupying the resources of the Court and the taxpayers in an effort to put them in prison for the rest of their lives. The indictment should be dismissed.

---

[11] Richard Perez-Pena, *Attorney General Sessions Orders Investigation After Bundy Mistrial*, N.Y. TIMES, December 21, 2017.  Available at https://www.nytimes.com/2017/12/21/us/attorney-general-sessions-bundy.html. *See also* http://abcnews.go.com/Politics/wireStory/bundy-mistrial-draws-sessions-probe-calls-broad-review-51961402;

DATED this 29th day of December, 2017.

Respectfully submitted,

RENE L. VALLADARES
Federal Public Defender

By:  */s/ Brenda Weksler*

BRENDA WEKSLER
Assistant Federal Public Defender

By:  */s/ Ryan Norwood*

RYAN NORWOOD
Assistant Federal Public Defender

1

<u>**CERTIFICATE OF ELECTRONIC SERVICE**</u>

2        The undersigned hereby certifies that she is an employee of the Federal Public Defender

3   for the District of Nevada and is a person of such age and discretion as to be competent to serve

4   papers.

5        That on December 29, 2017, she served an electronic copy of the above and foregoing

6   **MOTION TO DISMISS** via electronic service (ECF) to the persons named below:

7

8                STEVEN W. MYHRE
                 Acting United States Attorney
9                NADIA JANJUA AHMEN
                 Assistant United States Attorney
10               DAN SCHIESS
                 Assistant United States Attorney
11               501 Las Vegas Blvd. South
                 Suite 1100
12               Las Vegas, NV 89101

13                                    */s/ Lauren Conklin*
                                 Employee of the Federal Public Defender
14

15

16

17

18

19

20

21

22

23

24

25

26

27